UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH P. CUVIELLO, *et al.*,

        Plaintiffs,

   v.

CITY OF OAKLAND, *et al.*,

        Defendants.
_____/

No. C-06-5517 MHP (EMC)

**REPORT AND RECOMMENDATION RE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**(Docket No. 31)**

        Plaintiffs Joseph Cuviello and Deniz Bolbol have filed suit against Defendants the City of Oakland, Alameda County, Oakland-Alameda County Coliseum Authority, Oakland Coliseum Joint Venture L.L.C., SMG, Oakland Police Officer R. Villegas, Oakland Coliseum Assistant Security Manager "Skeet" Ellis, and Oakland Police Officer R. Valladon, alleging violation of their civil rights. Presently before the Court is Plaintiffs' motion for a preliminary injunction, which was referred to the undersigned for a report and recommendation.

        Having considered the parties' briefs and accompanying submissions, as well as the oral argument of pro se Plaintiffs and defense counsel at the hearing on the motion on August 13, 2007, the Court hereby recommends that the motion for a preliminary injunction be **GRANTED**.

## I.    FACTUAL & PROCEDURAL BACKGROUND

        Plaintiffs are members of Citizens for Cruelty-Free Entertainment, a San Francisco Bay Area group dedicated to the humane treatment of animals and educating the public about the abuse and mistreatment of animals in circuses. *See* Compl. ¶ 21. From August 16 to 19, 2007, the Ringling

Brothers Circus will hold performances at the Oracle Arena portion of the Oakland Coliseum (hereinafter "Coliseum/Arena"). The Oakland Coliseum/Arena is publicly owned property.

As clarified at the hearing herein, Plaintiffs seek a preliminary injunction of limited scope which would permit them to position themselves on the landing at the top of the ramp on the north side of the Coliseum/Arena ("north ramp landing") to videotape activity related to the circus animals in the parking lot area below. At the hearing, Plaintiffs stated that they were not seeking to engage in other First Amendment-related activity such as distributing leaflets. Nor are they seeking to photograph or videotape from the north ramp itself, just from the landing. Plaintiffs also seek the right to ascend the north ramp to reach the landing without buying a ticket to the circus.

The north ramp is one walkway by which the public can enter the Coliseum/Arena. It is one of the four primary means of pedestrian ingress and egress. *See* Handley Decl. ¶ 9. The ramp is 158 feet long and 8.5 feet wide. *See id.* ¶¶ 4-5. The exact dimensions of the landing at the top of the north ramp have not been provided. However, Plaintiffs represented at the hearing that the landing is at least 20 feet wide, and Defendants did not dispute this statement. The north ramp landing appears to provide the best vantage point for Plaintiffs to do their videotaping because the circus animals travel through the north tunnel between the Coliseum/Arena and the circus's secure area in the north parking lot. *See* Little Decl. ¶ 8.

Mr. Cuviello and Ms. Bolbol use the videotapes that they have recorded "to educate the public about the Circus'[s] treatment of the animals through flyers, video screenings, posters and the Internet." Cuviello Decl. ¶ 8; Bolbol Decl. ¶ 8. They also provide the videotapes "to the news media and to law enforcement agencies as evidence for complaints that [they] file alleging that the Circus is in violation of the law."[1] Cuviello Decl. ¶ 9; Bolbol Decl. ¶ 9. On previous occasions,

---

[1] Defendants have objected to paragraphs 8 and 9 of the Cuviello and Bolbol declarations on the grounds of relevance and prejudice. The objections are overruled. The reason why Plaintiffs seek access to the north ramp landing is relevant to this case. Also, there is no prejudice that the Court can discern from admission of the evidence. As to the other objection to the declarations, they are overruled, except for the objections to ¶ 7 of the Cuviello declaration and ¶ 7 of the Bolbol declaration which are sustained. The other paragraphs qualify as nonhearsay or exceptions to hearsay and are relevant.

their videotape of alleged mistreatment of animals has been aired on television news programs.[2] *See* Cuviello Decl. ¶ 10; Bolbol Decl. ¶ 10.

## II. DISCUSSION

A. Legal Standard

Under Ninth Circuit case law, a preliminary injunction should issue when a plaintiff shows "'either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor.'" *Lands Council v. Martin*, 479 F.3d 636, 639 (9th Cir. 2007). "'These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.'" *Diamontiney v. Borg*, 918 F.2d 793, 795 (9th Cir. 1990). The advancement of the public interest is also considered in certain cases. *See Lands Council*, 479 F.3d at 639 (9th Cir. 2007).

As noted above at the hearing, Plaintiffs clarified the exact nature of the injunctive relief they seek. Specifically, Plaintiffs explained that they seek an order: (1) enjoining Defendants from requiring Plaintiffs to have a ticket in order to enter the north ramp and position themselves at the landing at the top of the north ramp; (2) permitting Plaintiffs, and others acting in concert with them, to stand near the railing of the north ramp landing in order to videotape the circus animals; and (3) enjoining Defendants from harassing or otherwise preventing Plaintiffs from reaching the north ramp landing. Plaintiffs stated that they did not seek an order permitting them to position themselves and videotape on the north ramp itself (as opposed to the landing at the top), nor do they seek to leaflet.

B. Plaintiffs' Likelihood of Success on the Merits

In the instant case, Plaintiffs argue that they are entitled to relief under both the First Amendment of the United States Constitution and Article I, section 2(a) of the California

---

[2] In their reply, Plaintiffs filed a document denominated Exhibit 1, which was accompanied by a DVD containing, *inter alia*, various video clips of the arena ramps and Plaintiffs' interaction with security guards on prior occasions. Although not authenticated by a declaration, Ms. Bolbol did authenticate the contents of the exhibit and DVD under oath in open court. Defendants did not have any issue with the authentication but objected on grounds of relevance and prejudice. Those objections were overruled, and Exhibit 1 was admitted into evidence.

Constitution.  *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble . . . ."); Cal. Const. art. I, § 2(a) ("Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law may not restrain or abridge liberty of speech or press.").  Although Plaintiffs do not intend to leaflet or openly protest, their attempt to film alleged animal abuse previously was shared with news media and has generated public interest.  *See* Cuviello Decl., ¶¶ 8-10; Bolbol Decl., ¶¶ 8-10; Plaintiffs' Exhibit 1 ISO Reply (#12).  It constitutes free speech under the First Amendment and California Liberty of Speech Clause.  *See, e.g.*, *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (concluding that there was "a genuine issue of material fact does exist regarding whether [plaintiff] was assaulted and battered by a Seattle police officer in an attempt to prevent or dissuade him from exercising his First Amendment right to film matters of public interest"); *see also Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (agreeing with plaintiffs that "they had a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct"; explaining that "[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest"); *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005) (concluding that plaintiff had a First Amendment right to videotape state troopers conducting truck inspections on a public highway because of his concern about the safety of the inspections); *Lambert v. Polk County*, 723 F. Supp. 128, 133 (S.D. Iowa 1989) (noting that "[i]t is not just news organizations . . . who have First Amendment rights to make and display videotapes of events -- all of us, including [plaintiff], have that right").  Defendants do not contend otherwise.

The Ninth Circuit has held that, "federal constitutional issues should be avoided if cases can be decided on state law grounds. . . . The Supreme Court has indicated that federal constitutional issues should be avoided even when the alternative ground is one of state constitutional law." *Carreras v. City of Anaheim*, 768 F.2d 1039, 1042 (9th Cir. 1985).  With respect to Plaintiffs' state constitutional claims, Plaintiffs have demonstrated a high likelihood of success on the merits.

Because the Court concludes that the California Constitution is sufficient to support Plaintiffs' motion for a preliminary injunction, it does not reach Plaintiffs' First Amendment claims.

1. Public Fora

In *Kuba v. 1-A Agricultural Association*, 387 F.3d 850 (9th Cir. 2004), the Ninth Circuit explained that, under the California Constitution, "'permissible restrictions on expression in public fora must be content-neutral, be narrowly tailored to serve an important government interest, and leave open ample alternative channels for the communication of the message.'" *Id.* at 856. "The standard under the California Constitution for whether a particular area is a 'public forum' . . . varies from its federal cousin." *Id.* Under the California Constitution, the test is broader. *See id.* A public forum is not limited to traditional public fora such as streets, sidewalks, and parks. "'Rather, the test under California law is whether the communicative activity is basically incompatible with the normal activity of a particular place at a particular time.'" *Id.* at 857.

> In *Carreras*, [768 F.2d at 1039, the Ninth Circuit] held that the parking areas and pedestrian walkways outside Anaheim Stadium and the exterior walkways of the nearby convention center were public fora [under state law]. In that case, the "communicative activity" that had been restricted was solicitation of donations by the International Society for Krishna Consciousness of Laguna Beach, Inc. (ISKCON). [The Ninth Circuit] held that the city had offered no evidence that ISKCON's solicitation interfered with the success of the stadium as a business enterprise, and that the "mere annoyance" to patrons of having to respond to ISKCON's attempts to solicit donations did not establish incompatability. The exterior of the Anaheim Stadium (including its parking lots and pedestrian walk-ways) and the convention center walkways were therefore "public fora" under the California Constitution.

*Kuba*, 387 F.3d at 857.

In *Kuba*, the Ninth Circuit relied heavily on *Carreras* in concluding that the parking lots and walkways around the Cow Palace[3] were public fora under the California Constitution. The plaintiff in *Kuba* was an animal rights activist who challenged the Cow Palace policy of prohibiting individuals from demonstrating outside the building, except in designated "free expression zones," none of which was near an entrance to the building. The Ninth Circuit explained that, "[a]s in the

---

[3] The Cow Palace is a performance facility located south of San Francisco. It is owned by the State of California. *See Kuba*, 387 F.3d at 852.

United States District Court
For the Northern District of California

areas involved in *Carreras*, 'the public is free to come and go' in the parking lots and on the walkways around the Cow Palace, as people 'travel[] over the parking lot and walkways to attend . . . events or exhibitions.'" *Id.* "Also, 'the purposes of the . . . locations are very similar -- the facilitation of parking and the free flow of pedestrian and vehicular traffic.'" *Id.* Finally, as in *Carreras*, the defendant did not provide any evidence that the plaintiff's "protest activity (or protest activity generally) is a threat to the financial success of the Palace, or is in any other respect more than a mere annoyance to Cow Palace patrons." *Id.* Because "protest activity is not inherently incompatible with the activity to which the parking lots and walkways outside the Cow Palace are dedicated, . . . those areas are therefore public fora for purposes of California Liberty of Speech Clause analysis." *Id.*

Defendants concede the parking lots and general pedestrian areas of the Coliseum/Arena are public fora. They contend, however, the ramps and upper landing of the Coliseum/Arena are not. In view of *Carreras* and *Kuba*, the Court finds the north ramp of the Oakland Coliseum/Arena and the landing at the top at issue here are public fora. The north ramp and landing are like the parking lots and walkways in *Carreras* and *Kuba* -- these are areas where the public is free to come and go as they enter and exit the Coliseum/Arena. As in *Kuba*, there is no evidence that Plaintiffs' activity is a threat to the financial success of the Coliseum/Arena. Nor is there any evidence in the record that Plaintiffs or others engaged in free speech activities have caused traffic flow problems, created congestion, or posed a significant security problem on the ramp or landing.

Defendants contend that the north ramp and landing are not public fora because the Coliseum/Arena has recently enacted a policy this month under which "at all upcoming events in the foreseeable future" only pedestrians with tickets for the events at the Coliseum/Arena are permitted on the north and south ramps. *See* Little Decl. ¶ 5. This alleged change in policy does not, however, change the fundamental nature of the north ramp and landing as thoroughfares for the flow of pedestrians. The newly established restrictions constitute a time, place, and manner restriction, not a change in the fundamental character of the ramp and landing. Moreover, the north ramp and landing have historically been open to nonticketed pedestrians, demonstrating that communicative activity is not basically incompatible with normal pedestrian activity. Defendants cannot, by taking unilateral

action, convert an historically public forum into nonpublic forum, particularly where, as here, there is no record evidence justifying the new restriction.[4]

Defendants also contend that communicative activity is not compatible with the normal activity and usage of the ramps because of various security concerns. But as discussed below, Defendants' asserted security concerns are based on speculation, not experience or evidence. In any event, these assertions are not dispositive to the public forum analysis but rather informs the issue of whether there is a significant government interest justifying Defendants' time, place, and manner restrictions.

Accordingly, the free expression activities of Plaintiffs (or others) are not inherently incompatible with the activity to which the north ramp and landing are dedicated, and therefore the ramp and the landing are public fora for purposes of the California Liberty of Speech Clause.

### 2. Time, Place, and Manner

As noted above, "'permissible restrictions on expression in public fora must be content-neutral, be narrowly tailored to serve an important government interest, and leave open ample alternative channels for the communication of the message.'" *Id.* at 856. At this juncture, the aspects of Defendants' restrictions that are challenged by Plaintiffs are as follows: (1) the ban of pedestrians without a ticket from the north ramp and landing and (2) the ban on Plaintiffs and their associates from videotaping from the railing at the north ramp landing.[5]

#### a. Significant Government Interest

With respect to the importance of the government interest, the Court finds the assertion of the need to prevent traffic congestion is baseless given the current record. *See* Little Decl. ¶ 6

---

[4] The timing and circumstances of Defendants' action raises the specter that the new policy is designed to suppress Plaintiffs' free speech activity in particular. The Court need not and does not, however, decide whether Defendants' action is content neutral.

[5] At the hearing, Plaintiffs explained that they seek to videotape from only the north ramp landing itself, and not the north ramp, and that they use the north ramp merely to reach the landing. Because of the limited scope of relief sought at this juncture, the Court need not address at this stage the constitutionality of the broader prohibitions and their application to other members of the public. The Court notes, however, that the finding of public forum herein places a heavy burden on Defendants to demonstrate that any restrictions within the public forum (which includes the parking lots and pedestrian thoroughfares) constitute reasonable time, place, and manner restrictions consistent with the California Liberty of Speech Clause.

7

(stating that the north ramp is "a required handicapped-access ramp" and that allowing persons to loiter "potentially interferes with access to the arena for both handicapped and non-handicapped patrons"). Plaintiffs do not seek to videotape from the north ramp itself -- rather, only the landing of the north ramp. Defendants did not challenge Plaintiffs' representation that the landing is at least 20 feet wide. There is nothing in the record indicating that there has been a problem with pedestrian congestion in this wide landing area. There is no evidence that Plaintiffs' presence at the railing of the landing has caused or would cause a congestion problem or block an accessible path of travel. The video clip of Exhibit 1 showing security personnel asking Plaintiff Bolbol to leave the landing in 2005 reveals there were few, if any, pedestrians in the area at the time.

At the hearing, Defendants also contended that limiting access to the ramp and landing to ticketed customers serves the purpose of preventing a log queue and the potential for "gate crashers" at the upper entrance (located at the top of the ramp on the landing) by creating a buffer zone. But Defendants presented no evidence that such a huge buffer zone -- which includes a 158 foot-long, 8.5-foot wide ramp, *see* Hadley Decl., ¶¶ 4-5, and a large 20-foot wide landing area -- is needed. There is no evidence of any historical problem with long queues in this area. Nor is there any evidence of a problem with gate crashers at the Oracle Arena (as distinct from the Coliseum Stadium) particularly at family-oriented events such as a circus. In fact, as Plaintiffs pointed out at the hearing, there are no such buffer zones around the main entrance at the lower level of the Arena, and Defendants propose none there. Furthermore, until recently, no such ticket requirement has been imposed on a consistent basis; indeed, the only record of any restriction on ramp access was closure of the ramp when Plaintiffs previously attempted to videotape from the north ramp landing.

Defendants also claim a significant government interest in barring off the north ramp and landing area in order to protect the security and safety of people and animals. They point out that there are large air intake vents located at the top of the north ramp and claim that "[a]llowing persons to loiter in this vicinity creates a potential biological, chemical and/or radiological hazard for tens of thousands of patrons inside the arena." Little Decl. ¶ 7. Defendants also claim that allowing persons to loiter "creates a hazard insofar as animals are occasionally antagonized or disturbed by persons who toss objects down, shout, spit, etc." *Id.* ¶ 8.

8

The Court is not persuaded that the evidence submitted by Defendants -- *i.e.*, the Little declaration -- is sufficient under *Kuba*. "[M]erely invoking interests . . . is insufficient." *Kuba*, 387 F.3d at 859. There must be some concrete evidence supporting the asserted interests. *See id.* at 860 (rejecting "mere speculation"). The Little declaration largely engages in speculation, baldly asserting for example, "potential biological, chemical and/or radiological hazard." Little Decl. ¶ 7. Moreover, as Plaintiffs point out, simply requiring a person to buy a $15 ticket is unlikely to deter a terrorist. In addition, based on the pictures submitted by Defendant, the vents appear to be high enough above the ground so that they are not within easy reach of pedestrians.

As to the risk to animals, the Court acknowledges that the Little declaration mentions occasions on which animals have been antagonized or distributed by persons who toss objects down, shout, and spit. *See id.* ¶ 8. However, it does not provide information as to how many such occasions there have been. More important, it is not clear that this problem would be substantially exacerbated by the addition of individuals such as Plaintiffs who seek to engage in speech-related activity on the landing. In *Kuba*, the Ninth Circuit acknowledged that the defendant had submitted a declaration which "supports a conclusion that congestion is already a problem in some outdoor areas surrounding the arena"; however, the court noted that the declaration failed to "prove that the addition of a handful of individuals in any of the outdoor areas other than the designated zones would substantially exacerbate the problem." *Kuba*, 387 F.3d at 860. The same is true in the case at bar.

In sum, Defendants have failed to establish facts sufficient to prove that a significant governmental interest is served by the challenged restrictions.

### b.  Narrowly Tailored Restriction

Even if Defendants did provide sufficient support for their asserted interests, Defendants' restrictions on expressive activity are not narrowly tailored. *Cf. Kuba*, 387 F.3d at 862 ("Such measures as prohibiting protestors within a certain distance from the entrance to the building, or limiting the overall number of demonstrators in certain areas closer to the entrance, or requiring that protestors stand a certain distance from each other, are all measures that directly respond to the nature of congestion and traffic safety issues in parking lots"). The "buffer zone" created for

ticketed pedestrians is needlessly vast, extending down a 158-foot long ramp and encompassing a large landing area. It is more massive than *e.g.*, an apron in front of the ticket entrance (*Cf. Kuba, id.* at 861-62 (12' x 100' apron prone to extreme congestion)) and not justified by experience or evidence. Moreover, *all* nonticketed pedestrians are barred from the buffer zone even if they do not engage in First Amendment activity. Defendants have also barred all pedestrians from videotaping at the landing, rather than *e.g.*, restricting them to the railing in order to insure a clear path of travel. While the prohibitions are not as broad as those at the Cow Palace struck down in *Kuba*, they are still overly broad.

Thus, Plaintiffs have demonstrated a high likelihood of success on the merits with respect to their free speech claim under the California Constitution. The ramp and landing are public fora and the challenged restrictions do not constitute reasonable time, place, and manner restrictions.

C. <u>Possibility of Irreparable Injury</u>

When a plaintiff demonstrates a high likelihood of success on the merits, the plaintiff need only show a possibility of irreparable harm. *See Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 972-73 (9th Cir. 2002). "The Supreme Court has made clear that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury' for purposes of the issuance of a preliminary injunction." *Id.* at 973. The same reasoning applies to Plaintiffs' loss of freedoms under the California Liberty of Speech Clause.

Though not necessary given Plaintiffs' robust showing on the merits, the Court also notes that the balance of hardships tips sharply in Plaintiffs' favor given their free speech rights at stake and Defendants' failure to provide evidence showing any real harm likely to occur were the injunction granted.

Moreover, the public interest also weighs in favor of Plaintiffs' position since the free speech interests at issue (enhanced by the newsworthiness of the subject of Plaintiffs' speech-related activity) support a finding of public interest. *See id.* at 974.

### III. RECOMMENDATION

For the foregoing reasons, the Court recommends that a preliminary injunction be issued enjoining Defendants from: (1) requiring Plaintiffs to have a ticket in order to enter the north ramp

1 and videotape at the north ramp landing; (2) refusing to permit Plaintiffs, and up to four additional
2 persons acting in concert with Plaintiffs,[6] to stand at or near the railway of the north ramp landing in
3 order to photograph or videotape circus animals; and (3) harassing or preventing Plaintiffs from
4 reaching the north ramp landing, absent a law violation.  The preliminary injunction need only apply
5 to circus events scheduled at the Coliseum/Arena, such as the Ringling Brothers Circus which will
6 hold performances at the Coliseum/Arena from August 16 to 19, 2007, and should continue in
7 efffect until final judgment.[7]

8 The Court further recommends that no bond be required under Federal Rule of Civil
9 Procedure 65(c).  The Court has discretion to dispense with security when requiring a bond would
10 effectively deny access to judicial review.  *See People ex rel. Van de Kamp v. TRPA*, 766 F.2d 1319,
11 1325-26 (9th Cir. 1985).  At the hearing herein, Defendants asked for a substantial amount sufficient
12 (potentially millions of dollars) to indemnify them in the event that, as a result of the preliminary
13 injunction, they are not able to *e.g.*, prevent a terrorist attack, which they contend would cause
14 millions, if not billions, in damages.  Moreover, the Court has discretion to dispense with the bond
15 where, as here, there is no proof of likelihood of harm to the party enjoined.  *See Doctor's
16 Associates, Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997); *see also Americans United for
17 Separation of Church & State v. City of Grand Rapids*, 784 F. Supp. 403, 412 (W.D. Mich. 1990)
18 (finding no possibility of material damages resulting from grant of injunction preventing erection of
19 Menorah in public plaza).

20 Any party may file objections to this report and recommendation with the district judge by
21 noon, August 15, 2007.  *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72; Civil L.R. 72-3.  The
22 Court shortens the normally applicable 10-day period to file an objection given the exigent
23 circumstances.  *See Tripati v. Drake*, No. 89-55330, 1990 WL 100242, at *1 (9th Cir. July 19, 1990)
24 (unpublished memorandum); *United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978); *Hispanic

---

[6] At the hearing, Plaintiffs stated they did not envision ever having more than four other persons with them.

[7] Plaintiffs stated at the hearing they only seek to videotape at the circus and not at any other events.

11

*Counseling Center, Inc., v. Incorporated Village of Hempstead*, 237 F. Supp. 2d 284, 289-90 (E.D.N.Y. 2002). Because the circus starts August 16 and ends on August 19, exigent circumstances require expedited adjudication of the preliminary injunction.

Dated: August 14, 2007

_____
EDWARD M. CHEN
United States Magistrate Judge