**United States District Court**
For the Northern District of California

1

2

3

4

5                     UNITED STATES DISTRICT COURT

6                     NORTHERN DISTRICT OF CALIFORNIA

7

8    JOSEPH P. CUVIELLO, *et al.*,              No. C-06-5517 MHP (EMC)

9                    Plaintiffs,

10        v.                                    **REPORT AND RECOMMENDATION
                                                RE (1) PLAINTIFFS' MOTION FOR
                                                PARTIAL SUMMARY JUDGMENT; (2)**
11   CITY OF OAKLAND, *et al.*,                 **CITY DEFENDANTS' MOTION FOR
                                                SUMMARY JUDGMENT OR**
12                   Defendants.                **ALTERNATIVELY FOR PARTIAL
                                                SUMMARY JUDGMENT; AND (3)**
13                                              **COUNTY DEFENDANTS AND SMG
                                                DEFENDANTS' MOTION FOR**
14                                              **PARTIAL SUMMARY JUDGMENT**

15   _____/          **(Docket Nos. 201, 149, 151)**

16

17

18        Plaintiffs Joseph Cuviello and Deniz Bolbol have filed suit against various defendants for

19   violation of their civil rights under federal and state law.  Plaintiffs' lawsuit against Defendants are

20   based on events that took place in August 2005 and August 2006 at the Oakland Coliseum/Arena

21   (hereinafter "Arena").  Defendants in the case are (1) the City Defendants, consisting of the City of

22   Oakland ("City") and the individual police officers Rudy Villegas and Robert Valladon; (2) the

23   County Defendants, consisting of the County of Alameda ("County") and the Oakland-Alameda

24   County Coliseum Authority ("Authority"); and (3) the SMG Defendants, consisting of the Oakland

25   Coliseum Joint Venture ("Joint Venture"), SMG, and the individual Leroy "Skeet" Ellis.

26        Judge Patel, the presiding judge in the case at bar, referred the following motions to the

27   undersigned for a report and recommendation: (1) Plaintiffs' motion for partial summary judgment,

28   (2) the City Defendants' motion for summary judgment (or alternatively for partial summary

**United States District Court**
For the Northern District of California

1  judgment), and (3) the County Defendants and SMG Defendants' motion for partial summary

2  judgment.  A hearing was held on the three motions on March 11, 2009.  Having considered the

3  parties' briefs and accompanying submissions, the oral argument presented at the hearing on the

4  motions, and all other evidence of record, the Court hereby recommends that each motion be

5  **GRANTED** in part and **DENIED** in part.

6                                   **I.   PARTIES**

7  A.   Plaintiffs

8          Plaintiffs are members of Citizens for Cruelty-Free Entertainment, a San Francisco Bay Area

9  group dedicated to the humane treatment of animals.  *See* Docket No. 103 (Cuviello Decl. ¶ 4);

10  Docket No. 104 (Bolbol Decl. ¶ 4).  As members, Plaintiffs document and educate the public about

11  abuse and mistreatment of animals in circuses.  *See* Docket No. 103 (Cuviello Decl. ¶ 4); Docket

12  No. 104 (Bolbol Decl. ¶ 4).  Most notably, at least for purposes of this case, Plaintiffs have, during

13  Ringling Brothers Circus engagements in the Bay Area, videotaped the circus animals and

14  distributed leaflets to patrons.  *See* Docket No. 103 (Cuviello Decl. ¶ 3); Docket No. 104 (Bolbol

15  Decl. ¶ 3).  Video taken by Plaintiffs has been used and broadcasted by local and national news

16  media.  *See* Docket No. 103 (Cuviello Decl. ¶ 8); Docket No. 104 (Bolbol Decl. ¶ 8).  *See, e.g.*,

17  Docket No. 103 (Cuviello Decl., Ex. B) (Clips 9-10) (local television news reports).

18  B.   County Defendants

19          The County of Alameda is a governmental entity.  The County, along with the City, own the

20  Arena.[1]  *See* Docket No. 126 (Brill Decl. ¶ 2).

21  ───────────────

22          [1] In this report and recommendation, the Court relies on the two Brill declarations for facts
   regarding the ownership and management of the Arena.  *See* Docket Nos. 126, 153 (Brill declarations).

23  The Court does not rely on the evidence proffered by Plaintiffs – *i.e.*, a brochure that appears to be
   published by the Authority.  *See* Docket No. 102 (Mot. at 8) (referring to a publication available online

24  as a .pdf document); Docket No. 167 (Bolbol Decl., Ex. A) (brochure).  Defendants have objected to
   this evidence, and the objection should be **SUSTAINED**.  The Court may not take judicial notice of the

25  brochure, *see* Fed. R. Evid. 201(b) (providing that "[a] judicially noticed fact must be one not subject
   to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial

26  court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot
   reasonably be questioned"), and the copy of the brochure attached to one of the Bolbol declarations has

27  not been sufficiently authenticated.  For example, Ms. Bolbol claims authenticity of the brochure
   because the brochure is signed by Gail Steele, Chair of the Board of Commissioners for the Authority,

28  but there is nothing to establish the authenticity of that signature.  *See* Docket No. 167 (Bolbol Decl.
   ¶ 6).  Also, Ms. Bolbol claims authenticity because she downloaded the brochure from the Internet, *see*

United States District Court

For the Northern District of California

1    In 1995, the County and City formed the Authority "to oversee the Coliseum/Arena."

2   Docket No. 126 (Brill Decl. ¶ 3).  The Authority is also "a governmental entity."  Docket No. 126

3   (Brill Decl. ¶ 4); *see also* Docket No. 155 (McClaim Decl. ¶ 2) (stating that "[t]he Authority is a

4   public entity consisting of a Board of Commissioners appointed by the Oakland City Council and

5   the Alameda County Board of Supervisors equally").

6   C.    SMG Defendants

7    The Joint Venture and SMG are private entities.  The two entities are related.  More

8   specifically, SMG is one of the principal shareholders of the Joint Venture.  *See* Docket No. 153

9   (Brill Decl. ¶ 11).

10    "In 1998, pursuant to a Coliseum Complex Management Agreement, the [Authority]

11   contracted with the [Joint Venture] for facilities management at the Arena including event

12   organization, booking, promotion, advertising, security and concessions."  Docket No. 153 (Brill

13   Decl. ¶ 5).

14    In March 2005, the Authority and the Joint Venture – along with Oakland Alameda County

15   Coliseum, Inc. ("Coliseum, Inc."), which is a California public benefit nonprofit corporation –

16   entered into an amended and restated Coliseum Complex Management Agreement.  *See* Docket No.

17   153 (Brill Decl., Ex. A) (Management Agreement).  This Management Agreement specifies that

18   Coliseum, Inc. was hiring the Joint Venture "to promote, operate and manage the Complex [which

19   included the Arena]."  Management Agreement ¶ 2.1(a); *see also* Management Agreement ¶ 2.2

20   (stating that the Joint Venture "shall perform and furnish such management services and systems as

21   are appropriate or necessary to operate, manage and promote the Complex, as agent of Coliseum

22   [Inc.]").  Coliseum, Inc. "appoint[ed] the Authority as the sole and exclusive administrative agent

23   for all matters in and pertaining to [the Management Agreement]."  Management Agreement ¶

24   2.1(c).

25    In 2005 and 2006, the Joint Venture employed Mr. Ellis as an assistant security manager.

26   *See* Docket No. 126 (Brill Decl. ¶ 7).  In 2005 and 2006, the Joint Venture did not employ the

27   _____

28   Docket No. 167 (Bolbol Decl. ¶ 6), but that fact alone is insufficient to demonstrate that the brochure
is therefore reliable.

United States District Court

For the Northern District of California

1    security guards who worked at the Arena itself but rather contracted with third parties to provide

2    security.  Those third parties employed the security guards who worked at the Arena in 2005 and

3    2006.  *See* Docket No. 126 (Brill Decl. ¶ 8).  As noted below, the Joint Venture also "contracted

4    directly with the Oakland police department to provide additional on-site security assistance" at the

5    Arena.  Docket No. 153 (Brill Decl. ¶ 16); *see also* Docket No. 127 (Ellis Decl. ¶ 8) (noting that the

6    Joint Venture used both security personnel as well as police officers to handle security).

7    D.    City Defendants

8         The City of Oakland is a governmental entity.  Officers Villegas and Valladon are employees

9    of the City's Police Department.  *See* Docket No. 117 (Villegas Decl. ¶ 1); Docket No. 118

10   (Valladon Decl. ¶ 1).

11        It is undisputed that "the Joint Venture contracted directly with the Oakland police

12   department to provide additional on-site security assistance" at the Arena.  Docket No. 153 (Brill

13   Decl. ¶ 16); *see also* Docket No. 127 (Ellis Decl. ¶ 8) (noting that the Joint Venture used both

14   security personnel as well as police officers to handle security).  Apparently, pursuant to this

15   arrangement, both Officers Villegas and Valladon performed overtime at the Arena during events.

16   *See*  Docket No. 117 (Villegas Decl. ¶ 1); Docket No. 118 (Valladon Decl. ¶ 1).

17                    **II.    OBJECTIONS TO EVIDENCE**

18        Before addressing the merits of the parties' motions, the Court must first, to the extent

19   necessary, resolve the parties' evidentiary objections as those objections will inform what facts the

20   Court may consider in addressing the parties' motions.

21   A.    Defendants' Objections to Plaintiffs' Evidence

22        Defendants have raised various objections to evidence presented by Plaintiffs.  *See* Docket

23   Nos. 115, 128 (objections).  The Court addresses only those objections that are relevant to resolution

24   of the parties' motions for summary judgment or partial summary judgment.

25        1.    Hearsay Objections

26        Defendants have objected that statements allegedly made by Mr. Ellis, the individual police

27   officers, and security personnel at the Arena are hearsay.  The Court recommends that this objection

28   be **OVERRULED**.

                                    4

**United States District Court**
For the Northern District of California

1    Mr. Ellis's statements are offered against the Joint Venture.  At the time he made the

2    statements, he was an employee of the Joint Venture.  His statements concerned matters within the

3    scope of the employment.  Accordingly, the statements are not hearsay under Federal Rule of

4    Evidence 801(d)(2).  *See* Fed. R. Evid. 801(d)(2) (providing that a statement is not hearsay if it is

5    offered against a party and is "a statement by the party's agent or servant concerning a matter within

6    the scope of the agency or employment, made during the existence of the relationship").

7    The individual police officers' statements are offered against the City and the Joint Venture.

8    At the time they made the statements, they were employees of the City.  Also, the evidence

9    sufficiently establishes, for purposes of Rule 801(d)(2), that the officers were agents of the Joint

10   Venture.  *See* Docket No. 153 (Brill Decl. ¶ 16) (stating that "the Joint Venture contracted directly

11   with the Oakland police department to provide additional on-site security assistance"); *see also*

12   *Harris v. Itzhaki*, 183 F.3d 1043, 1054 (9th Cir. 1999) (noting that "Federal Rule of Evidence

13   801(d)(2)(D) requires the proffering party to lay a foundation to show that an otherwise excludable

14   statement relates to a matter within the scope of the agent's employment" and that, "[i]f the jury

15   finds that Ms. Waldman was the Itzhakis' agent, her statement – 'The owners don't want to rent to

16   Blacks' – would be admissible, since it relates to a matter within the scope of her agency, i.e.,

17   showing empty apartments").  The officers' statements concerned matters within the scope of their

18   employment and agency.  Accordingly, the statements are not hearsay under Rule 801(d)(2).

19   The security guards' statements are offered against the Joint Venture.  At the time they made

20   the statements, they were not direct employees of the Joint Venture but the evidence sufficiently

21   establishes under Rule801(d)(2) that they were the Joint Venture's agents – *i.e.*, the Joint Venture

22   contracted with third parties to provide security and those third parties employed the security guards.

23   The statements of the security guards concerned matters within the scope of the agency.

24   Accordingly, the statements are not hearsay under Rule 801(d)(2).  Moreover, even if the security

25   guards were not agents, their statements should still be admissible to the extent they are submitted

26   not for the truth of the matter asserted (*e.g.*, whether particular areas of the Arena were in fact off

27   limits) but rather for the effect on the listener (*i.e.*, deterring Plaintiffs from exercising their right to

28

1    free speech).  *See United States v. Inglese*, 282 F.3d 528, 538 (7th Cir. 2002) (noting that an

2    out-of-court statement is not hearsay when offered to show the effect it had on the listener).

3              2.        Objections Related to Unidentified Security Personnel

4              Defendants have objected to statements allegedly made by unidentified security personnel on

5    various grounds.  The Court recommends that these objections be **OVERRULED**.

6              To the extent Defendants have objected that the statements are not relevant because the

7    phrase "security personnel" (or some other similar phrase) is vague and ambiguous, the objection is

8    without merit.  One would be hard pressed to come up with a definition of the phrase other than a

9    person who provides security services.  Furthermore, there is no doubt that the security personnel

10   involved in the disputed events were either Joint Venture employees or agents providing security at

11   the Arena.

12             To the extent Defendants have objected that Plaintiffs have failed to lay a foundation for the

13   conclusion that the person at issue was a security guard, Plaintiffs have laid a sufficient foundation.

14   Plaintiffs personally saw the person at issue.

15             To the extent Defendants have objected that Plaintiffs lack personal knowledge as to who

16   employed the security person, that objection is **OVERRULED**.  Defendants have offered evidence

17   that the Joint Venture contracted with third parties to provide security and those third parties

18   employed the security guards.  *See* Docket No. 126 (Brill Decl. ¶ 8) (stating that the Joint Venture

19   "contracted with third parties companies . . . for security services at the Coliseum/Arena").  Nothing

20   suggests that the security guards were guards other than those employed by the third parties.

21             3.        Objections to Video Excerpts

22             Finally, Defendants have objected to (1) the DVDs attached as Exhibits A and B to the

23   Cuviello declaration in support of Plaintiffs' motion and (2) the pictures attached as Exhibit C to the

24   same Cuviello declaration.  *See* Docket No. 103 (Cuviello Decl., Exs. A-C).  The Court recommends

25   that the objections be **OVERRULED**.

26             Defendants' contention that the evidence has not been properly authenticated and lacks

27   foundation should be rejected.  In their declarations, Plaintiffs explain that they personally shot the

28   video footage.  To the extent Defendants have concerns that the video footage may have been

United States District Court

For the Northern District of California

1    doctored, or that the excerpts are taken out of context, then Defendants could have asked Plaintiffs

2    for the entirety of the video footage and subjected the footage to forensic review or Defendants

3    could have proffered other evidence.  They did not do so.

4          Defendants argue still that the evidence is hearsay.  Hearsay is defined in the Federal Rules

5    of Evidence as "a statement, other than one made by the declarant while testifying at the trial or

6    hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  A

7    statement is defined as "an oral or written assertion" or "nonverbal conduct of a person if it is

8    intended by the person as an assertion."  Fed. R. Evid. 801(a).  Defendants have not offered any

9    argument as to why the pictures themselves (Exhibit C) are assertions.  The same is true with respect

10   to the DVDs (Exhibits A and B).  *See Hill v. Amoco Oil Co.*, No. 97 C 7501, 2003 U.S. Dist. LEXIS

11   1795, at *29 n.30 (N.D. Ill. Jan. 27, 2003) (rejecting defendant's argument that a video segment of

12   alleged discriminatory incident was hearsay; stating that "the video segment is no more hearsay than

13   a photograph is hearsay").  This argument should therefore be rejected.

14         Finally, Defendants point out that the DVDs contain hearsay.  The problem with this

15   contention is, as discussed above, statements made by Mr. Ellis, the police officers, or security

16   personnel all constitute or could constitute admissions by party-opponents.  *See* Fed. R. Evid.

17   801(d)(2)(D).  As for statements made by Plaintiffs, some statements arguably constitute hearsay.

18   However, the bulk of the statements are not hearsay because they are not really offered for the truth

19   of the matter asserted but rather as context for the statements of Mr. Ellis, police officers, and

20   security personnel or as evidence of Plaintiffs' state of mind.  *Cf. Estate of Moreland v. Dieter*, 395

21   F.3d 747, 754 (7th Cir. 2005) (indicating that "interrogators' questions were not hearsay because

22   they were offered to provide context for the defendants' statements in the interviews and were not

23   offered for their truth").  To the extent the videos contain hearsay statements of Plaintiffs, the

24   statements are not considered for the truth of the matters asserted.

25   B.    Plaintiffs' Objections to Defendants' Evidence

26         Plaintiffs have also raised various objections to evidence presented by Defendants.  *See*

27   Docket No. 169 (objections).  The Court addresses only the one objection which is relevant to

28   resolution of the parties' motions for summary judgment or partial summary judgment.

1   Plaintiffs have objected that Mr. Ellis's statement, made in a declaration, that a security

2   guard was not arrested, charged, or cited for an alleged assault of Ms. Bolbol is hearsay.  The Court

3   recommends that the objection be **OVERRULED**.  As noted above, hearsay is defined in the

4   Federal Rules of Evidence as a statement, and a statement is "an oral or written assertion" or

5   "nonverbal conduct of a person if it is intended by the person as an assertion."  Fed. R. Evid. 801(a).

6   Whether or not the security guard was arrested, charged, or cited is not a written or oral assertion.

7   There is no showing that Mr. Ellis's statement was derived from inadmissible hearsay.

8                          **III.   FACTUAL BACKGROUND**

9   Having resolved the evidentiary objections, the Court now turns to the relevant facts for the

10  parties' motions for summary judgment and partial summary judgment.  Where there are disputes of

11  fact, they are so noted.

12  A.   General Background

13  At issue are events that took place in conjunction with Ringling Brothers Circus

14  engagements at the Arena in August 2005 and 2006.  The Joint Venture and the Ringling Brothers

15  Circus had a contract for the engagements.  *See* Docket No. 153 (Brill Decl. ¶ 12 & Ex. B) (Circus

16  Agreement); *see also* Docket No. 127 (Ellis Decl. ¶ 8).  The Circus Agreement required the Joint

17  Venture to provide, *inter alia*, "security at the Arena for the housing and movement of animals in the

18  event that there is insufficient space inside the arena building for animal housing."  Circus

19  Agreement ¶ 9(d).  The contract also required the Joint Venture to "[p]rovide, employ and control . .

20  . the standard building security services."  Circus Agreement ¶ 9(o).  Actual security procedures for

21  the circus performances in 2005 and 2006 were established at production meetings, which involved

22  the participation of circus officials and Mr. Ellis.  *See* Docket No. 154 (Ellis Decl. ¶ 5).  "Per Circus

23  instructions, videotaping was not allowed in performances or in ticketed areas."  Docket No. 127

24  (Ellis Decl. ¶ 9).

25  The north ramp is one walkway by which the public can access the Arena.  *See* Docket No.

26  127 (Ellis Decl. ¶ 4).  The ramp is approximately twenty-feet wide and "connects the ground

27  level/parking lot area to a landing/walkway area which circles the Arena."  Docket No. 127 (Ellis

28

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    Decl. ¶ 4).  For purposes of convenience, the upper landing area by the north ramp shall hereinafter

2    be called the "north landing."

3          Adjacent to the north ramp is a stairwell and just below the north ramp is a tunnel "which

4    provides direct access for performances from the ground level/parking lot area into the Arena."

5    Docket No. 127 (Ellis Decl. ¶ 5).  The Ringling Brothers Circus uses the tunnel to bring personnel,

6    equipment, and animals into the Arena for performances.  *See* Docket No. 154 (Ellis Decl. ¶ 6).

7          In 2005 and 2006, the tunnel as well as the north ramp and portions of the north landing

8    were, for the most part, restricted to the public during Circus events.[2]  For example, during most (but

9    not all) of the incidents at issue, there were either security guards or security gates at the bottom of

10   the north ramp.  *See, e.g.*, Docket No. 103 (Cuviello Decl., Ex. A) (Clips 5-9); Docket No. 103

11   (Cuviello Decl., Ex. B) (Clips 1(a), 4).  The SMG Defendants claim that the north ramp and landing

12   were actually "closed to the public during actual performance periods in the Arena."  Docket No.

13   127 (Ellis Decl. ¶ 7).  There is some evidence to support such, *see* Docket No. 103 (Cuviello Decl.,

14   Ex. A) (Clip 4), but there is also evidence indicating that at least some people were still able to

15   access the landing.  *See* Docket No. 103 (Cuviello Decl., Ex. A) (Clips 10-11); Docket No. 103

16   (Cuviello Decl., Ex. B) (Clip 3).  According to the SMG Defendants, the north ramp and landing

17   were restricted "to avoid frightening of animals, injuries to patrons, injuries to circus

18   performers/handlers [and] to ensure no objects fell into the tunnel."  Docket No. 154 (Ellis Decl. ¶

19   11).

20   B.    August 2005

21         It is undisputed that in each instance in August 2005, as well as in August 2006, Plaintiffs

22   sought access to the north ramp and landing of the Arena for vantage points to view and videotape

23   the circus animals.  In each instance, Defendants' refusal to permit access prevented Plaintiffs from

24   videotaping the animals.

25

26

27   _____

28         [2] In addition, in 2005 and 2006, a part of the parking lot, adjacent to and just north of the Arena,
     was closed off as a circus "'set-up' area."  Docket No. 154 (Ellis Decl. ¶ 10).

**United States District Court**
For the Northern District of California

1          1.      August 18, 2005

2          On August 18, 2005, Plaintiffs tried to access the north ramp and landing in order in order to

3    videotape the living conditions and treatment of the animals used by the circus.  *See* Docket No. 103

4    (Cuviello Decl. ¶ 10); Docket No. 104 (Bolbol Decl. ¶ 10).  They were prevented from accessing

5    these areas by, *inter alia*, Officer Villegas.  Plaintiffs, along with another animal activist, told

6    Officer Villegas that they were not trespassing pursuant to California Penal Code § 602 because the

7    statute contains an exemption for constitutionally protected activity but they were still denied access.

8    *See* Docket No. 103 (Cuviello Decl., Ex. A) (Clips 1-2).

9          2.      August 19, 2005

10         On August 19, 2005, Ms. Bolbol again tried to get to the north landing but was prevented

11   from doing so by Mr. Ellis.  Mr. Ellis indicated that she needed a ticket to be in the restricted area.

12   However, he did not specifically state that, if she had a ticket, she would be allowed to videotape in

13   the area.  *See* Docket No. 103 (Cuviello Decl., Ex. A) (Clip 5).

14         3.      August 20, 2005

15         On August 20, 2005, Ms. Bolbol accessed the north landing but was told by Mr. Ellis and

16   other security personnel that she was not allowed there.  Although Mr. Ellis and/or other security

17   personnel indicated that a ticket was needed to be in the restricted area, there was no specific

18   statement that Ms. Bolbol would be allowed to videotape if she purchased a ticket.  *See* Docket No.

19   103 (Cuviello Decl., Ex. A) (Clip 7).  Officers Villegas and Valladon showed up on the landing and,

20   according to them, they observed and were told by Mr. Ellis that Ms. Bolbol was refusing to leave in

21   spite of being instructed to do so.  Docket No. 117 (Villegas Decl. ¶ 6); Docket No. 118 (Valladon

22   Decl. ¶ 6).  Officer Villegas indicated to Ms. Bolbol that she would be placed under a citizen's arrest

23   if she did not leave the area.  Ms. Bolbol subsequently decided to leave the landing.  *See* Docket No.

24   103 (Cuviello Decl., Ex. A) (Clip 7).

25         Thereafter, Ms. Bolbol purchased a ticket.  She then accessed the north landing but was told

26   by Mr. Ellis that, even though she had a ticket, she had to leave because her ticket was for the

27   following show at 3:30 p.m.  Mr. Ellis did not specifically state that Ms. Bolbol would be allowed to

28   videotape at the time of the 3:30 p.m. show.  *See* Docket No. 103 (Cuviello Decl., Ex. A) (Clips 8-

United States District Court

For the Northern District of California

9). Officers Villegas and Valladon showed up on the landing and, according to them, they observed that Ms. Bolbol was refusing to leave in spite of being instructed to do so. *See* Docket No. 117 (Villegas Decl. ¶ 7); Docket No. 118 (Valladon Decl. ¶ 7). Mr. Ellis stated that he was getting ready to do a citizen's arrest, and Officer Villegas told Ms. Bolbol that she would be taken to jail instead of being cited and released. However, Ms. Bolbol was not actually arrested and instead she left the landing. *See* Docket No. 103 (Cuviello Decl., Ex. A) (Clips 8-9).

After the 3:30 p.m. show had started, Mr. Cuviello took the ticket that Ms. Bolbol had purchased and accessed the north landing. Security personnel told him both at the bottom of the north ramp and at the north landing that the doors were closed. Mr. Ellis and Officers Villegas and Valladon were called to the landing, and Mr. Ellis and Officer Villegas told Mr. Cuviello that his ticket was not valid and that he was under arrest for entering and refusing to leave the restricted area. *See* Docket No. 103 (Cuviello Decl., Ex. A) (Clips 1- 2). Mr. Cuviello was arrested for trespass pursuant to California Penal Code § 602(m).[3] *See* Docket No. 163 (Cuviello Decl., Ex. A) (police report). Mr. Cuviello was taken to jail and not released (on bail) until the following morning. *See* Docket No. 103 (Cuviello Decl. ¶ 26).

C. <u>August 2006</u>

According to Plaintiffs, on August 18, 2006, Ms. Bolbol was physically assaulted by a security person while she was trying to video the animals near the bottom of the northeast stairs. *See* Docket No. 103 (Cuviello Decl., Ex. B) (Clip 4); Docket No. 104 (Bolbol Decl. ¶ 30). The SMG Defendants dispute this. *See* Docket No. 154 (Ellis Decl. ¶ 26) (stating, upon information and belief, that Ms. Bolbol had actually "harassed and taunted an elderly security guard in the area").

Subsequently, Ms. Bolbol went to the north landing. While there, she was approached by Mr. Ellis and Officers Villegas and Valladon. They told her that the north landing was only open to persons with tickets and that she would be arrested if she did not leave. Ms. Bolbol chose to leave

---

[3] The police report actually referred to § 602(l), but that appears to have been an inadvertent error. In 2004, the language contained in § 602(l) was moved to § 602(m). Presumably, the officers intended to cite Mr. Cuviello for the violation provided for in § 602(m) because, at the time of the arrest in 2005, § 602(l) prohibited the entering and refusing to leave lands under cultivation or enclosed by a fence, or lands with trespassing signs posted not less than three to the mile along all external boundaries. Clearly, none of these provisions would apply to the north ramp and landing.

United States District Court
For the Northern District of California

1  the landing.  The officers and Ms. Bolbol walked down the ramp, where they were met by Mr.

2  Cuviello.  Mr. Cuviello suggested that Ms. Bolbol ask the officers to accept her citizen's arrest of

3  the security person who had assaulted her.  Ms. Bolbol did so but neither officer acted upon her

4  request.  *See* Docket No. 103 (Cuviello Decl., Ex. B) (Clip 5).  Subsequently, Ms. Bolbol called the

5  City police and asked that officers who were not working at the Arena be sent over.  Officers were

6  sent and, after they watched her video, they indicated to her that the security person would be

7  arrested and cited.  *See* Docket No. 103 (Cuviello Decl., Ex. B) (Clips 6-7).  The SMG Defendants

8  dispute that the security guard was ever cited or arrested.  *See* Docket No. 154 (Ellis Decl. ¶ 27)

9  (stating that he is informed and believes that the security guard was not arrested, charged, or cited as

10  a result of the incident).

**IV.    FIRST AMENDED COMPLAINT**

12      Based upon the events that took place in August 2005 and August 2006, Plaintiffs filed suit

13  against Defendants.  In their first amended complaint ("FAC"), they assert the following causes of

14  action.  The claims are asserted by both Plaintiffs against all Defendants unless otherwise noted.

15  (1)    A violation of 42 U.S.C. § 1983 based on a violation of Plaintiffs' free speech rights as

16          protected by the U.S. Constitution.

17  (2)    A violation of § 1983 based on a violation of Plaintiffs' free speech rights as protected by the

18          California Constitution.

19  (3)    A violation of § 1983 based on a violation of Mr. Cuviello's right to be free from unlawful

20          seizures in violation of the U.S. Constitution.

21  (4)    A violation of § 1983 based on a violation of Mr. Cuviello's right to be free from unlawful

22          seizures in violation of the California Constitution.

23  (5)    A violation of § 1983 based on the false arrest and imprisonment of Mr. Cuviello in violation

24          of California Penal Code §§ 236 and 602.8 and California Civil Code § 43.

25  (6)    A violation of § 1983 based on a violation of Plaintiffs' equal protection rights as protected

26          by the U.S. Constitution.

27  (7)    A violation of § 1983 based on a violation of Plaintiffs' equal protection rights as protected

28          by the California Constitution.

(8)     A violation of § 1983 based on a violation of Mr. Cuviello's right to be free from excessive

bail in violation of the U.S. Constitution.  This claim is asserted against the County only.

(9)     A violation of § 1983 based on a violation of Mr. Cuviello's right to be free from illegal

searches in violation of California Penal Code § 4030.  This claim is asserted against the

County only.

(10)    Assault and battery.  This claim is asserted by Ms. Bolbol against only the City, the County,

the Authority, the Joint Venture, and SMG.

(11)    A violation of California Civil § 51.7.  This claim is asserted by Ms. Bolbol against only the

City, the County, the Joint Venture, and SMG.

(12)    A violation of § 1983 based on malicious prosecution.  This claim is asserted by Mr.

Cuviello against only the individual police officers and Mr. Ellis.

(13)    A violation of California Civil Code § 52.1 based on, *inter alia*, violations of Plaintiffs' free

speech rights, right to be free from unlawful seizures, and equal protection rights, as

protected by both the federal and state constitutions.

Each of the above claims has been put into issue, either by virtue of Plaintiffs' motion,

Defendants' motions, or both Plaintiffs' and Defendants' motions.  More specifically:

(1)     In their motion, Plaintiffs seek partial summary judgment on the first, second, third, fourth,

fifth, sixth, seventh, and thirteenth causes of action.

(2)     In their motion, the City Defendants seek summary judgment or partial summary judgment

on all the causes of action asserted against them – *i.e.*, the first, second, third, fourth, fifth,

sixth, seventh, tenth, eleventh, twelfth, and thirteenth causes of action; and

(3)     In their motion, the County and SMG Defendants seek partial summary judgment on all the

causes of action asserted against them except for the eleventh cause of action.

## V.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is genuine

1    only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See*

2    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of

3    evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for

4    the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in

5    the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the

6    nonmovant's favor.  *See id.* at 255.

7         Where the plaintiff has the ultimate burden of proof, he or she may prevail on a motion for

8    summary judgment only if he or she affirmatively demonstrates that there is no genuine dispute as to

9    every essential element of its claim.  *See River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d

10   1458, 1462 (9th Cir. 1992).

11        Where the plaintiff has the ultimate burden of proof, the defendant may prevail on a motion

12   for summary judgment simply by pointing to the plaintiff's failure "to make a showing sufficient to

13   establish the existence of an element essential to [the plaintiff's] case."  *Celotex Corp. v. Catrett*,

14   477 U.S. 317, 322 (1986).

15        However, if the defendant is moving for summary judgment based on an affirmative defense

16   for which it has the burden of proof, the defendant "must establish beyond peradventure *all* of the

17   essential elements of the . . . defense to warrant judgment in [its] favor."  *Martin v. Alamo Cmty.*

18   *College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (internal quotation marks omitted; emphasis in

19   original); *see also Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006)

20   (noting that a defendant bears the burden of proof at summary judgment with respect to an

21   affirmative defense).

22   **VI.   SECTION 1983 CLAIMS BASED ON VIOLATIONS OF STATE LAW**

23   **(SECOND, FOURTH, FIFTH, SEVENTH, AND NINTH CAUSES OF ACTION)**

24        As indicated above, *see* Part IV, *supra*, many of the claims raised by Plaintiffs in their FAC

25   are § 1983 claims.  The City Defendants contend that several of those § 1983 claims should be

26   dismissed because they are predicated on violations of state law rather than federal law.  The City

27   Defendants are correct that § 1983 provides for liability only when there is a violation of federal

28   law, not state law.  *See Howlett v. Rose*, 496 U.S. 356, 358 (1990) (noting that § 1983 "creates a

1    remedy for violations of federal rights committed by persons acting under color of state law"); *see*

2    *also* 1 Martin A. Schwartz, Section 1983 Litigation § 1.01, at 1-3 (4th ed. 1995) (noting that

3    "[s]ection 1983 authorizes a court to grant relief when a party's federally protected rights have been

4    violated by a state or local official or other person who acted under color of state law").

5    Accordingly, the Court recommends that the City Defendants be **GRANTED** summary judgment

6    with respect to the second, fourth, fifth, and seventh causes of action.

7         For the same reason, the Court recommends that the County and SMG Defendants be

8    **GRANTED** summary judgment with respect to the second, fourth, fifth, and seventh causes of

9    action, plus the ninth cause of action.  The Court acknowledges that the County and SMG

10   Defendants did not make the above argument in any of their papers; however, as a practical matter,

11   it makes no sense to allow Plaintiffs to proceed with these claims against the County and SMG

12   Defendants when (1) they are clearly invalid claims and (2) Plaintiffs were put on notice of the issue

13   through the City Defendants' papers.

14                          **VII.    FREE SPEECH CLAIMS**

15                   **(FIRST AND THIRTEENTH CAUSES OF ACTION)**

16        As reflected in the FAC, *see* Part IV, *supra*, Plaintiffs claim that their free speech rights – as

17   protected by both the federal and state constitutions – were violated.  More specifically, in the first

18   cause of action, Plaintiffs assert a § 1983 claim based on the alleged violation of their free speech

19   rights as protected by the U.S. Constitution.  In their thirteenth cause of action, Plaintiffs assert a

20   claim pursuant to California Civil Code § 52.1, which provides that

21           [a]ny individual whose exercise or enjoyment of rights secured by the
             Constitution or laws of the United States, or of rights secured by the
22           Constitution or laws of this state, has been interfered with, or
             attempted to be interfered with, as described in subdivision (a) [*i.e.*,
23           interference by threats, intimidation, or coercion], may institute and
             prosecute in his or her own name and on his or her own behalf a civil
24           action for damages, including, but not limited to, damages under
             Section 52, injunctive relief, and other appropriate equitable relief to
25           protect the peaceable exercise or enjoyment of the right or rights
             secured.

26

27   Cal. Civ. Code § 52.1(b) (emphasis added).  Plaintiffs' § 52.1 claim includes an allegation that their

28   free speech rights, as protected by both the federal and state constitutions, were violated.  Because

1   the Ninth Circuit has instructed that "federal constitutional issues should be avoided if cases can be

2   decided on state law grounds[,] . . . even when the alternative ground is one of state constitutional

3   law," *Carreras v. City of Anaheim*, 768 F.2d 1039, 1042 (9th Cir. 1985), the Court addresses first

4   Plaintiffs' § 52.1 claim based on the alleged violation of the California Constitution.

5   A.      Section 52.1 Claim – Free Speech Rights Protected by California Constitution

6          The California Constitution provides that "[e]very person may freely speak, write, and

7   publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law

8   may not restrain or abridge liberty of speech or press."  Cal. Const., art. I, § 2(a).

9          1.      Protected Speech

10         In the instant case, the speech at issue is Plaintiffs' videotaping activity.  No Defendant

11  disputes that this activity is speech protected by the California Constitution.  Moreover, as this Court

12  previously stated in its report and recommendation on Plaintiffs' motion for a preliminary injunction

13  (which was ultimately adopted by Judge Patel), Plaintiffs' videotaping activity constitutes speech

14  protected by the California Constitution, particularly because they are taping matters of public

15  interest.  *See* Docket No. 47 (R&R at 4).

16         2.      Public Forum

17         The focus of the parties' dispute is on the legality of Defendants' restrictions which

18  prevented Plaintiffs' expressive activity.  Under the California Constitution, "'permissible

19  restrictions on expression in public fora must be content-neutral, be narrowly tailored to serve an

20  important government interest, and leave open ample alternative channels for communication of the

21  message.'"  *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004).  Thus, in the instant case,

22  the threshold issue is whether there is a genuine dispute of material fact that the north ramp and

23  landing of the Arena constitute public fora.

24         Under the California Constitution, whether a place is a public forum depends on "'whether

25  the communicative activity is basically incompatible with the normal activity of a particular place at

26  a particular time.'"  *Id.* at 857.  Although the parties have provided little evidence in conjunction

27  with their motions, the undisputed evidence establishes that Plaintiffs' presence and videotaping

28  activity are not basically incompatible with the normal activity of the north ramp and landing during

16

1    Ringling Brothers Circus engagements.  As reflected in one of the Ellis declarations, the north ramp

2    and landing are normally used to provide access into the Arena.  *See* Docket No. 127 (Ellis Decl. ¶

3    4) (stating that "the 'north ramp' is one walkway by which the public can normally enter the

4    [Arena]" and that "[i]t is a handicap accessible ramp, approximately 20 feet wide which connects the

5    ground level/parking lot to a landing/walkway area which encircles the Arena").  There is no dispute

6    that the public uses the north ramp and landing when Ringling Brothers Circus engagements are at

7    the Arena; it is an access route for the public to reach the upper level entrance of the Arena.

8            Plaintiffs' presence and videotaping activity are not incompatible with use of the ramp and

9    landing for ingress and egress.  As reflected by the video footage submitted by Plaintiffs, *see*

10   *generally* Docket No. 103 (Cuviello Decl., Exs. A-B) (video footage), the ramp is fairly wide –

11   approximately twenty feet, *see* Docket No. 127 (Ellis Decl. ¶ 4). Nothing in the video footage

12   suggests, much less proves, that Plaintiffs' videotaping activity blocks circus patrons from accessing

13   the Arena, causes traffic congestion, or leads to other such problems.  It is obvious that any

14   videotaping by Plaintiffs would take place at the edge of the ramp or landing by the railing, out of

15   the path of pedestrian traffic.

16           Notably, Defendants have not provided any countervailing evidence to demonstrate that the

17   north ramp and landing are not public fora.  Defendants failed to do so even after this Court

18   previously found that the north ramp and landing are public fora under the California Constitution.

19   *See* Docket No. 47 (R&R at 5-7).  Nothing presented in connection with the instant summary

20   judgment motions alters that conclusion.

21           Accordingly, the Court finds that there is no genuine dispute that the north ramp and landing

22   are public fora under the California Constitution, and thus, the main question is whether the

23   restrictions on speech in the fora pass constitutional muster.

24           3.       Restrictions on Speech

25           For a public forum, any restriction on speech under the California Constitution "must be

26   content-neutral, be narrowly tailored to serve an important government interest, and leave open

27   ample alternative channels for communication of the message."  *Kuba*, 387 F.3d at 856.  In the

28   instant case, the relevant restrictions on speech imposed by the Joint Venture and its agents and

United States District Court

For the Northern District of California

1    employees are as follows: (1) Prior to a circus performance, only circus patrons with tickets for that

2    specific performance are permitted on the north ramp and landing; (2) after the performance begins,

3    all persons – even circus patrons with tickets – are barred from being on the north ramp and landing,

4    *see* Docket No. 127 (Ellis Decl. ¶ 7); and (3) "[p]er Circus instructions, videotaping was not allowed

5    in performances or in ticketed areas." Docket No. 127 (Ellis Decl. ¶ 9).

6         Plaintiffs contend that the above restrictions, although content neutral on their face, are

7    actually content based because they were designed to prevent Plaintiffs in particular from

8    videotaping because of their political views.[4]  At this juncture, however, the Court assumes content

9    neutrality (except where noted below) because, even with this assumption, the restrictions cannot be

10   deemed constitutional as there is no admissible evidence supporting the asserted government interest

11   for the restrictions. Plaintiffs' free speech claim based on content or viewpoint discrimination is

12   discussed in Part VII.A.10, *infra*.

13        At the hearing, Defendants conceded that the first restriction – which limits access to the

14   north ramp and landing, prior to a circus performance, to circus patrons with tickets – does not serve

15   the alleged interest in protecting animal safety and the safety of the public. This is because even a

16   person with a ticket may, *e.g.*, throw something at an animal from the landing. Thus, Defendants

17   admitted that the first restriction serves only the claimed interest in preventing traffic congestion.

18   However, "merely invoking interests in regulating traffic around an exhibit or performance facility

19   is insufficient." *Kuba*, 387 F.3d at 859. There must be evidence that the proposed communicative

20   activity endangers those interests. *See id.* at 859-60. Here, Defendants have not offered any

21   evidence that persons engaging in videotaping, or even leafletting or demonstrating, are likely to

22   cause, or have in the past caused, pedestrian traffic congestion on the north ramp or landing. *See id.*

---

24   [4] Under federal law, "[a] regulation is content based 'if either the main purpose in enacting it was

25   to suppress or exalt speech of a certain content, or it differentiates based on the content of speech on its face.'" *Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419, 444 (9th Cir. 2008). "[D]iscrimination against one set of views or ideas is but a subset or particular instance of the more general phenomenon of

26   content discrimination." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 830-11 (1995) (adding that the distinction between content discrimination and viewpoint discrimination "is not

27   a precise one"). "[V]iewpoint discrimination occurs when the government 'denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.' 'Discrimination

28   against speech because of its message is presumed to be unconstitutional.'" *Flint v. Dennison*, 488 F.3d 816, 833 (9th Cir. 2007).

**United States District Court**
For the Northern District of California

1   at 860 (noting that the government had no basis to expect more than a handful of protestors and that,

2   for other events, activity similar to that of protestors took place without incident).  Nor is there any

3   evidence that collecting tickets at the building entrance on the north landing, as is presumably done

4   at the lower level building entrance of the Arena, has led or would lead to any congestion on the

5   north ramp or landing during the circus events.  The Court notes that, if traffic congestion were an

6   actual concern, then one would expect there to be a ticketing requirement for these external areas (at

7   the bottom of the ramp or at the top of the ramp where the exterior landing area begins) for all

8   events at the Arena (*e.g.*, Warriors games), not just the circus, but Defendants have failed to offer

9   any evidence that this ticketing restriction applies to other such events.

10      As for the second restriction identified above – *i.e.*, the restriction barring all access to the

11  north ramp and landing once a circus performance begins – Defendants claim that it serves the

12  asserted interest of protecting animal safety, as well as the safety of the public.  Defendants explain

13  that, during circus performances, animals are continually led from the parking lot to the Arena, and

14  back again, through a tunnel that is below the north ramp and landing.  *See* Docket No. 127 (Ellis

15  Decl. ¶¶ 5-6).  While the Court does not doubt that animal safety and the safety of the public are

16  significant interests, again, there must be evidence that the proposed communicative activity

17  endangers those interests.  Here, Defendants have failed to proffer any evidence at all on this point –

18  not even, *e.g.*, a declaration from a Ringling Brothers employee or an expert on animal behavior.

19      Defendants seem to argue that it is obvious that the presence of persons on the north ramp

20  and landing endangers those interests but the Court fails to discern the obviousness of this

21  proposition.  It is not obvious that the presence of persons on the north ramp and landing (above the

22  entrance to the tunnel) would in fact endanger animal safety and the safety of the public.  Mere

23  proximity of persons to the animals is not an issue as circus patrons are presumably in fairly close

24  proximity to the animals during the actual circus.  As for the need to protect animals from falling

25  objects, Defendants admitted at the hearing that an object cannot simply fall from the north ramp or

26  landing on to an animal proceeding through the tunnel.  There is a canopy or structure below the

27  landing such that a person would have to deliberately throw an object at the animal to reach it – *i.e.*,

28

1    a willful act.  But such a willful act could be done anywhere, not just from the north ramp or

2    landing.

3            As to the restriction on videotaping, Defendants have not advanced any specific justification

4    other than those above which prevented Plaintiffs' mere presence on the ramp and landing.  There is

5    no evidence which suggests that videotaping from the railing would interfere with pedestrian traffic

6    or threaten animal safety.

7            Because it is Defendants' burden to provide evidence supporting its asserted government

8    interest, *see Kuba*, 387 F.3d at 859, and Defendants have failed to meet their burden, the Court

9    concludes that the restrictions at issue do not pass muster as a narrowly tailored means of serving an

10   important governmental interest.  Nor have Defendants established that the restrictions leave open

11   ample alternative channels where Plaintiffs can engage in their free speech activity.  *See id.* at 856.

12   They point to no other effective vantage points from which Plaintiffs could videotape the circus

13   animals and their treatment.

14           4.      Interference by Threats, Intimidation, or Coercion

15           That the restrictions at issue are not constitutional does not, however, end the inquiry.

16   California Civil Code § 52.1 requires that the interference with Plaintiffs' constitutionally protected

17   rights be accomplished by means of threats, intimidation, or coercion.  *See* Cal. Civ. Code § 52.1(b).

18           As to this issue, Defendants have not made any argument that they did not interfere with

19   Plaintiffs' free speech rights by means of threats, intimidation, or coercion.  Even if they had, there

20   is no genuine dispute that there was such interference – *i.e.*, through the threat of an arrest or a

21   citizen's arrest and, in Mr. Cuviello's case, an actual arrest.  *See Cuviello v. City of Stockton*, No.

22   CIV S-07-1625 LKK/KJM, 2009 U.S. Dist. LEXIS 4896, at *56, *75 (E.D. Cal. Jan. 26, 2009)

23   (noting that "the particular coercive power of law enforcement officers has led courts to impose

24   liability when detention . . . is threatened"; also concluding that there is coercion when there is

25   simply a threat of a citizen's arrest); *see also Cole v. Doe*, 387 F. Supp. 2d 1084, 1103 (N.D. Cal.

26   2005) (stating that "[u]se of law enforcement authority to effectuate a stop, detention (including use

27   of handcuffs), and search can constitute interference by 'threat[], intimidation, or coercion'").

28

United States District Court

For the Northern District of California

1    The Court therefore turns to the issue of whether, as a matter of law, any of the defendant

2    individuals or entities may be found liable or not liable as a matter of law.

3         5.    Individual Police Officers

4    Whether Officers Villegas and Valladon may be held personally liable for violating

5    Plaintiffs' rights depends on whether they enjoy a state law immunity.

6    As a preliminary matter, the Court notes that "qualified immunity of the kind applied to

7    actions brought under United States Code section 1983" is inapplicable to § 52.1 claims. *Venegas v.*

8    *County of Los Angeles*, 153 Cal. App. 4th 1230, 1246 (2007) (stating that § 1983 qualified immunity

9    does not apply to actions brought under California Civil Code § 52.1); *see also Briley v. City of*

10   *Hermosa Beach*, No. CV 05-8127 AG (SHx), 2008 U.S. Dist. LEXIS 87583, at *18 (C.D. Cal. Sept.

11   29, 2008) (rejecting defendants' argument that "qualified immunity also applies to claims arising

12   under California law and the California Constitution, when the claims are based on the same facts as

13   those alleged under federal law"; noting that "[d]efendants have cited no compelling authority for

14   this interpretation of California law").

15   The only immunities asserted by the individual officers in the instant case are those provided

16   for in the following California statutes: (1) California Penal Code §§ 847(b) and 837 and (2)

17   California Government Code § 820.2.  *See* Docket No. 114 (Opp'n at 8-9).  California Penal Code

18   §§ 847(b) and 837 have no applicability to Plaintiffs' free speech claim.  The statutes deal with

19   liability of law enforcement officers for false arrest or imprisonment.  *See* Cal. Pen. Code § 847(b)

20   (providing that law enforcement officers shall not be liable for false arrest or imprisonment if the

21   arrest was made pursuant to § 837); *id.* § 837 (providing for a citizen's arrest).  Because the claim at

22   issue here is a free speech claim, not a false arrest claim per se, the only question for the Court is

23   whether Officers Villegas and Valladon are protected by California Government Code § 820.2.[5]

24   _____

25   [5] The Court notes that California Government Code § 820.6 provides for a kind of qualified immunity.  The statute states that, "[i]f a public employee acts in good faith, without malice, and under the apparent authority of an enactment that is unconstitutional, invalid or inapplicable, he is not liable

26   for an injury caused thereby except to the extent that he would have been liable had the enactment been constitutional, valid and applicable."  Cal. Gov't Code § 820.6.  However, Officers Villegas and

27   Valladon have not asserted this specific immunity, either in opposition to Plaintiffs' motion for partial summary judgment or in support of their own motion for summary judgment.  Even if they had, it

28   appears inapplicable here.  "Enactment" is defined in California Government Code § 810.6 as "a

21

Section 820.2 provides as follows: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of discretion vested in him, whether or not such discretion be abused."  Cal. Gov't Code § 820.2.  This immunity is commonly known as discretionary act immunity.  According to the California Supreme Court,

> a "workable definition" of immune discretionary acts draws the line between "planning" and "operational" functions of government. Immunity is reserved for those "basic policy decisions [which have] . . . been [expressly] committed to coordinate branches of government," and as to which judicial interference would thus be "unseemly."  Such "areas of quasi-legislative policy-making . . . are sufficiently sensitive" to call for judicial abstention from interference that "might even in the first instance affect the coordinate body's decision-making process."

> [In contrast,] there is no basis for immunizing lower-level, or "ministerial," decisions that merely implement a basic policy already formulated.  Moreover, . . . immunity applies only to deliberate and considered policy decisions, in which a "[conscious] balancing [of] risks and advantages . . . took place.  The fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision."

*Caldwell v. Montoya*, 10 Cal. 4th 972, 981 (1995).

Notably, in a case pending in the Eastern District of California involving the very same Plaintiffs and the same or similar claims, a federal court concluded that there was no discretionary act immunity for a police officer and an assistant city attorney who had interfered with Plaintiffs' free speech rights precisely because of the above distinction.  Judge Karlton explained:

> Here, the actions upon which plaintiffs' claims against the City defendant[s] rely are not all top level, policy-making decisions that would give rise to immunity under § 820.2.  Instead, plaintiffs allege that the City defendants acted improperly in their understanding of the access for speech activities to which plaintiffs were entitled under the federal and state constitutions and in their understanding of what the Penal Code requires with regards to acceptance of citizens' arrests.  In other words, plaintiffs allege that the City defendants improperly

---

constitutional provision, statute, charter provision, ordinance or regulation."  Cal. Gov't Code § 810.6. *But see O'Toole v. Superior Court*, 140 Cal. App. 4th 488, 505 (2006) (treating a school district's policy requiring a special permit before a person could display posters or hand out literature as an enactment for purposes of § 820.6, but noting that the parties did not dispute that the district policy was an enactment).

1    implemented the laws governing them.  As such, the discretionary
2    immunity of Government Code section 820.2 is not implicated.

3    *Cuviello*, 2009 U.S. Dist. LEXIS 4896, at *59-60.

4         The same reasoning was embraced by a state appellate court in *Gillan v. City of Marino*, 147

5    Cal. App. 4th 1033 (2007).  In *Gillan*, the plaintiff, a high school basketball coach, had been accused

6    of sexual harassment by a former team member and, as a result, was arrested by the police.

7    Ultimately, the district attorney decided not to prosecute the plaintiff based on a lack of sufficient

8    corroboration.  Subsequently, the plaintiff asserted a § 52.1 claim against, *inter alia*, the officers

9    involved in the investigation and arrest based upon a violation of the Fourth Amendment – *i.e.*, an

10   arrest without probable cause.  The state appellate court agreed that the detention was lacking in

11   probable cause, stating as follows: "We conclude, as did the jury, based on the totality of the

12   circumstances, that the information known to the police at the time of [the plaintiff's] detention was

13   not sufficiently consistent, specific, or reliable to cause a reasonable person to believe the

14   accusations of sexual molestation."  *Id.* at 1047.  In response to the defendants' contention that §

15   820.2 provided immunity from liability for the § 52.1 claim, the state court disagreed.  According to

16   the court, "[t]he decision to arrest [the plaintiff] was not a basic policy decision, but only an

17   operational decision by the police purporting to apply the law."  *Id.* at 1051.

18        The individual officers point out that there is legal authority contrary to both *Cuviello* and

19   *Gillan*.  In *McCarthy v. Frost*, 33 Cal. App. 3d 872 (1973), a state appellate court stated that "[a]

20   decision to arrest, or to take some protective action less drastic than arrest, is an exercise of

21   discretion for which a peace officer may not be held liable in tort."  *Id.* at 875 (1973).  Other state

22   appellate courts have indicated the same.  *See Bonds v. Cal. ex rel. Cal. Highway Patrol*, 138 Cal.

23   App. 3d 314, 321 (1982) (stating that, "[a]s with the decision to investigate, an officer's decision to

24   arrest, or to take some protective action less drastic than arrest, is an exercise of discretion for which

25   a peace officer may not be held liable in tort") (internal quotation marks omitted); *Watts v.*

26   *Sacramento*, 136 Cal. App. 3d 232, 234 (1982) (stating that "'[a] decision to arrest, or to take some

27   protective action less drastic than arrest, is an exercise of discretion for which a peace officer may

28   not be held liable in tort'"; adding that "[s]ettling a disagreement as to plaintiffs' right to be on the

1    land by ordering them to leave is clearly action short of arrest for which the officers are immune

2    from liability").

3          While the above authority supports the officers' position, it is significant that there is no

4    direct California Supreme Court precedent supporting their interpretation of § 820.2.  In fact, the

5    California Supreme Court's decision in *Caldwell*, which confined discretionary immunity to policy

6    decisions, suggests the contrary.  *See Caldwell*, 10 Cal. 4th at 981.  In any event, the most recent

7    state appellate court authority on this issue is *Gillan*.  The Court is also persuaded by Judge

8    Karlton's holding in *Cuviello*.  Finally, the broader immunity advocated by the individual officers

9    would appear to yield a paradoxical result.  It would allow for immunity even where an officer

10   knowingly acted in violation of clearly established law so long as some judgment or discretion was

11   involved – something that is not permissible even under the qualified immunity standard for federal

12   § 1983 claims.

13         In sum, the Court concludes that the individual police officers are not protected by

14   discretionary act immunity.  Accordingly, the Court recommends that, with respect to the § 52.1 free

15   speech claim based on content-neutral speech restrictions, Plaintiffs' motion for partial summary

16   judgment against the officers be **GRANTED** and the officers' motion for partial summary judgment

17   be **DENIED**.

18         6.    City

19         The City's liability under § 52.1 rises and falls with the liability of the individual officers.

20   Cal. Gov't Code § 815.2(a) provides that "[a] public entity is liable for injury proximately caused by

21   an act or omission of an employee of the public entity within the scope of his employment if the act

22   or omission would, apart from this section, have given rise to a cause of action against that employee

23   or his personal representative."  Cal. Gov't Code § 815.2(a); *see also Eastburn v. Regional Fire*

24   *Protection Auth.*, 31 Cal. 4th 1175, 1180 (2003) (stating that "Government Code section 815.2,

25   subdivision (a), makes a public entity vicariously liable for its employee's negligent acts or

26   omissions within the scope of employment, but section 815.2, subdivision (b), adds the important

27   qualification that a public entity is not liable for injuries committed by an employee who is immune

28   from liability for such injuries").  Thus, unlike federal law under § 1983, under state law, vicarious

1   liability obtains.  Because, for the reasons stated above, the individual officers are not immune, the

2   City is likewise not immune.

3        Accordingly, the Court recommends that, with respect to the § 52.1 free speech claim based

4   on content-neutral speech restrictions, Plaintiffs' motion for partial summary judgment against the

5   City be **GRANTED** and the City's motion for partial summary judgment be **DENIED**.

6        7.   SMG Defendants

7        Whether the SMG Defendants may be held liable for violating Plaintiffs' rights depends on

8   whether they are state actors because the California Supreme Court has held that the free speech

9   clause under the state Constitution "only protects against state action."  *Golden Gateway Ctr. v.*

10  *Golden Gateway Tenants Ass'n*, 26 Cal. 4th 1013, 1031 (2001).

11       Unfortunately, what constitutes state action under California law is not entirely clear.  The

12  California Supreme Court has indicated that there are at least some differences between state and

13  federal law.  For example, under California's free speech clause, "the actions of a private property

14  owner constitute state action . . . if the property is freely and openly accessible to the public."  *Id.* at

15  1033.  Of course, this difference is not relevant in the instant case because the owners of the Arena

16  are government entities (*i.e.*, the City and County) and not private actors (*i.e.*, the SMG Defendants).

17  In the absence of any state law authority relevant to the state action claim at issue here, the Court

18  relies on federal decisions addressing the issue of state action, particularly since both parties cite

19  federal decisions in their briefs.

20       a.   Mr. Ellis

21       There is no dispute that Mr. Ellis, the assistant security manager of the Joint Venture, played

22  a leading role in enforcing the restrictions against Plaintiffs.  He directed the security officers in

23  restricting Plaintiffs' access to the north ramp and landing.  He also ordered the citizen's arrest of

24  Mr. Cuviello.  The question is whether Mr. Ellis's conduct constituted state action, which is required

25  where a § 52.1 claim is predicated on a free speech violation under the California Constitution.  *See*

26  *id.* at 1031 (noting that the free speech clause under the state Constitution "only protects against

27  state action").

28

**United States District Court**
For the Northern District of California

1    Plaintiffs' contention that Mr. Ellis is a state actor rests primarily on *Howerton v. Gabica*,

2  708 F.2d 380 (9th Cir. 1983).  In turn, Mr. Ellis relies primarily on *Collins*, 878 F.2d at 1145, to

3  support his argument that he is not a state actor.

4    In *Collins*, the Ninth Circuit underscored that

5       merely complaining to the police does not convert a private party into
         a state actor.  Nor is execution by a private party of a sworn complaint
6       which forms the basis of an arrest enough to convert the private
         party's acts into state action.  The Tenth Circuit's two section 1983
7       cases involving citizen's arrests also provide useful guidance.  In *Lee*,
         the private party, besides effecting the citizen's arrest, also transported
8       the arrested party to the police station, attempted to persuade the
         police to file charges, and swore out a complaint against the arrested
9       party.  Nonetheless, the Tenth Circuit held that this did not constitute
         joint action.  Similarly, in *Carey*, Continental's airport manager,
10      Gilbert, called an airport security officer, helped to escort Carey to the
         airport security station, and ultimately signed a complaint charging
11      him with trespassing.  The Tenth Circuit reasoned that "Gilbert's
         complaining about Carey's presence to a Tulsa police officer who,
12      acting within the scope of his statutory duties, arrested Carey after
         questioning him, does not, without more, constitute state action for
13      which Gilbert can be held responsible."

14  *Id.* at 1155.

15    Notably, the Ninth Circuit in *Collins* went on to discuss *Howerton* as a contrasting case

16  where there was clearly joint action between private individuals and the police.

17       [I]n *Howerton*, we found joint action between a landlord, Gabica, and
         various police officers based on their sustained, joint efforts to evict
18      Howerton, one of Gabica's tenants.  We were careful to limit our
         holding by observing:
19
20          This case involves more than a single incident of police
             consent to "stand by" in case of trouble.  Police were on
21          the scene at each step of the eviction.  Mr. Gabica
             testified that the police presence gave him the feeling
22          he had the right to cut off the utilities.  Moreover, the
             police officer actively intervened – he privately
23          approached the Howertons and recommended that they
             leave the trailerhouse.  An unsolicited visit by a police
24          officer is hardly passive, or "merely standing by."
             There is also some indication that on another occasion,
25          when Officer Baldwin responded to a call from Mrs.
             Gabica reporting a domestic disturbance at the
26          Howerton residence, he inquired whether the tenants
             had found a new rental.  The actions of Officer Baldwin
27          created an appearance that the police sanctioned the
             eviction.

28

26

United States District Court
For the Northern District of California

1 | Our holding in *Howerton* was therefore premised on the fact that the
2 | Gabicas "repeatedly requested aid by the police to effect the eviction, and the police intervened at every step."

3 | *Id.* at 1154.

4 | To the extent *Collins* and *Howerton* represent ends of a continuum, this case is closer to

5 | *Howerton*. The instant case involves more than just a complaint by a private citizen to the police (as

6 | in the *Lee* and *Carey* cases cited in *Collins*). Here, "the Joint Venture contracted directly with the

7 | Oakland police department to provide additional on-site security assistance," Docket No. 153 (Brill

8 | Decl. ¶ 16), and the individual police officers assigned to that task substantially deferred to Mr.

9 | Ellis, as reflected by the officers' own declarations, *see* Docket No. 117 (Villegas Decl. ¶ 1) (stating

10 | that he has worked with Mr. Ellis on many occasions and that, based on this experience, he believes

11 | Mr. Ellis "to be a reasonable, fair and credible individual, and a very knowledgeable and good

12 | manager of security services"); Docket No. 118 (Valladon Decl. ¶ 1) (stating the same), as well as

13 | Plaintiffs' video footage. The footage provides particularly compelling evidence. It shows that not

14 | only the security personnel but also the police officers took their directions from Mr. Ellis – *i.e.*,

15 | where Plaintiffs were allowed to go, the conditions under which the Plaintiffs could access the ramp

16 | and landing, and the enforcement sanctions (*e.g.*, whether Plaintiffs would suffer an arrest). This

17 | deference to Mr. Ellis occurred on more than one occasion. In short, the video footage shows that

18 | Mr. Ellis functioned, in effect, not simply as a private citizen complaining to the police, but as the

19 | officers' commander on the scene. Defendants have produced no evidence to the contrary.

20 | The Court thus finds that the evidence of record establishes a relationship between Mr. Ellis

21 | and the police that exceeded even that found in *Howerton*. *See Howerton*, 708 F.2d at 384

22 | (distinguishing a repossession where police officers stand by and where the officers, along with the

23 | repossessor, confront the debtor in order to effectuate the repossession); *cf. Hughes v. Meyer*, 880

24 | F.2d 967, 972 (7th Cir. 1989) (noting that "private parties are not state actors when they merely call

25 | on the law for assistance, even though they may not have grounds to do so; 'there must be a

26 | conspiracy, an agreement on a joint course of action in which the private party and the state have a

27 | common goal'"). The uncontested evidence establishes a joint course of action (if not outright

28 |

1  control by Mr. Ellis) to effectuate a common goal of keeping Plaintiffs out of the restricted areas.

2  Defendants present no evidence rebutting this relationship.

3      Accordingly, with respect to the § 52.1 free speech claim based on content-neutral speech

4  restrictions, the Court recommends that Plaintiffs' motion for partial summary judgment against Mr.

5  Ellis be **GRANTED** and Mr. Ellis's motion for partial summary judgment be **DENIED**.

6              b.    Joint Venture and SMG

7      As noted above, Mr. Ellis was employed by the Joint Venture as security manager for the

8  Arena.  *See* Docket No. 127 (Ellis Decl. ¶ 2).  To the extent the Joint Venture and SMG assert that

9  they may not be held vicariously liable for the actions of Mr. Ellis, *see* Opp'n at 4, this argument is

10  without merit.  There is nothing to suggest that Mr. Ellis was doing anything but acting within the

11  scope of his employment with the Joint Venture/SMG in enforcing the restrictions against Plaintiffs.

12  Under normally applicable agency law, the Joint Venture/SMG may be held liable for Mr. Ellis' acts

13  within the scope of his enforcement.  *See Myers v. Trendwest Resorts, Inc.*, 148 Cal. App. 4th 1403,

14  1427 (2007) (stating that, under the doctrine of respondeat superior, an "employer is indirectly or

15  vicariously liable for torts committed by its employees within the scope of their employment").  The

16  case law authority cited by the Joint Venture, *see* Docket No. 150 (Mot. at 18), is inapposite because

17  it concerns vicarious liability with respect to public, not private, entities.  Although Mr. Ellis may be

18  deemed a state actor for purposes of the application of § 52.1, the Joint Venture and SMG are in fact

19  private entities.

20      Even if the Joint Venture and SMG were treated as public entities, California Government

21  Code § 815.2(a) would establish vicarious liability.  *See Eastburn*, 31 Cal. 4th at 1180 (stating that

22  "Government Code section 815.2, subdivision (a), makes a public entity vicariously liable for its

23  employee's negligent acts or omissions within the scope of employment").  The Joint

24  Venture/SMG's citation to *Masoud v. County of San Joaquin*, No. CIV. S-06-1170 FCD EFB, 2006

25  U.S. Dist. LEXIS 81828 (E.D. Cal. Nov. 8, 2006), is inapposite.  In *Masoud*, the court rejected the

26  plaintiffs' argument that "county defendants, to the extent that they made the initial decision to

27  remove the children from the home, are somehow liable for the physical force and threats made by

28  law enforcement in effecting that removal" – noting that "plaintiffs cite no authority in support of

United States District Court

For the Northern District of California

their theory of vicarious liability." *Id.* at *17 n.4.  The court, however, did not discuss § 815.2(a), which this Court finds determinative.  In *Walker v. City of Hayward*, No. C07-6205 TEH, 2008 U.S. Dist. LEXIS 44719 (N.D. Cal. June 6, 2008), also cited by the Joint Venture/SMG, the plaintiff sought to hold a private security company vicariously liable for actions that police officers took.  That is a situation markedly different from that here – *i.e.*, where Mr. Ellis and the Joint Venture/SMG clearly have an employee-employer relationship, a relationship that did not exist in *Walker*.

Even if state action could not be established vicariously, there are other bases for finding the Joint Venture and SMG state actors.  In arguing that they are not state actors, the Joint Venture and SMG rely heavily on *Villegas v. Gilroy Garlic Festival Association*, 541 F.3d 950 (9th Cir. 2008).  There, the Ninth Circuit noted that "[s]ome of the factors to consider in determining" whether a private actor may appropriately be characterized as a state actor are "(1) the organization is mostly comprised of state institutions; (2) state officials dominate decision making of the organization; (3) the organization's funds are largely generated by the state institutions; and (4) the organization is acting in lieu of a traditional state actor."  *Id.* at 955.  In stating such, however, the Ninth Circuit did not say that these were the only factors to consider.  In fact, the Ninth Circuit identified the above four factors based on a Supreme Court case, *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 295-96 (2001).  In that case the Supreme Court specifically explained that

> [w]hat is fairly attributable [to state action] is a matter of normative judgment, and *the criteria lack rigid simplicity*.  From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government.

*Id.* at 295-96 (emphasis added); *see also Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002) (quoting *Brentwood* and noting that, "[b]ecause of the fact-intensive nature of the inquiry, courts have developed a variety of approaches to the State actor issue," with at least "seven approaches to the issue including the coercion test, the joint action test, the public function test, and the entwinement test").  In light of *Brentwood* and other Ninth Circuit authority post-dating *Brentwood*, including

United States District Court

For the Northern District of California

1    *Lee*, the Court rejects the Joint Venture and SMG's suggestion that the four factors listed in *Villegas*

2    are exclusive and, standing alone, dispositive as to whether or not there is state action.  There are

3    other bases for finding state action.

4          Guided by *Brentwood*, the Court concludes the Joint Venture and SMG are state actors

5    because (1) as discussed above, the Joint Venture hired Oakland Police officers to provide additional

6    security at the Arena, exercised control over them, and used the officers' color of authority in

7    enforcing the restrictions at issue; (2) there is a symbiotic relationship between the Authority and the

8    Joint Venture/SMG based on financial integration between the entities, *see Burton v. Wilmington*

9    *Pkg. Auth.*, 365 U.S. 715, 723-26 (1961) (finding state action on the part of a privately owned

10   restaurant which refused to serve African-American customers because, *inter alia*, the restaurant

11   was located in a public parking garage, benefitted from the Parking Authority's tax exemption and

12   maintenance of the premises, and in turn, provided the Parking Authority with the income it needed

13   to maintain fiscal viability); *Brunette v. Humane Soc'y*, 294 F.3d 1205, 1213 (9th Cir. 2002)

14   (discussing *Burton*), and (3) the Authority effectively delegated free speech regulation at the Arena

15   (public property) to the Joint Venture/SMG.  *See Lee*, 276 F.3d at 556 (stating that "the regulation of

16   speech in the Commons [an open-air plaza that is a public forum] is a public function and the

17   [private entity] became a State actor when the City delegated that regulation to the [private entity]").

18   The Court does not opine whether each of these factors alone would be sufficient to give rise to state

19   action.  At the very least, the combination is sufficient as a matter of law.

20         First, as discussed above, the police officers took their direction with respect to security at

21   the Arena from Mr. Ellis, who was acting within the scope of his employment for the Joint

22   Venture/SMG.

23         Second, the evidence of record establishes that, under the Management Agreement: (1)

24   Coliseum, Inc. paid the Joint Venture at least a fixed fee, *see* Management Agreement ¶ 4.1; (2)

25   Coliseum, Inc. also paid for the operating expenses of the Arena under the Agreement, *see*

26   Management Agreement ¶ 5.1; and (3) the City and County obtained a financial benefit under the

27   Agreement.  *See* Docket No. 153 (Brill Decl. ¶ 6) (noting that some of the revenues earned by the

28   Joint Venture are returned to the City and County "by way of revenue sharing and business licensing

United States District Court

For the Northern District of California

fees").  Notably, the financial relationship between the Authority and the Joint Venture here was more closely intertwined and more symbiotic than the financial relationship between the public and private entities in *Burton*, where the Supreme Court found state action based on a financial relationship.  Rather than just a leasing agreement, there was a management agreement wherein the public owners of the Arena and the Joint Venture effectively shared revenue and financial risks.  *See Rendell-Baker v. Kohn*, 457 U.S. 830, 843 (1982) (noting that, "[i]n response to the argument that the restaurant's profits, and hence the State's financial position, would suffer if it did not discriminate, the [*Burton*] Court concluded that this showed that the State profited from the restaurant's discriminatory conduct[;] [t]he Court viewed this as support for the conclusion that the State should be charged with the discriminatory actions"); *Morse v. North Coast Opportunities*, 118 F.3d 1338, 1341 (9th Cir. 1997) (stating that there must be "additional evidence of interdependence, such as the physical location of the private entity in a building owned and operated by the State, and a showing that the State profited from the private entity's discriminatory conduct").  It is evident that the decision to keep Plaintiffs off the ramp and landing was made pursuant to the Joint Venture's contract with the Ringling Brothers to provide security for the circus and its animals and performers.  *See* Circus Agreement ¶¶ 9(d), (o).  There is no dispute that such security is a material term of the circus's contract with the Joint Venture/SMG, and thus, by preserving that contract, the Joint Venture and SMG and ultimately the Authority profited from the security measures implemented by Mr. Ellis at the behest of the circus.

Finally, the Authority effectively delegated regulation of speech at the Arena to the Joint Venture/SMG through the Management Agreement.  As noted above, the Management Agreement provides that the Joint Venture is to be given "exclusive authority over the day-to-day operation of the Complex and all activities therein" – albeit "provided that [the Joint Venture] shall follow all policies and guidelines of the Coliseum hereafter established or modified by the Coliseum."  Management Agreement ¶ 2.1(b).  There is no evidence in the record that the Authority exercised or retained any control over the means and manner of security enforcement at the Arena.  The only evidence is that all of the material security decisions in the instant case were made by Mr. Ellis on behalf of the Joint Venture/SMG.  *See Lee*, 276 F.3d at 556.

1    Accordingly, with respect to the § 52.1 free speech claim based on content-neutral speech

2    restrictions, the Court recommends that Plaintiffs' motion for partial summary judgment against the

3    Joint Venture and SMG be **GRANTED** and the Joint Venture and SMG's motion for partial

4    summary judgment be **DENIED**.

5         8.    <u>County Defendants</u>

6    California Government Code § 895.2 provides in relevant part:

> Whenever any public entities enter into an agreement, they are jointly
> and severally liable upon any liability which is imposed by any law
> other than this chapter upon any one of the entities or upon any entity
> created by the agreement for injury caused by a negligent or wrongful
> act or omission occurring in the performance of such agreement.

10   Cal. Gov't Code § 895.2.  Plaintiffs contend that the County may be held liable for the actions of the

11   Authority pursuant to § 895.2.[6]  However, even if the establishment of the Authority were deemed

12   an agreement between the City and the County under § 895.2, there is no evidence that the wrongful

13   acts alleged here occurred in the performance of any such agreement as required by § 895.2.  *See*

14   Cal. Gov't Code § 895.2, Law Revision Commission Comments ("This section makes each of the

15   public entities that are parties to an agreement jointly and severally liable to the injured party for any

16   torts that may occur in the performance of the agreement for which any one of the entities, or any

17   entity created by the agreement, is otherwise made liable by law.").

18        Even if the County could be held liable for conduct of the Authority, the Authority itself may

19   be held liable only if (1) the actions of the individual police officers or (2) the actions of the SMG

20   Defendants (in particular, the Joint Venture and its employee Mr. Ellis) may be vicariously imputed

21   to the Authority.

22        As to the first issue, the Court notes that Plaintiffs do not appear to argue that the officers are

23   direct agents of the Authority.  There is no evidence of any direct contractual relationship between

24   the Authority (or the County) and the City police department.  Rather, Plaintiffs' contention seems

---

[6]  In their papers, Defendants simply argue that § 895.2 may not be used to hold the public
entities liable for the actions of the Joint Venture, a private entity.  *See* Docket No. 178 (City Defs.'
Supp. Br. at 4) (noting that the Joint Venture is not a public entity and therefore § 895.2 is not
applicable); Docket No. 179 (County Defs.' Supp. Br. at 5) (same).  Defendants do not address the issue
of whether § 895.2 may be the basis for holding the County liable for the actions of the Authority.

United States District Court

For the Northern District of California

to be that the Authority is liable because the Joint Venture was the Authority's agent and the Joint Venture hired the individual officers (through the Oakland Police Department) to provide additional security.  *See* Docket No. 153 (Brill Decl. ¶ 16) (stating that "the Joint Venture contracted directly with the Oakland police department to provide additional on-site security assistance").  Thus, the first issue ultimately collapses with the second issue – the question is whether or not the Authority may be held liable for the actions of the Joint Venture (which did contract with the police department).

According to Plaintiffs, the Authority may be held liable because the Joint Venture was its agent.  Plaintiffs point out that, under the Management Agreement, the Joint Venture was deemed "the sole and exclusive managing agent of the Coliseum to manage, operate, and promote the Complex [including the Arena] during the Management Term."  Management Agreement ¶ 2.1(b).  Plaintiffs note that, "[u]nder the doctrine of respondeat superior, an 'innocent' principal is vicariously liable for the torts of an agent, committed while acting within the scope of the agency."  Docket No. 176 (Pls.' Supp. Br. at 7).  In support, Plaintiffs cite, *inter alia*, the Witkins treatise, *see* 3 Witkin, Summ. of Cal. Law, Agency & Employ. § 165, at 208 (10th ed.), as well as California Civil Code § 2338, which provides in relevant part that "a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business, and for his willful omission to fulfill the obligations of the principal."  Cal. Civ. Code § 2338.

The problem for Plaintiffs is that this general rule of agency assumes an agency relationship wherein the principal has sufficient control over the agent to impose vicarious liability.  In this case, there is no claim that the Joint Venture was effectively an employee of the Authority.  Instead, any agency relationship would exist by virtue of the Joint Venture being an independent contractor.[7]

---

[7] "Agent and independent contractor are not necessarily exclusive legal categories, as are employee and independent contractor.  Thus, one who contracts to act on behalf of another and subject to the other's control except as to physical conduct, is both an agent and an independent contractor." 3 Witkin, Summ. of Cal. Law, Agency & Employ. § 21, at 61 (10th ed.); *see also* Rest. (3d) Agency § 1.01, cmt. c (noting that "the common term 'independent contractor' is equivocal in meaning and confusing in usage because some termed independent contractors are agents while others are nonagent service providers").

1   Under California law, the general rule is that "an employer is ordinarily not liable for the negligence

2   or other tort of an independent contractor or of the contractor's employees."  6 Witkin, Summ. of

3   Cal. Law, Torts § 1236, at 615 (10th ed.); *see also* Rest. (2d) Torts § 409 (providing that, with some

4   exceptions, "the employer of an independent contractor is not liable for physical harm caused to

5   another by an act or omission of the contractor or his servants").  *See, e.g.*, *Williams v. Fairhaven*

6   *Cemetery Ass'n*, 52 Cal. 2d 135, 139 (1959) (stating that "'[t]he [employer's] general supervisory

7   right to control the work [of the independent contractor] so as to insure its satisfactory completion in

8   accordance with the terms of the contract does not make the hirer of the independent contractor

9   liable for the latter's negligent acts in performing the details of the work'").

10              The explanation for [this rule] most commonly given is that, since the
11              employer has no power of control over the manner in which the work
               is to be done by the contractor, it is to be regarded as the contractor's
12              own enterprise, and he, rather than the employer, is the proper party to
               be charged with the responsibility of preventing the risk, and bearing
13              and distributing it.

14   Rest. (2d) Torts § 409, cmt. b.

15              Regardless of the label (employee or independent contractor), however, vicarious liability

16   may be established where the employer or principal exercises control over both the ends and manner

17   of the work of the agent.  *Cf. Bostrom v. County of San Bernardino*, 35 Cal. App. 4th 1654, 1668-69

18   (1995) (finding no vicarious liability from employer-independent contractor relationship where the

19   former hires the latter to perform work and the former exercises control over only the results of the

20   work, not the means by which it is accomplished).  This principle applies to public entities.  *See* Cal.

21   Gov't Code § 815.4 (providing that "[a] public entity is liable for injury proximately caused by a

22   tortious act or omission of an independent contractor of the public entity to the same extent that the

23   public entity would be subject to such liability if it were a private person").

24              The critical question therefore is whether the Authority exercised control over the manner in

25   which the Joint Venture conducted security at the Arena.  In their papers, Plaintiffs offer little by

26   way of argument.  As for the County Defendants, they contend that "the evidence before the court

27   establishes that no entity or defendant was an independent contractor of the County or the

28   Authority" and that "[n]o such contractual relationship existed between the County or the Authority

1   and the Joint Venture." *See* Docket No. 179 (County Defs.' Supp. Br. at 4).  The Court finds neither

2   position persuasive.

3         The County Defendants' argument is not convincing because it is contradicted by the record

4   evidence.  There is a contractual relationship between the Authority and Joint Venture:  the

5   Management Agreement.  The Management Agreement specified that the Joint Venture was given

6   "exclusive authority over the day-to-day operation of the Complex and all activities therein,"

7   provided that it "follow all policies and guidelines of the Coliseum hereafter established or modified

8   by the Coliseum."  Management Agreement ¶ 2.1(b).  This provision indicates that control over

9   management was given to the Joint Venture.

10         While Plaintiffs might argue that the latter part of the provision left open the possibility that

11   the Authority could exert control over the means and not just the results of security, no evidence was

12   presented as to whether the Authority actually exercised control over the means, particularly with

13   respect to the security actually arranged by the Joint Venture.  Plaintiffs have cited no evidence

14   beyond the Management Agreement.  They offered no testimonial or other documentary evidence

15   showing any exercise or degree of control.  Nor did Plaintiffs make a request, pursuant to Federal

16   Rule of Civil Procedure 56(f), for a continuance on the County Defendants' motion so that Plaintiffs

17   could conduct discovery into the matter.  Plaintiffs therefore failed to establish evidence of control

18   over not just results but also means – a requisite element in proving the County Defendants' liability.

19   *See River City Mkts., Inc.*, 960 F.2d at 1462.

20         Therefore, the Court recommends that, with respect to the § 52.1 free speech claim based on

21   content-neutral speech restrictions, Plaintiffs' motion for partial summary judgment against the

22   County Defendants be **DENIED**.  As to the County Defendants' motion for partial summary

23   judgment, Plaintiffs' failure to make a showing sufficient to establish an essential element of their

24   claim likewise warrants **GRANTING** of the motion under *Celotex*.

25         9.   <u>Damages</u>

26         For the reasons discussed above, the Court concludes that summary judgment in favor of

27   Plaintiffs and against the City Defendants and the SMG Defendants is appropriate for the § 52.1 free

28   speech claim based on content-neutral speech restrictions.  Accordingly, the Court turns to the issue

1   of damages.  As reflected in their motion for partial summary judgment, Plaintiffs seek actual

2   damages, civil penalties, and punitive damages (except against the City).  Each category of relief

3   requested is addressed below.

4                      a.      Actual Damages

5           Section 52.1(b) provides that

6                  [a]ny individual whose exercise or enjoyment of rights secured by the
                   Constitution or laws of the United States, or of rights secured by the
7                  Constitution or laws of this state, has been interfered with, or
                   attempted to be interfered with, as described in subdivision (a) [*i.e.*,
8                  interference by threats, intimidation, or coercion], may institute and
                   prosecute in his or her own name and on his or her own behalf a civil
9                  action for damages, including, but not limited to, damages under
                   Section 52, injunctive relief, and other appropriate equitable relief to
10                 protect the peaceable exercise or enjoyment of the right or rights
                   secured.
11

12  Cal. Civ. Code § 52.1(b).  As is clear from the above language, "damages" are a remedy for a § 52.1

13  violation, and Defendants do not dispute that Plaintiffs' actual damages are in fact "damages" for

14  purposes of § 52.1.

15          The actual damages sought by Plaintiffs appear to be $40,000 for Mr. Cuviello (consisting of

16  a bail payment of $2,500, unspecified costs for defending himself against the criminal trespass

17  charge, unspecified costs for litigating the instant case, and emotional distress suffered) and $32,000

18  for Ms. Bolbol (consisting of unspecified costs for litigating the instant case and emotional distress

19  suffered).  *See* Docket No. 102 (Mot. at 40-41).  Plaintiffs have not proven as a matter of law actual

20  damages in these amounts, particularly as Plaintiffs have not offered any evidence as to their actual

21  damages other than Mr. Cuviello's bail payment.  *See* Docket No. 103 (Cuviello Decl. ¶ 28)

22  (discussing bail payment).  Moreover, Plaintiffs provide no authority that costs of litigating the

23  instant case constitute "damages" recoverable under § 52.1.  Accordingly, the Court recommends

24  that the issue of the precise amount of actual damages be left to the trier of fact to decide.

25                     b.      Civil Penalty

26          Plaintiffs argue that, even if actual damages may not be awarded at this juncture, Plaintiffs

27  should still be awarded civil penalties now – more specifically, $25,000 against each Defendant for

28  his or its conduct in August 2005 and another $25,000 against each Defendant for his or its conduct

United States District Court

For the Northern District of California

1   in August 2006.  The Court does not agree and finds instead that, with respect to the free speech

2   claim based on content-neutral speech restrictions, Plaintiffs are barred as a matter of law from

3   receiving any civil penalty.[8]

4          As noted above, § 52.1(b) provides that a party may seek as relief "damages, *including, but*

5   *not limited to, damages under Section 52*, injunctive relief, and other appropriate equitable relief."

6   Cal. Civ. Code § 52.1(b) (emphasis added).  In § 52, damages are mentioned both in subsection (a)

7   and subsection (b).  Section 52.1 does not specify whether it incorporates § 52(a), § 52(b), or both; it

8   makes a general reference to § 52.  *See* 2-3000 CACI VF-3015 (directions for use for Judicial

9   Council of California Civil Jury Instructions, Verdict Form on Bane Act) ("Civil Code section 52.1

10  references all damages under section 52, but does not specify whether subdivision 52(a) or 52(b), or

11  both, is/are intended.  Depending on how this point is decided, select question 5 and/or 6 as

12  appropriate").

13         Because § 52.1 broadly refers to damages under § 52, without limiting its reference to either

14  § 52(a) or § 52(b) specifically, the Court concludes that it is possible for a plaintiff who prevails on a

15  § 52.1 claim to obtain damages under both subsections, including § 52(b).  However, the Court does

16  not agree with Plaintiffs' position that a prevailing plaintiff is automatically entitled to the damages

17  listed in § 52(b).  Certainly, Plaintiffs have cited no authority to support that position, and the

18  Judicial Council of California verdict form for § 52.1 claims indicates that it is an open question as

19  to how a court should determine which damages under § 52 are appropriate.  *See id.*

20  _____

21         [8] The Court notes that, even if Plaintiffs were not so barred, it would not agree with their position
    that they are entitled to multiple civil penalties.  In support of their argument for multiple civil penalties,
22  Plaintiffs point out that § 52(b) discusses liability "for each and every offense." Cal. Civ. Code § 52(b).
    While this is true, Plaintiffs have taken this phrase out of context.  Section 52(b) actually provides that
23  there is liability "for each and every offense *for the actual damages suffered*," Cal. Civ. Code § 52(b)
    (emphasis added); the statute does not specifically state that there should be a civil penalty for each and
24  every offense.  Moreover, it is notable that § 52(b) refers only to "a" civil penalty.  *See* Cal. Civ. Code
    § 52(b)(2) (providing that whoever denies the right under § 51.7 is liable for "[a] civil penalty").  These
25  facts counsel against an award of multiple civil penalties against a single defendant.

26         Plaintiffs assert still that, as a matter of policy, the Court should adopt their interpretation
    because "a contrary interpretation . . . would insulate an individual or entity that committed a violation
27  of the statute from penalties for later violations, so long as the violations were jointly claimed in the
    same suit." Docket No. 176 (Pls.' Supp. Br. at 3).  The Court is not persuaded by this reasoning.  Under
28  § 52(b), a plaintiff may always obtain his or her actual damages.  Moreover, repeated violations would
    make a punitive damages award more likely, not to mention injunctive or other equitable relief.

United States District Court
For the Northern District of California

1    When the language of a statute "is ambiguous, a court may consider the consequences of

2  each possible construction and will reasonably infer that the enacting body intended an

3  interpretation producing practical and workable results rather than one producing mischief or

4  absurdity." *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 567 (2007).  Section 52(a)

5  provides for more limited damages compared to § 52(b).  Under § 52(a), a defendant "is liable for

6  each and every offense for the actual damages, and any amount that may be determined by a jury, or

7  a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no

8  case less than four thousand dollars."  Cal. Civ. Code § 52(a).  In contrast, under § 52(b), a

9  defendant is liable for actual damages, plus punitive damages (with no limits) and a civil penalty.

10  *See* Cal. Civ. Code § 52(b).  Implicitly, the reason that more substantial damages are available under

11  § 52(b) is because § 52(b) is intended to provide compensation for more serious offenses.  Section

12  52(b) expressly compensates for violations of: (1) § 51.7 (the Ralph Act), which protects persons

13  from violence or intimidation by threat of violence based on their political affiliation or other

14  protected characteristic such as race or sex and (2) § 51.9, which protects persons from intentional

15  sexual harassment (specifically, in business, service, and professional relationships).  Significantly,

16  the § 52(b) civil penalty is available only for a violation of § 51.7, not § 51.9.  *See* Cal. Civ. Code §

17  52(b)(2) (providing for a civil penalty "to the person denied the right provided by Section 51.7").

18  The legislative history for § 52 confirms the unavailability of civil penalties for § 51.9 violations.

19  *See* Cal. Assembly Bill No. 519 (1999).  In contrast to § 52(b), and the civil penalty in particular, §

20  52(a) compensates for relatively less serious offenses – *i.e.*, violations of §§ 51, 51.5, and 51.6,

21  which generally protect persons from discrimination in business establishments.

22    Given this difference between § 52(a) and the civil penalty under § 52(b), the Court

23  concludes that, for a § 52.1 plaintiff to be entitled to the more substantial and penal-like damages

24  provided for in § 52(b), he or she must establish a violation of § 52.1 akin to a violation of § 51.7 in

25  terms of the severity of the offense (particularly where a civil penalty is sought as no civil penalty is

26  available for a violation of § 51.9).  For a typical § 51.7 violation, the offending party intentionally

27  and purposefully seeks to violate another party's rights, as demonstrated by the use of violence or

28  intimidation by the threat of violence.  In many – if not most – instances, the offense under § 52.1

United States District Court
For the Northern District of California

1   will also be severe since § 52.1 requires that a person's rights be interfered with by means of threat,

2   intimidation, or coercion, which often involves violence or threat of violence.  *See* Cal. Code Civ.

3   Proc. § 52.1(b); *see also Stamps v. Superior Court*, 136 Cal. App. 4th 1441, 1456 (2006) (noting that

4   both § 51.7 (the Ralph Act) and § 52.1 (the Bane Act) "were designed to stem the number of hate

5   crimes which the Legislature recognized had grown to an alarming proportion").

6          The instant case, however, is different in that Plaintiffs' constitutional rights were violated

7   not so much by physical violence as by threat of arrest and, in Mr. Cuviello's case, an actual arrest.

8   Assuming such coercion would be sufficient to invoke remedies under § 52(b), there is a more

9   unique mitigating aspect to this case.  To the extent Plaintiffs' claim is based on an assumption that

10  the restrictions were content neutral, the City Defendants did not intentionally and purposefully seek

11  to deprive Plaintiffs of their rights; rather their conduct was undertaken to protect public and animal

12  safety and done so in the context of some ambiguity as to the scope of the constitutional free speech

13  rights at issue.  *See* Part VII.B.4, *infra* (explaining why qualified immunity applies to individual

14  officers).   Thus, Plaintiffs are not entitled to summary judgement on their claim for a civil penalty.

15  With respect to the SMG Defendants, although Mr. Ellis willfully acted to prevent Plaintiffs from

16  accessing the north ramp and landing, there is a factual dispute over whether his actions were

17  motivated by a specific intent to deprive Plaintiffs of their rights, as opposed to enforcing access

18  restrictions he believed were constitutional.[9]

19         Accordingly, the Court recommends that Plaintiffs' motion for partial summary judgment

20  with respect to an award of for a civil penalty be **DENIED**.

21              c.    Punitive Damages

22         Because the Court recommends that Plaintiffs' motion for partial summary judgment as to

23  civil penalties be denied, for the same reasons, the Court recommends that Plaintiffs' motion for

24  partial summary judgment on  punitive damages pursuant to § 52(b) be denied as well.

25

26  _____

27         [9] To the extent Plaintiffs allege they were intentionally denied rights because of their political
    views, *see* Part VII.A.10; Part VIII, *infra*, there are questions of fact that remain in dispute.  While proof
    of such intentional suppressions may provide sufficient malice to award a civil penalty under § 52(b),
28  Plaintiffs are not entitled to summary judgment on this record.

United States District Court

For the Northern District of California

Furthermore, case law indicates that, under § 52(a), a plaintiff may not be awarded punitive damages pursuant to California Civil Code § 3294[10] in addition to the possible treble actual damages award (or no less than $4,000) specified in the statute. *See Freeman v. Alta Bates Summit Med. Ctr. Campus*, No. C 04-2019 SBA, 2004 U.S. Dist. LEXIS 21402, at *18 (N.D. Cal. Oct. 12, 2004) (concluding that punitive damages not available under § 52(a) other than treble actual damages); *Loskot v. Lulu's Rest.*, No. CIV. S-00-1497 WBS PAN, 2000 U.S. Dist. LEXIS 22252, at *8 (E.D. Cal. Nov. 15, 2000) (concluding that "punitive damages for violations of Section[] 52(a) . . . are limited to three times the amount of actual damages, and the request for punitive damages under Cal. Civ. Code § 3294 is improper"); *Mantic Ashanti's Cause v. Godfather's Pizza*, No. 98-CV-2264 TW (AJB), 1999 U.S. Dist. LEXIS 16675, at *20 n.5 (S.D. Cal. June 1, 1999) (stating that "'punitive damages' are authorized under [§ 52(a)], but only to the extent they do not exceed the treble damages cap imposed by Section[] 52(a)"); *see also* Cal. Assembly Bill No. 519 (1999) (stating that punitive damages are not available under § 52(a)).

Even if punitive damages under California Civil Code § 3294 were possible, to the extent Plaintiffs' claims are based on the restrictions having been content-neutral, Plaintiffs may not recover punitive damages because there is not sufficient malice under such circumstances to support such. Plaintiffs argue that the officers acted either oppressively or maliciously because, from 2003 to 2006, they "repeatedly violated [Plaintiffs'] rights when the law was well established in favor of Plaintiffs." Docket No. 165 (Opp'n at 24). However, as discussed in Part VII.B.4, *infra*, Plaintiffs' free speech rights were not clearly established as it would not have been clear to a reasonable officer that his conduct was unlawful in the situation he or she confronted. Accordingly, as to Plaintiffs'

---

[10] California Civil Code § 3294(a) provides as follows: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Cal. Civ. Code § 3294(a); *see also* Simon *v. San Paolo U.S. Holding Co., Inc.*, 35 Cal. 4th 1159, 1184 (2005) (stating that, "[w]here the defendant's oppression, fraud or malice has been proven by clear and convincing evidence, California law permits the recovery of punitive damages 'for the sake of example and by way of punishing the defendant'").

content-neutral free speech claim, Plaintiffs' motion for partial summary judgment should be **DENIED**, and the police officers' motion for partial summary judgement should be **GRANTED**.[11]

Plaintiffs suggest that, at the very least, Officer Valladon should still be held liable for punitive damages because he filed a false police report. According to Plaintiffs, "Officer Valladon filed a false police report wherein he stated that 'Cuviello refused to show [his] ticket.' This statement belies the videotape evidence whereby Plaintiff Cuviello not only showed his ticket but read aloud the information on the ticket." Docket No. 165 (Opp'n at 12); *see also* Docket No. 103 (Cuviello Decl., Ex. B) (Clip 1(b)). Contrary to what Plaintiffs argue, there is no evidence of fraud. The police report written by Officer Valladon reflects only that a statement was made by an unidentified person that (1) he or she asked to see Mr. Cuviello's ticket and (2) Mr. Cuviello refused. *See* Docket No. 163 (Cuviello Decl., Ex. A at 2-3) (police report). There is no indication that Officer Valladon knew that the person's statement was not true. The video footage provided by Plaintiffs does not establish otherwise. Indeed, the video footage indicates that Mr. Ellis wanted to scan Mr. Cuviello's ticket but Mr. Cuviello did not give Mr. Ellis the ticket. Furthermore, it is not evident that the alleged false report which occurred after the fact constitutes a part of the gravamen of Plaintiffs' free speech claim.

Accordingly, the Court recommends that, with respect to the § 52.1 claim based on content-neutral speech restrictions, Plaintiffs' request for punitive damages be **DENIED** and that the individual officers' motion for partial summary judgment with respect to punitive damages be **GRANTED**.

>    10.    Content-Based Restrictions

Except as indicated, the analysis above, assumes the restrictions on speech were content neutral. Plaintiffs, however, have asserted that the restrictions on speech, though neutral on their face, were in fact content- and viewpoint-based -- *i.e.*, an attempt to suppress Plaintiffs' speech because of their political viewpoint. If proven, neither side seriously disputes that this would

---

[11] As to that portion of Plaintiffs' claim based on an assertion of viewpoint discrimination by Defendants, there are disputed issues of fact as to whether Plaintiffs' constitutional rights were intentionally violated and if so, by whom. *See* Part VII.A.10; Part VIII, *infra*. Thus, both Plaintiffs' and the officers' motions for partial summary judgment should be denied as to that claim.

United States District Court

For the Northern District of California

1    constitute a constitutional violation. *See Flint*, 488 F.3d at 833 (noting that "'[d]iscrimination

2    against speech because of its message is presumed to be unconstitutional'").  While an inference

3    could be made that the speech restrictions were based on Plaintiffs' viewpoint, that inference is not

4    inexorable as there is also evidence from which it may be inferred that Defendants were simply

5    trying to protect public and animal safety.

6            Even if the restrictions were in fact content- or viewpoint-based and motivated by an intent

7    to suppress Plaintiffs' views, thus establishing a violation of Plaintiffs' constitutional rights, liability

8    as to *each* defendant would have to be assessed.  For example, was it Mr. Ellis who imposed the

9    restrictions on behalf of the Joint Venture/SMG because of the circus's concerns about Plaintiffs?  If

10   so, then Mr. Ellis and the Joint Venture/SMG could be held liable.  The Joint Venture/SMG could

11   also be held liable if it directed Mr. Ellis to impose content-based speech restrictions.  If the officers

12   were aware of the purpose of suppressing Plaintiffs' viewpoint and knowingly took steps to enforce

13   those unconstitutional restrictions, they -- along with the City -- might be held liable as well.  *See*

14   *Jacobs*, 526 F.3d at 444 (noting that, under federal law, "[a] regulation is content based 'if either the

15   main purpose in enacting it was to suppress or exalt speech of a certain content, or it differentiates

16   based on the content of speech on its face'").  In such circumstances, as noted above, damages under

17   § 52(b), and not just damages under § 52(a), would come into play because there would have been

18   the intentional violation of Plaintiffs' rights.

19           However, the material facts on these matters are disputed and hence any motion for partial

20   summary judgment by any of the parties on Plaintiffs' claim of intentional viewpoint discrimination

21   should be **DENIED** with one exception.  That exception concerns the County Defendants.  For

22   Plaintiffs' claim of content or viewpoint discrimination, the County Defendants' motion for partial

23   summary judgment should be **GRANTED** in any event.  There is no evidence to suggest that the

24   County or the Authority devised or ordered the speech restrictions or played an active role in

25   enforcing them.  Moreover, as discussed above, the County Defendants cannot be held vicariously

26   liable for the actions of their independent contractor, the Joint Venture/SMG.  *See* Part VII.A.8,

27   *supra*.

28

United States District Court

For the Northern District of California

1    B.    <u>Section 1983 Claim – Free Speech Rights Protected by U.S. Constitution</u>

2    Title 42 U.S.C. § 1983 provides in relevant part that

3        [e]very person who, under color of any statute, ordinance, regulation,
         custom, or usage, of any State or Territory or the District of Columbia,
4        subjects, or causes to be subjected, any citizen of the United States or
         other person within the jurisdiction thereof to the deprivation of any
5        rights, privileges, or immunities secured by the Constitution and laws,
         shall be liable to the party injured in an action at law, suit in equity, or
6        other proper proceeding for redress . . . .

7    42 U.S.C. § 1983.  In the instant case, Plaintiffs assert that Defendants, under the color of state law

8    violated their free speech rights as protected by the First Amendment of the U.S. Constitution.  That

9    amendment provides in relevant part that "Congress shall make no law . . . abridging the freedom of

10   speech."  U.S. Const., amend. I.

11       1.    <u>Avoidance</u>

12       As noted above, "federal constitutional issues should be avoided if cases can be decided on

13   state law grounds[,] . . . even when the alternative ground is one of state constitutional law."

14   *Carreras*, 768 F.2d at 1042.  Given this standard, arguably, the Court should not entertain the § 1983

15   claim based on the alleged violation of Plaintiffs' free speech rights as protected by the U.S.

16   Constitution.  However, because there appear to be some differences in terms of the remedies

17   available for a violation of federal law and a violation of state law (*e.g.*, the punitive damages

18   standard, attorney's fees, etc.), and because this Court is preparing only a report and

19   recommendation, the Court shall address the § 1983 claim on its merits.

20       2.    <u>Protected Speech</u>

21       For the reasons stated in Part VII.A.1, *supra*, Plaintiffs' videotaping activity constitutes

22   speech protected by the U.S. Constitution, particularly because they are taping matters of public

23   interest.  *See* Docket No. 47 (R&R at 4).

24       3.    <u>Public Forum</u>

25       In evaluating the alleged First Amendment violation, the Court must first "identify the nature

26   of the forum, because the extent to which the Government may limit access depends on whether the

27   forum is public or nonpublic."  *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788,

28   797 (1985); *see also Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) (quoting

**United States District Court**
For the Northern District of California

1      *Cornelius*).  A place may fall into one of three categories of fora under the First Amendment: (1) a

2      traditional public forum; (2) a designated public forum; or (3) a nonpublic forum.

3          A "traditional" or "quintessential" public forum is a place that "by long tradition or by

4      government fiat [has] been devoted to assembly and debate."  *Perry Educ. Ass'n v. Perry Local*

5      *Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also Cornelius*, 473 U.S. at 802 (citing *Perry*).

6      Streets, parks, and sidewalks are commonly cited examples of traditional public fora.  *See Perry*,

7      460 U.S. at 45.  A designated public forum is a place that falls outside the scope of a traditional

8      public forum but is nevertheless dedicated by the government to be "a place or channel of

9      communication for use by the public at large for assembly and speech, for use by certain speakers,

10     or for the discussion of certain subjects."  *Cornelius*, 473 U.S. at 802.  A nonpublic forum is a place

11     that is neither a traditional nor designated public forum.  *See Perry*, 460 U.S. at 45.

12         Plaintiffs do not seem to contend that the north ramp and landing of the Arena are traditional

13     public fora.  To the extent they have made such an argument, it should be rejected.  The Supreme

14     Court has construed the traditional public forum category narrowly when evaluating sidewalks,

15     noting that "the location and purpose of a publicly owned sidewalk is critical to determining whether

16     such a sidewalk constitutes a [traditional] public forum."  *United States v. Kokinda,* 497 U.S. 720,

17     728 (1990) (finding that a sidewalk leading exclusively to the post office entrance was not a

18     traditional public forum, in contrast to *United States v. Grace*, 461 U.S. 171, 179 (1983), where

19     sidewalks were "indistinguishable from any other sidewalks in Washington, D.C.").  *See, e.g.*, *Acorn*

20     *v. Metro. Pier & Expo. Auth.*, 150 F.3d 695, 702 (7th Cir. 1998) (finding that pier sidewalks were

21     not traditional public fora because "[t]he sidewalks are not through routes; they lead only to the pier

22     facilities themselves"); *Lewis v. Colo. Rockies Baseball Club*, 941 P.2d 266, 274 (Colo. 1997)

23     (finding that sidewalks around a stadium were traditional public fora where they were integrated by

24     design into city sidewalks and "the architectural design and layout of the sidewalks and walkways

25     fail to indicate to the public that they have entered a private area").  While, in the instant case, the

26     north ramp and landing are arguably comparable to sidewalks, and, while they are visually and

27     architecturally integrated into the sidewalk areas surrounding the Arena, they are also elevated,

28     making them physically distinct from the surrounding sidewalks.  Furthermore, like the sidewalks in

United States District Court

For the Northern District of California

1   *Kokinda*, the north ramp and landing lead exclusively to the Arena's entrances.  *See Kokinda,* 497

2   U.S. at 728.  Nor is there any evidence suggesting a long tradition of devoting the ramp and landing

3   to assembly and debate.

4          The Court therefore focuses on the issue of whether the north ramp and landing constitute

5   designated public fora.  Under federal law, a designated public forum must be intentionally

6   dedicated as such by the government.  *See Cornelius*, 473 U.S. at 802.  In evaluating government

7   intent, courts have considered "the policy and practice of the government to ascertain whether it

8   intended to designate a place not traditionally open to assembly and debate as a public forum . . .

9   [and] examined the nature of the property and its compatibility with expressive activity to discern

10  the government's intent."  *Cornelius,* 473 U.S. at 802 (citing *Perry*, 460 U.S. at 47).  The latter

11  factor, *i.e.*, compatibility of the forum with expressive activity, is identical to the public forum

12  inquiry under the California Constitution.  *See* Part VII.A.2, *supra*.  However, the addition of the

13  former factor – the policy and practice of the government and the government's intent – makes the

14  federal category of designated public forum under federal law narrower than the public forum

15  category defined by California law.  *See Carreras*, 768 F.2d at 1044 (noting that "the California

16  courts have interpreted the California Liberty of Speech Clause to provide greater protection for

17  expressive activity than does the First Amendment to the United States Constitution"); *see also*

18  *Kuba*, 387 F.3d at 856 (stating that "[t]he standard under the California Constitution for whether a

19  particular area is a 'public forum' is one aspect of constitutional law in which the California

20  Constitution varies from its federal cousin").  A further analysis of relevant policy and practice at the

21  Arena is therefore necessary.

22         This factual inquiry focuses on evidence of consistent government practice and cannot be

23  disposed of with a single government statement of contrary policy.  In *Hopper*, the court emphasized

24  "consistency in application" and noted that "[a] policy purporting to keep a forum closed (or open to

25  expression only on certain subjects) is no policy at all for purposes of public forum analysis if, in

26  practice, it is not enforced or if exceptions are haphazardly permitted."  *Hopper*, 241 F.3d at 1076;

27  *see also Grace Bible Fellowship v. Maine Sch. Admin. Dist. No. 5*, 941 F.2d 45, 47 (1st Cir. 1991)

28  (finding that in public forum analysis, "actual practice speaks louder than words"); *Paulsen v.*

1   *County of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991) (stating that "[i]ntent is not merely a matter of

2   stated purpose[;] . . . it must be inferred from a number of objective factors"); *Calash v. City of*

3   *Bridgeport*, 788 F.2d 80, 83 (2d Cir. 1986) (analyzing "the circumstances under which the forum

4   was created" and "past use" in determining whether a stadium was a designated public forum).  In

5   the instant case, the parties have provided little evidence about the policy and practice with respect

6   to the use of the Arena and, in particular, the north ramp and landing of the Arena.  Plaintiffs have

7   provided video footage of several occasions, but even the footage does not indicate a consistent

8   policy or practice.  For example, at times the bottom of the north ramp was blocked by a security

9   gate or security guard, but at other times it appeared open to public access.  Notably, both parties

10  failed to provide any evidence about what the policy and practice was prior to 2003, nor have the

11  parties provided any competent evidence as to the policies and practices relating to other non-circus

12  events.  Given the lack of evidence about historical and consistent policy and practice proffered by

13  either party, the Court concludes that there is a genuine dispute of material fact as to whether the

14  north ramp and landing were designated public fora.

15          To the extent Plaintiffs argue that there is no genuine dispute about policy and practice

16  because the Court, in its prior report and recommendation on their preliminary injunction motion,

17  stated that "the north ramp and landing have historically been open to nonticketed pedestrians,"

18  Docket No. 47 (R&R at 6), the Court does not agree.  That statement did not establish the policy and

19  practice as a matter of law for facial adjudication.  Rather, the statement was made in the specific

20  context of the preliminary injunction motion and was made in large part based upon representations

21  made at the hearing.

22          Accordingly, because of the genuine dispute of material fact, the Court recommends that

23  most of the parties' motions for summary judgment be **DENIED**, except as provided below.

24          4.      Individual Police Officers

25          At this juncture, except as noted below, the Court assumes that the speech restrictions are

26  content neutral.  *See* Part VII.B.8, *infra* (discussing content-based theory).  Assuming such, for the

27  reasons stated above, *see* Part VII.B.3, *supra*, whether the officers violated Plaintiffs' First

28  Amendment rights presents a genuine dispute of material fact.  However, even if the officers were

1   found to have restricted Plaintiffs' right to free speech in violation of First Amendment (by

2   preventing them from accessing the north ramp and landing to videotape the circus animals), the

3   officers might still be immune from liability.  Thus, the Court must address the officers' contention

4   that they are entitled to qualified immunity.

5          Qualified immunity protects officials from § 1983 claims unless the alleged conduct (1)

6   violated a constitutional right (2) that was "clearly established."  *Saucier v. Katz*, 533 U.S. 194, 201-

7   02 (2001).  For a right to be clearly established "[t]he contours of the right must be sufficiently clear

8   that a reasonable official would understand that what he is doing violates that right."  *Anderson v.*

9   *Creighton*, 483 U.S. 635, 640 (1987).  The "relevant, dispositive inquiry is whether it would be clear

10  to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533

11  U.S. at 202.  As the Ninth Circuit has elaborated:

12              Our inquiry focuses on the precise circumstances of a particular case
                as well as the state of the law at the time of the alleged violation.  We
13              engage in an "objective but fact-specific inquiry." . . . For a legal
                principle to be clearly established, it is not necessary that "the very
14              action in question has previously been held unlawful."  Rather, a
                clearly-established right exists if "in the light of pre-existing law the
15              unlawfulness [is] apparent."  In other words, there must be some
                parallel or comparable factual pattern to alert an officer that a series of
16              actions would violate an existing constitutional right, but the facts of
                already decided cases do not have to match precisely the facts with
17              which an officer is confronted.  The matching of fact patterns demands
                only a level of particularity such "'that a reasonable official would
18              understand that what he is doing violates th[e] right.'"  "[I]f officers of
                reasonable competence could disagree on [the] issue, immunity should
19              be recognized."

20  *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008).

21          The Court concludes that the officers are protected by qualified immunity.  The issue of

22  whether Plaintiffs' speech was protected is infused with fact-specific inquiries such that a reasonable

23  officer could have thought it lawful to restrict Plaintiffs' access to the ramp and landing.  First,

24  although the Ninth Circuit ruled in favor of an animal rights activist in its *Kuba* opinion in 2004 –

25  *i.e.*, before the events at issue – *Kuba* was based on rights under the California Constitution which

26  are more protective of speech than the federal constitution at issue in Plaintiffs' § 1983 claim here.

27  For the reasons stated above, there is a substantial question whether the ramp and landing constitute

28  limited public fora, a predicate to the First Amendment claim here.  In addition, even if the areas in

United States District Court

For the Northern District of California

1    question were public fora, a reasonable police officer could have believed that restricting access to

2    the north ramp and landing protected a significant government interest – *i.e.*, that the restriction

3    barring all access to the area once a circus performance begins protects animal and public safety.

4    *See Cuviello*, 2009 U.S. Dist. LEXIS 4896, at *27 (holding such a restriction reasonable where

5    evidence showed that pedestrians' close proximity to circus animals during their walk through

6    public streets might spook the animals or injure participants).  As officers in the field, they were not

7    in a position – unlike the Court in judging evidence submitted in support of motions for summary

8    judgment – reasonably to make that determination.

9           Based on the foregoing, the Court concludes that it would not be sufficiently clear to a

10   reasonable officer that limiting access to the north ramp and landing violated Plaintiffs' First

11   Amendment rights.  The Court therefore recommends that, with respect to the § 1983 free speech

12   claim based on content-neutral speech restrictions (*i.e.*, not a claim of intentional suppression of

13   Plaintiffs' speech because of their content or viewpoint), the officers' motion for partial summary

14   judgment be **GRANTED**.

15          5.    <u>City</u>

16          It is well established that a municipality such as the City can be held liable under § 1983 for

17   a constitutional violation by its employees or officials but only if it can be said that the violation

18   results from the municipality's official policies or customs.  *See Monell v. Department of Soc.*

19   *Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom,

20   whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

21   official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

22                  [T]here are three ways to show a policy or custom of a municipality:
                    (1) by showing "a longstanding practice or custom which constitutes
23                  the standard operating procedure of the local government entity"; (2)
                    "by showing that the decision-making official was, as a matter of state
24                  law, a final policymaking authority whose edicts or acts may fairly be
                    said to represent official policy in the area of decision"; or (3) "by
25                  showing that an official with final policymaking authority either
                    delegated that authority to, or ratified the decision of, a subordinate."

26

27   *Villegas*, 541 F.3d at 964.

28

United States District Court
For the Northern District of California

1    As noted above, the City along with the County formed the Authority "to oversee the

2    Coliseum/Arena," Docket No. 126 (Brill Decl. ¶ 3), and the Authority effectively delegated

3    regulation of speech to the Joint Venture/SMG.  Accordingly, there is a plausible basis for municipal

4    liability based on a delegation theory.  *See, e.g.*, *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1190

5    (9th Cir. 1995) (concluding that "the City is vicariously liable for actions and policies made by the

6    police chief, city council or lower law enforcement officials to whom policy-making authority is

7    delegated").  The Court cannot say, however, that such delegation has been established as a matter

8    of law.  Moreover, as noted above, there is a genuine dispute of material fact as to whether the north

9    ramp and landing of the Arena are designated public fora.  Accordingly, the Court recommends that

10   both Plaintiffs' motion for partial summary judgment against the City and the City's motion for

11   partial summary judgment be denied, with one exception.

12   The exception concerns Plaintiff's theory that the City is liable based on a failure to train the

13   individual police officers.  As to that theory, even if there were a First Amendment violation by the

14   officers, the City cannot be held liable on this basis.

15   "A municipality's failure to train an employee who has caused a constitutional violation can

16   be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the

17   rights of persons with whom the employee comes into contact" and the deficiency was the moving

18   force behind the deprivation of the plaintiff's constitutional rights.  *Long v. County of Los Angeles*,

19   442 F.3d 1178, 1185-86 (9th Cir. 2006).  The Supreme Court has emphasized that "[o]nly where a

20   failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable

21   for such a failure under § 1983"; there is no § 1983 liability where "an otherwise sound program has

22   occasionally been negligently administered."  *City of Canton v. Harris*, 489 U.S. 378, 389, 391

23   (1989).

24   In *Canton*, the Supreme Court gave two examples of cases in which "policymakers of the

25   city can reasonably be said to have been deliberately indifferent to the need" for more or different

26   training.  *Canton*, 489 U.S. at 390.  First, there is the situation where, "in light of the duties assigned

27   to specific officers or employees the need . . . is so obvious, and the inadequacy so likely to result in

28   the violation of constitutional rights."  *Id.*

49

United States District Court

For the Northern District of California

1
2
3
4

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.

5   *Canton*, 489 U.S. at 390 n.10. Second, there is the situation where "the police, in exercising their

6   discretion, so often violate constitutional rights that the need for further training must have been

7   plainly obvious to the city policymakers." *Id.*

8     Plaintiffs argue that their situation fits both of those mapped out in *Canton*. The Court does

9   not agree. It may well be a moral certainty that police officers will be required to deal with the

10  constitutional limitations on the restrictions of free speech. *See* Docket No. 165 (Opp'n at 18-19).

11  However, the City has tendered evidence that it did provide training on free speech. Both Officers

12  Villegas and Valladon stated in their declarations that they had "received training and instruction

13  concerning respecting and protecting the rights of individuals, including individuals exercising their

14  rights of free speech." Docket No. 149 (Supp. Villegas Decl. ¶ 5); Docket No. 149 (Supp. Valladon

15  Decl. ¶ 5). Plaintiffs have not offered any direct evidence to show how that training was inadequate.

16  *See Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) (stating that "[a] plaintiff pressing a

17  § 1983 claim must identify a failure to provide specific training that has a causal nexus with their

18  injuries and must demonstrate that the absence of that specific training can reasonably be said to

19  reflect a deliberate indifference to whether the alleged constitutional deprivations occurred"); *see*

20  *also Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991) (noting that "[t]he undisputed

21  evidence establishes that the agents received highly specialized and extensive training in arrest and

22  SWAT procedures" so that "[t]he fact the agents may not have been trained in every conceivable

23  hostile arrest scenario, e.g., what to do if an unarmed suspect manages to free himself in the

24  presence of two or three other armed agents, would not render their training 'inadequate'").

25  Admittedly, the individual officers, in their declarations, describe their training in very general

26  terms. However, Plaintiffs did not make a Rule 56(f) request to conduct discovery on the training

27  alluded to by the individual officers. While the exchange between the officers and Plaintiffs caught

28  on video suggests the training may not have been very specific (*see, e.g.*, Docket No. 103 (Cuviello

United States District Court
For the Northern District of California

Decl., Ex. A) (Clips 1-2)), this circumstantial evidence falls far short of establishing a systemic failure to train.

In any event, it is not clear that injury to Plaintiffs would have been avoided had more or different training been implemented since Plaintiffs' free speech rights were not clearly established. As the court noted in *Long*, "in order to demonstrate that the County's policy deficiencies were the moving force behind the deprivation of Mr. Idlet's constitutional rights, Appellant must prove that the injury to Mr. Idlet would have been avoided had the County adequately trained MSB medical staff and/or instituted adequate general policies to guide the medical staff's exercise of its professionally-informed discretion." *Long*, 442 F.3d at 1190; *see also Veneklase v. City of Fargo*, 248 F.3d 738, 748 (8th Cir. 2001) (noting that " the law regarding the parameters of the First Amendment right to protest against abortion in a residential area was not clearly established at the time of plaintiffs' arrest, [and so] the City's failure to its train [sic] police officers could not serve as the moving force behind the violation of plaintiffs' First Amendment rights" – *i.e.*, "[s]ince the parameters of plaintiffs' First Amendment rights were still in question, any training of the City's police officers would necessarily leave those parameters in doubt"). As evident from the above discussion, the analysis of the free speech claims is legally complicated and factually subtle, far more subtle than Plaintiffs' characterization of the law they attempted to convey to the officers at the Arena.

As for Plaintiffs' claim that the police so often violated free speech rights that the need for further training must have been obvious, the evidence of record does not support that claim as a matter of law. According to Plaintiffs, "numerous officers [were] involved in numerous events over a period of years acting in violation of Plaintiffs' constitutionally protected rights." Docket No. 165 (Opp'n at 19). All of the incidents referred to by Plaintiffs, *see* Docket No. 165 (Opp'n at 17) (referring to Docket No. 103 (Cuviello Decl., Ex. B) (Clips 14-18)), with the exception of one, took place during the Ringling Brothers circus engagement in August 2003. The exception was a single incident that took place on August 17, 2005, *i.e.*, the day before the first incident at issue in this case.

1    Plaintiffs have not provided any evidence indicating that, prior to the events at issue, City

2  policymakers actually knew of any of the incidents that took place in August 2003.  Likewise,

3  Plaintiffs have not submitted any evidence suggesting that, prior to the events at issue, City

4  policymakers actually knew of the incident on August 17, 2005.  It is unlikely that City

5  policymakers had knowledge about the incident on August 17, 2005, given that the incident took

6  place only the day before the first incident at issue.  Moreover, without denigrating the importance

7  of the free speech rights at issue, these prior incidents were not so significant as to give rise to an

8  inference that policymakers would have learned of them.  If the City policymakers did not know of

9  the prior incidents, the need for more or different training was not obvious.  *See Bonenberger v.*

10  *Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997) (stating that there must be knowledge of the prior

11  pattern of similar incidents); *Robles v. City of Fort Wayne*, 113 F.3d 732, 736 (7th Cir. 1997)

12  (stating that "the City's failure to provide further training in this circumstance would rise to the level

13  of deliberate indifference only if it was aware of a series of constitutional violations" and here the

14  plaintiff failed to produce "evidence of a pattern of similar violations or of the City's awareness of

15  that pattern").

16    Of course, actual knowledge on the part of City policymakers is not necessary; that is, a need

17  for more or different training could be obvious if the prior violations were widespread or sufficiently

18  numerous.  *See Pineda v. City of Houston*, 291 F.3d 325, 330 nn.13, 15 (5th Cir. 2004) (noting that

19  "the sheer numerosity of incidents can provide evidence of constructive knowledge") (emphasis

20  omitted); *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990) (stating that Sheriff's

21  Department's decisionmakers "had no actual notice of unconstitutional practices by Livingston" and

22  that there was "no evidence of a history of widespread prior abuse by Department personnel that

23  would have put the sheriff on notice of the need for improved training or supervision").  But in the

24  instant case no reasonable jury could find that the six incidents alluded to by Plaintiffs were so

25  numerous or widespread such that the City should have known about the incidents.  In other words,

26  it cannot be said that there was a pattern of violations that would make it obvious to City

27  policymakers that more or different training was necessary.  Finally, as stated above, it is not clear

28

1    that injury to Plaintiffs would have been avoided had more or different training been implemented

2    since Plaintiffs' free speech rights were not clearly established.

3            Accordingly, the Court recommends that the City's motion for partial summary judgment,

4    with respect to the failure-to-train theory, be **GRANTED**.  The City's motion is otherwise

5    **DENIED**, as is the entirety of Plaintiffs' motion.

6            6.      County Defendants

7            Similar to above, *see* Part VII.B.5, *supra*, there is a plausible basis for municipal liability

8    based on the County's delegation to the Authority and the Authority's delegation in turn to the Joint

9    Venture/SMG.  Both Plaintiffs' motion for partial summary judgment against the County

10   Defendants and the County Defendants' motion for partial summary judgment should be **DENIED**

11   because, *inter alia*, there is a genuine dispute as to whether the north ramp and landing are

12   designated public fora.  *See* Part VII.B.3, *supra*.

13           7.      SMG Defendants

14           Section 1983 requires that the offending party be acting under color of state law.  *See* 42

15   U.S.C. § 1983.  In addition, "the First Amendment protects individuals only against government, not

16   private, infringements upon free speech rights."  *George v. Pacific-CSC Work Furlough*, 91 F.3d

17   1227, 1229 (9th Cir. 1997).  In essence, there is a state action requirement under both § 1983 and the

18   First Amendment.  *See id.* (noting that, "[i]n § 1983 actions, 'color of state law' is synonymous with

19   state action").  Therefore, for any of the SMG Defendants to be held liable for Plaintiffs' § 1983 free

20   speech claim, they must be state actors.  For the reasons stated above, *see* Part VII.A.7, *supra*, the

21   Court concludes that Mr. Ellis and the Joint Venture/SMG are state actors for purposes of the § 1983

22   claims.  However, neither party is entitled to summary judgment on the merit of the First

23   Amendment claim because there is a genuine dispute of material fact as to whether the north ramp

24   and landing are public fora.

25           The Court notes that, with respect to the Joint Venture and SMG, summary judgment is also

26   inappropriate for an independent reason.  As the Joint Venture and SMG point out -- and as

27   Plaintiffs have not disputed -- under § 1983,

28

United States District Court

For the Northern District of California

> private parties who act under color of state law may not be held liable on the basis of respondeat superior.  This means that a private entity state actor can be held liable under § 1983 only when the enforcement of the entity's *policy or practice* caused the deprivation of the plaintiff's federally protected rights.

1 Schwartz, Section 1983 Litigation § 6.04[E], at 6-37 to 6-39 (4th ed.) (emphasis added).  *See, e.g.*, *id.* § 6.04[E] n.159, at 6-37 to 6-39 (citing cases); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999) (stating that "the principles of § 1983 municipal liability articulated in *Monell* and its progeny apply equally to a private corporation that employs special police officers"); *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990) (noting that, "[a]lthough *Monell* dealt with municipal employers, its rationale has been extended to private businesses"); *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993) (noting that "a corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies"); *Iskander v. Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (stating that "a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights"); *Cervantes v. San Jose Reg'l Trauma*, No. C 09-0071 PJH (PR), 2009 U.S. Dist. LEXIS 10036, at *4 (N.D. Cal. Jan. 21, 2009) (stating that, "although a private entity may be sued under section 1983 if the plaintiff can show a close nexus between the State and the challenged action, a plaintiff seeking to assert a section 1983 claim against such a defendant must show that a policy or custom of the defendant caused the constitutional tort").

In the instant case, there is insufficient evidence to establish any custom or policy of the Joint Venture/SMG, and therefore Plaintiffs' motion for partial summary judgment should be denied. However, the Joint Venture/SMG's motion for partial summary judgment should also be denied because, plausibly, the Joint Venture/SMG delegated final policymaking authority to Mr. Ellis in this instance.  *See* Docket No. 154 (Ellis Decl. ¶ 5) (stating that actual security procedures for the circus performances in 2005 and 2006 were established at production meetings, which involved the participation of circus officials and Mr. Ellis).  Of course, the Court is mindful that there is a distinction between delegated authority and delegated discretion.  *See Christie v. Iopa*, 176 F.3d 1231, 1236-38 (9th Cir. 1999) (emphasizing that "delegating discretion is not equivalent to delegating final policymaking authority" and indicating that delegation of the latter occurs when the

United States District Court

For the Northern District of California

1   officials discretionary decision is not "'constrained by policies not of that official's making'" or not

2   "'subject to review by the municipality's authorized policymakers'").[12]  This issue cannot be

3   resolved on summary judgment based on the current record.

4          Accordingly, the Court recommends that, with respect to the § 1983 free speech claim, both

5   Plaintiffs' motion for partial summary judgment and the SMG Defendants' motion for partial

6   summary judgment be **DENIED**.

7          8.     Content-Based Speech Restrictions

8          The analysis above, except as noted, assumes content neutrality.  As previously noted,

9   Plaintiffs also asserted that the restrictions on speech, though neutral on their face, were in fact

10  imposed because of their political viewpoint.  There are disputed issues of fact which prevent any

11  party from obtaining summary judgment as to this claim.  Accordingly, the Court recommends that

12  all parties' motions for partial summary judgment on the content-based theory be **DENIED**, with

13  one exception.

14         That exception concerns the City.  While the City may be held liable on a delegation theory,

15  for the reasons stated above, *see* Part VII.B.5, *supra*, there is insufficient evidence to support

16  Plaintiffs' failure-to-train theory.  This deficiency exists whether Plaintiffs assert that the restrictions

17  on speech were content neutral or based on viewpoint discrimination.  Accordingly, the City is

18  entitled to partial summary judgment on the latter theory, but not the former.

19         The Court notes, however, that, if Plaintiffs were able to prove that the police officers

20  purposefully engaged in content-based discrimination in violation of Plaintiffs' First Amendment

21  rights, the officers would not be entitled to qualified immunity.  Government officials are not

22  entitled to qualified immunity for intentional constitutional violations, *see Anderson v. Creighton*,

23  483 U.S. 635, 638 (1987) (explaining that government officials are not entitled to qualified

24  immunity for intentional constitutional violations); *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir.

25

26         [12] The Court notes that Mr. Ellis has not raised any defense of qualified immunity.  Even if he
   had, it is unlikely that such a defense would prevail.  *See Fugate v. Philp*, No. C 06-0277 MMC (PR),
27  2008 U.S. Dist. LEXIS 63989, at *50 (N.D. Cal. Aug. 21, 2008) (noting that "[t]he defense of qualified
   immunity is not categorically available to private actors acting under color of state law" and stating that
28  "courts must look to both the history and to the purposes that underlie the immunity afforded
   government employees, in order to determine whether such immunity extends to private parties").

1    1999) (stating that "[a] successful § 1983 claimant must establish that the defendant acted

2    knowingly or intentionally to violate his or her constitutional rights such that mere negligence or

3    recklessness is insufficient"); *Austin Municipal Secs., Inc. v. National Ass'n of Secs. Dealers, Inc.*,

4    757 F.2d 676, 687 (5th Cir. 1985) (stating that qualified immunity "subject[s] an official to liability

5    only when he has intentionally violated a person's constitutional rights"), and it is clearly

6    established that, even in a nonpublic forum, a government official cannot engage in viewpoint

7    discrimination.  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 74 L. Ed.

8    2d 794, 103 S. Ct. 948 (1983) (stating that, for a nonpublic forum, "[i]n addition to time, place, and

9    manner regulations, the State may reserve the forum for its intended purposes, communicative or

10   otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression

11   merely because public officials oppose the speaker's view"); *Holloman v. Harland*, 370 F.3d 1252,

12   1282 (11th Cir. 2004) (stating that right to be free from viewpoint discrimination was clearly

13   established); *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003) (stating that

14   "government actors violate a clearly established right if they discriminate on the basis of the views

15   espoused by the speaker").  Because there are factual issues as to Plaintiffs' claim of viewpoint

16   discrimination, no summary judgement on the issues of qualified immunity is appropriate.

17                    **VIII.    EQUAL PROTECTION CLAIMS**

18              **(SIXTH AND THIRTEENTH CAUSES OF ACTION)**

19         As reflected in the FAC, *see* Part IV, *supra*, Plaintiffs claim that their equal protection rights

20   – as protected by both the federal and state constitutions – were violated.  More specifically, in the

21   sixth cause of action, Plaintiffs assert a § 1983 claim based on the alleged violation of their equal

22   protection rights as protected by the U.S. Constitution.  In their thirteenth cause of action, Plaintiffs

23   assert a claim pursuant to California Civil Code § 52.1.  Plaintiffs' § 52.1 claim includes an

24   allegation that their equal protection rights, as protected by both the federal and state constitutions,

25   were violated.  Although the Ninth Circuit has instructed that "federal constitutional issues should

26   be avoided if cases can be decided on state law grounds," *Carreras*, 768 F.2d at 1042, as a practical

27   matter, the analysis for the § 1983 claim and the § 52.1 claim based on the violation of the state

28   constitution does not materially differ – or at least, neither side has pointed to any material

United States District Court

For the Northern District of California

1  difference.  *See Kenneally v. Medical Bd.*, 27 Cal. App. 4th 489, 495 (1994) (noting that "[t]he

2  Fourteenth Amendment's guarantee of equal protection and the California Constitution's protection

3  of the same right are substantially equivalent and are analyzed in a similar fashion")

4  　　　To establish equal protection, Plaintiffs must prove that Defendants acted in a discriminatory

5  manner and that the discrimination was intentional.  *See Federal Deposit Ins. Corp. v. Henderson*,

6  940 F.2d 465, 471 (9th Cir. 1991).  Plaintiffs' position is that Defendants intentionally discriminated

7  against them based on their engagement in free speech activity and/or their political views on animal

8  rights.  *See Maher v. Roe*, 432 U.S. 464, 470 (1977) (in discussing equal protection claim, stating

9  that a court must examine "'whether [state legislation] operates to the disadvantage of some suspect

10  class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution,

11  thereby requiring strict judicial scrutiny'"); *Sanchez v. City of Modesto*, 145 Cal. App. 4th 660, 686

12  (2006) (noting that "strict scrutiny under the equal protection clause [is] triggered by a classification

13  used to burden a fundamental right").  However, there is a genuine dispute of material fact as to

14  whether Defendants intentionally discriminated against Plaintiffs in order to suppress their political

15  viewpoint.  Therefore, the motions for partial summary judgment should be **DENIED**.

## IX.   UNLAWFUL SEIZURE CLAIMS
### (THIRD AND THIRTEENTH CAUSES OF ACTION)

18  　　　As reflected in the FAC, *see* Part IV, *supra*, there are two claims for unlawful seizure alleged

19  in the complaint.  Both claims are predicated on Mr. Cuviello having been arrested on August 20,

20  2005, for criminal trespass.  The unlawful seizure claims are brought by Mr. Cuviello alone, and not

21  Ms. Bolbol, as only Mr. Cuviello was arrested.

22  　　　The unlawful seizure claims differ only with respect to their legal theory, not the facts.  In

23  the third cause of action, Mr. Cuviello asserts a § 1983 claim based on the alleged violation of his

24  Fourth Amendment rights as protected by the U.S. Constitution.  In the thirteenth cause of action,

25  Mr. Cuviello asserts a claim pursuant to California Civil Code § 52.1.  The § 52.1 claim includes an

26  allegation that his right to be free from unlawful seizure, as protected by both the federal and state

27  constitutions, was violated.  Because the Ninth Circuit has instructed that "federal constitutional

28  issues should be avoided if cases can be decided on state law grounds[,] . . . even when the

**United States District Court**
For the Northern District of California

1    alternative ground is one of state constitutional law," *Carreras*, 768 F.2d at 1042, the Court

2    addresses first the 52.1 claim based on the alleged violation of the California Constitution.

3    A.    Section 52.1 Claim – Right to Be Free from Unlawful Seizures Under California Constitution

4           1.    Probable Cause

5           Article I, § 13 of the California Constitution provides that "[t]he right of the people to be

6    secure in their persons, houses, papers, and effects against unreasonable seizures and searches may

7    not be violated; and a warrant may not issue except on probable cause, supported by oath or

8    affirmation, particularly describing the place to be searched and the persons and things to be seized."

9    Cal. Const. art. I, § 13.  In the instant case, Mr. Cuviello alleges that his rights under the California

10   Constitution were violated because he was arrested without probable cause.

11          The Ninth Circuit has noted that,

12                 [u]nder California law, an officer has probable cause for a
            warrantless arrest "if the facts known to him would lead a [person] of
13          ordinary care and prudence to believe and conscientiously entertain an
            honest and strong suspicion that the person is guilty of a crime."  This
14          is very similar to the Fourth Amendment test applied by this court,
            which provides that "[p]robable cause exists when, under the totality
15          of the circumstances known to the arresting officers, a prudent person
            would have concluded that there was a fair probability that [the
16          suspect] had committed a crime."

17   *Peng v. Mei Chin Penghu*, 335 F.3d 970, 976 (9th Cir. 2003); *see also Blankenhorn v. City of*

18   *Orange*, 485 F.3d 463, 471 (9th Cir. 2007) (noting that California and federal standards for probable

19   cause for arrest are "consistent"); *Wood v. Emmerson*, 155 Cal. App. 4th 1506, 1525 (2007) (noting

20   that, in California, an officer has probable cause for a warrantless arrest when "the facts known to

21   the arresting officer would persuade someone of reasonable caution that the person to be arrested has

22   committed a crime"; adding that "[t]he concept is a fluid one-turning on the assessment of

23   probabilities in a particular factual context").

24          In the instant case, Mr. Cuviello contends that there is no genuine dispute that there was no

25   probable cause for his arrest because (1) the officers blindly accepted Mr. Ellis's citizen's arrest,

26   without doing any independent investigation of their own, and (2) Mr. Cuviello's videotaping

27   activity was constitutionally protected such that he was exempt from trespass under the California

28   Penal Code.  The Court takes each of these arguments in turn.

United States District Court
For the Northern District of California

As to the first argument, Mr. Cuviello is correct that an officer may not blindly accept a citizen's arrest; rather, an officer must independently investigate the basis for a citizen's arrest.  *See Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 925 (9th Cir. 2001) (stating that to establish "probable cause, officers may not solely rely on the claim of a citizen witness that he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses"); *see also Kuba*, 2006 U.S. Dist. LEXIS 81095, at *16 (holding that "[a] police officer [] is not entitled to hide behind a citizen's arrest in place of making a determination of whether probable cause exists").  Nevertheless, there is a genuine dispute as to whether, in the instant case, the individual police officers simply accepted Mr. Ellis's citizen's arrest without question or based the arrest upon something more.  In declarations submitted to the Court, both officers testified that the decision to arrest Mr. Cuviello was based not only on Mr. Ellis's witness statement but also their own observations.  *See* Docket No. 149 (Supp. Villegas Decl. ¶ 4); Docket No. 149 (Supp. Valladon Decl. ¶ 4).  Specifically, the officers observed Mr. Cuviello refuse to leave the area several times upon being asked to do so by Arena security, including immediately prior to the arrest.  *See* Docket No. 117 (Villegas Decl. ¶¶ 8-9); Docket No. 118 (Valladon Decl. ¶¶ 8-9).

The Court agrees, however, with Mr. Cuviello's second argument – *i.e.*, that there was no probable cause to arrest him for trespass because he was engaged in constitutionally protected activity.  In reaching this conclusion, the Court begins by noting that the officers cited Mr. Cuviello for having violated California Penal Code § 602(l), now § 602(m).[13]  *See* Docket No. 163 (Cuviello Decl., Ex. A) (police report).  Section 602(m) provides that it is trespass for a person to "[e]nter[] and occupy[] real property or structures of any kind without the consent of the owner, the owner's agent, or the person in lawful possession."  Cal. Pen. Code § 602(m).  It does not contain a specific exemption for constitutionally protected activity, although it is difficult to imagine that any court would conclude that the statute permits criminalization of activity protected by the California or U.S. Constitution.

---

[13] Section 602(l) became § 602(m) in 2004.  Since the arrest was made in 2005, the officers presumably intended to cite Mr. Cuviello for the violation provided for in § 602(m) and made an inadvertent error by citing him under § 602(l).  Additionally, Mr. Cuviello was formally charged under § 602(m).  *See* Docket No. 163 (Cuviello Decl., Ex. A) (criminal complaint).

United States District Court

For the Northern District of California

1    The Court finds that the officers did not have probable cause to arrest Mr. Cuviello pursuant

2    to § 602(m) – not because the statute implicitly contains an exemption for constitutionally protected

3    activity but rather because the California Supreme Court has explained that a violation of the statute

4    "requires occupation of the property, a 'nontransient, continuous type of possession.'"  *In re*

5    *Catalano*, 29 Cal. 3d 1, 10 n.8 (1981); *see also People v. Wilkinson*, 248 Cal. App. 2d Supp. 906,

6    910-11 (1967) (stating that, given the legislative purpose in passing the statute, "it is rather obvious

7    that some degree of dispossession and permanency be intended"; concluding that "the transient

8    overnight use of four 3 x 7 foot areas in a very large ranch for sleeping bags and campfire purposes

9    was not the type of conduct which the Legislature intended to prevent when it used the word

10   'occupy'").  There is no evidence, in the instant case, that Mr. Cuviello tried to use any areas in the

11   Arena in a permanent or nontransient way.

12       That there was no probable cause to arrest for trespass pursuant to § 602(m), however, does

13   not end the inquiry because the probable cause inquiry is not restricted to the specific California

14   Penal Code subdivision for which Mr. Cuviello was cited.  *See Torres v. City of Los Angeles*, 548

15   F.3d 1197, 1207 (9th Cir. 2008) (noting that "probable cause supports an arrest so long as the

16   arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of

17   their stated reason for the arrest").  Of particular significance to the instant case is § 602(o) of the

18   California Penal Code.[14]

19       Under § 602(o), a person commits trespass for

20           [r]efusing or failing to leave land, real property, or structures
             belonging to or lawfully occupied by another and not open to the
21           general public, upon being requested to leave by (1) a peace officer at
             the request of the owner, the owner's agent, or the person in lawful
22           possession, and upon being informed by the peace officer that he or

23   _____

24       [14] Plaintiffs also contend that § 602.8 of the California Penal Code is relevant to the instant case
     but the statute does not seem to be applicable.  The statute provides: "Any person who without the
25   written permission of the landowner, the owner's agent, or the person in lawful possession of the land,
     willfully enters any lands under cultivation or enclosed by fence, belonging to, or occupied by, another,
26   or who willfully enters upon uncultivated or unenclosed lands where signs forbidding trespass are
     displayed at intervals not less than three to the mile along all exterior boundaries and at all roads and
27   trails entering the lands, is guilty of a public offense."  Cal. Pen. Code § 602.8.  There is no evidence
     in the instant case that the Arena property is used for cultivation or that there are signs forbidding
28   trespass displayed at the Arena.  *See, e.g.*, *Cuviello*, 2009 U.S. Dist. LEXIS 4896, at *41 n.15 (noting
     inapplicability of § 602.8 to another case involving Plaintiffs).

1  she is acting at the request of the owner, the owner's agent, or the
2  person in lawful possession, or (2) the owner, the owner's agent, or the
   person in lawful possession.

3  Cal. Pen. Code § 602(o).  Section 602(o), however, contains an express exemption for

4  constitutionally protected activity, stating in relevant part that "this subdivision shall not apply to

5  persons on the premises who are engaging in activities protected by the California or United States

6  Constitution."  *Id.*

7      In the instant case, both the individual police officers and Mr. Ellis asked Mr. Cuviello to

8  leave the north ramp and/or landing but Mr. Cuviello refused.  Thus, the only question in the instant

9  case is whether the officers had probable cause to believe that Mr. Cuviello was not engaging in

10 constitutionally protected activity – *i.e.*, would a reasonable person, based on the facts known to the

11 officers at the time of Mr. Cuviello's arrest, have concluded that there was a fair probability that Mr.

12 Cuviello's videotaping activity was not constitutionally protected and that therefore Mr. Cuviello

13 was committing a trespass by refusing to leave?

14      Although the evidence of record is not clear cut as to what facts were known to the

15 individual police officers at the time of the arrest, the video footage is sufficient to establish that

16 there was nothing to suggest to the officers that Mr. Cuviello's activity was incompatible with the

17 normal activity of the north ramp and landing during the circus.  The footage shows that the north

18 ramp and landing were not heavily congested areas.  Simply because Mr. Ellis told the police

19 officers that the north ramp and landing were restricted areas, *see* Docket No. 117 (Villegas Decl. ¶

20 3); Docket No. 118 (Valladon Decl. ¶ 3), does not establish a lack of compatibility.  In addition,

21 there is nothing in the record to indicate that the officers knew of any facts suggesting that the

22 presence of persons on the north ramp and landing would endanger animal or public safety.

23 Accordingly, a reasonable person, based on the facts known to the officers, would not have

24 concluded that Mr. Cuviello's videotaping activity was not constitutionally protected.  *Cf. People v.*

25 *Garcia*, 111 Cal. App. 4th 715, 723 (2003) (noting that "[a]n officer applying for a warrant must

26 exercise reasonable professional judgment and have a reasonable knowledge of what the law

27

28

61

United States District Court

For the Northern District of California

1  prohibits"). The Court therefore finds that the officers lacked probable cause to arrest Mr. Cuviello

2  because of the exemption for constitutionally protected activity in § 602(o).[15]

3      2.      Interference by Threats, Intimidation, or Coercion

4      The fact that the officers lacked probable cause to arrest Mr. Cuviello, however, does not end

5  the inquiry. As noted above, California Civil Code § 52.1 requires that the interference with Mr.

6  Cuviello's constitutionally protected rights be accomplished by means of threats, intimidation, or

7  coercion.

8      As above, Defendants have not made any argument that they did not interfere with Mr.

9  Cuviello's rights by means of threats, intimidation, or coercion. Even if they had, there is no

10  genuine dispute that an arrest satisfies this requirement. *See Cuviello*, 2009 U.S. Dist. LEXIS 4896,

11  at *56, *75 (noting that "the particular coercive power of law enforcement officers has led courts to

12  impose liability when detention . . . is threatened"; also concluding that there is coercion when there

13  is simply a threat of a citizen's arrest); *see also Cole*, 387 F. Supp. 2d at 1103 (stating that "[u]se of

14  law enforcement authority to effectuate a stop, detention (including use of handcuffs), and search

15  can constitute interference by 'threat[], intimidation, or coercion'").

16      The Court therefore turns to the issue of whether, as a matter of law, any of the defendant

17  individuals or entities may be found liable or not liable as a matter of law.

18      3.      Individual Police Officers

19      Although, for the reasons stated above, the officers lacked probable cause to arrest Mr.

20  Cuviello, they are immune from the § 52.1 claim pursuant to California Penal Code §§ 837 and

21  847(b). Section 847(b) provides:

22          There shall be no civil liability on the part of, and no cause of action
            shall arise against, any peace officer . . . , acting within the scope of

23

24  _____

25      [15] The Court notes that, although it concludes that there was a lack of probable cause to arrest
    Mr. Cuviello, it does not agree with Mr. Cuviello that the officers lacked probable cause simply because
26  he presented them with broad quotations from and citations to the California Constitution and cases. *See*
    Docket No. 163 (Cuviello Decl., Ex. B) (list of citations). *Cf. O'Toole v. Superior Court*, 140 Cal. App.
27  4th 488, 506 (2006) ("Directing the officers' attention to  a statutory provision stating they could not
    interfere with plaintiffs' First Amendment rights is not the same as providing the officers with legal
28  authority that the District's specific permit requirement was unconstitutional."). Those citations did not
    analyze the application of the legal principles to the case at hand, a more complicated task.

United States District Court

For the Northern District of California

his or her authority, for false arrest or false imprisonment arising out of any arrest under any of the following circumstances:

(1)     The arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful.

(2)     The arrest was made pursuant to a charge made, upon reasonable cause, of the commission of a felony by the person to be arrested.

(3)     *The arrest was made pursuant to the requirements of Section 142, 837, 838, or 839.*

Cal. Pen. Code § 847(b) (emphasis added).  Section 837 provides in relevant part that "[a] private person may arrest another . . . [f]or a public offense committed or attempted in his presence."  *Id.* 837(1).  In the instant case, it is clear that the officers arrested Mr. Cuviello based upon the citizen's arrest of Mr. Cuviello effected by Mr. Ellis.

Mr. Cuviello contends that §§ 847(b) and 837 cannot provide immunity in the instant case because, here, the individual police officers and Mr. Ellis did not have a police officer-citizen relationship but rather an employer-employee relationship (*i.e.*, because the Joint Venture/SMG hired the officers to provide additional security at the Arena).  This argument is not convincing because, even if the police officers were employees of the Joint Venture/SMG, they maintained the power to arrest Mr. Cuviello based solely on their authority as police officers without the request or direction of Mr. Ellis.  Thus, vis-a-vis the arrest, within the meaning of § 837, the police officers and Mr. Ellis did have a police officer-citizen relationship.[16]  The fact that Mr. Ellis exercised sufficient control such that his conduct constituted state action under § 52.1, does not alter the application of § 837.  At least, Plaintiffs have failed to present any authority so holding.

Mr. Cuviello argues still that the officers should be denied immunity because they failed to conduct any investigation as to whether the citizen's arrest was justified, *i.e.*, supported by probable cause.  The problem with this contention is that California cases clearly state that "[a] peace officer

---

[16] The Court notes that, per the California Supreme Court, security guards, such as Mr. Ellis, should be considered private citizens.  *See People v. Zelinski*, 24 Cal. 3d 357, 362 (1979) (noting that store detectives and security guards have no more power to enforce the law than other private persons).  Even though the Court has concluded that Mr. Ellis is a state actor for purposes of assessing liability, he still had no more authority to arrest Mr. Cuviello than any other private person.

**United States District Court**
For the Northern District of California

1   who accepts custody of a person following a citizen's arrest is not required to correctly determine

2   whether the arrest was justified and cannot be held liable for the arrest if it was improper."

3   *Hamburg v. Wal-Mart Stores, Inc.*, 116 Cal. App. 4th 497, 503-04 (2004).  Notably, an officer

4   cannot be held liable even if, as "it turns out, there were no grounds for the citizen's arrest."  *Meyers*

5   *v. Redwood City*, 400 F.3d 765, 772-73 (9th Cir. 2005); *see also Arpin v. Santa Clara Valley Transp.*

6   *Agency*, 261 F.3d 912, 925-26 (9th Cir. 2001) (holding that, where officers accepted delivery of

7   arrestee after a bus driver made a citizen's arrest, officers were not liable under California law on

8   claims of false arrest and unlawful imprisonment).

9          Accordingly, the Court concludes that, although the officers lacked probable cause to arrest

10  Mr. Cuviello, they are immune from suit pursuant to §§ 847(b) and 837.  Accordingly, the Court

11  recommends that, with respect to the § 52.1 unlawful seizure claim, Mr. Cuviello's motion for

12  partial summary judgment be **DENIED** and the officers' motion for partial summary judgment be

13  **GRANTED**.

14          4.   <u>City</u>

15          Because the officers are immune from the § 52.1 unlawful seizure claim, so too is the City.

16  *See* Cal. Gov't Code § 815.2(b) ("Except as otherwise provided by statute, a public entity is not

17  liable for an injury resulting from an act or omission of an employee of the public entity where the

18  employee is immune from liability."); *Arpin*, 261 F.3d at 920-21 (noting that, under California law, a

19  peace officer who accepts delivery of a person following a citizen's arrest is not liable for false

20  arrest or false imprisonment even if the officer determines that there is no grounds for making a

21  criminal complaint; adding that, as a result, county and sheriff's department were also immune

22  pursuant to § 815.2(b)).  The Court therefore recommends that, with respect to this claim, Plaintiffs'

23  motion for partial summary judgment be **DENIED** and the City's **GRANTED**.

24          5.   <u>County Defendants</u>

25          Mr. Cuviello seeks to hold the County Defendants liable for the state unlawful seizure claim

26  based on a theory of vicarious liability – *i.e.*, the County Defendants are vicariously liable for the

27  actions of the individual police officers and/or the actions of the SMG Defendants.  The Court finds

28  neither argument availing.

United States District Court

For the Northern District of California

1    With respect to the officers, for the reasons stated above, they have immunity from the state

2    unlawful seizure claim, and accordingly the County Defendants would be immune as well.  *See* Cal.

3    Gov't Code § 815.2(b).  As to vicarious liability based on the conduct of the SMG Defendants, as

4    noted in Part VII.A.5, *supra*, the Joint Venture is nothing more than an independent contractor hired

5    by the Authority, and there is no evidence of sufficient control by the Authority to impose vicarious

6    liability.

7    Accordingly, the Court recommends that, with respect to the § 52.1 unlawful seizure claim,

8    Plaintiffs' motion for partial summary judgment against the County Defendants be **DENIED** and the

9    County Defendants' motion for partial summary judgment be **GRANTED**.

10    6.    SMG Defendants

11    Whether the SMG Defendants may be held liable for violating Mr. Cuviello's right to be free

12    from unlawful seizures depends on whether they are state actors because the California Supreme

13    Court has held that article I, § 13 of the California Constitution protects only against state action.

14    *See Jones v. Kmart Corp.*, 17 Cal. 4th 329, 333 (1998) (noting that "'the right to be free from

15    unreasonable search and seizure provided in article I, section 13 of the California Constitution is

16    subject to a state action requirement"); *see also People v. Zelinski*, 24 Cal. 3d 357, 365 (1979)

17    (noting that, although article I, § 13 of the California Constitution "contains no language indicating

18    that the 'security' protected . . . is limited to security from governmental searches or seizures,

19    California cases have generally interpreted this provision as primarily intended as a protection of the

20    people against such governmentally initiated or governmentally directed intrusions").

21    a.    Mr. Ellis

22    Although, in their briefs, the parties discuss whether or not Mr. Ellis is a state actor based

23    largely on federal law standards, the Court finds that there is relevant state law authority that should

24    be considered, more specifically, *Zelinski*, 24 Cal. 3d at 357.

25    In *Zelinski*, the issue for the California Supreme Court was whether evidence obtained by

26    private security guards should be excluded in a criminal proceeding.  The security guards were

27    employees of a department store.  Two guards observed the defendant steal merchandise, for

28    example, by putting some items into her purse.  The guards stopped the defendant outside the store

and one placed her under arrest for theft.  The defendant was taken to the store's security office

where another security guard conducted a search for weapons.  After the search of the defendant's

person was completed, another guard opened the defendant's purse and removed one of the stolen

items along with a pill vial that was on top of the stolen item.  That guard examined the vial,

removed a balloon that was inside, examined the substance contained in the balloon, and then set the

vial and balloon aside to await the police who had been called.  Subsequently, the police took

custody of the vial and the defendant was charged with unlawful possession of heroin.  *See id.* at

360-61.

In the criminal prosecution that ensued, the government argued against exclusion on the

ground that the search and seizure were made by private persons.  *See id.* at 364.  The California

Supreme Court acknowledged that article I, § 13 of the California Constitution, which provides for

"[t]he right of the people to be secure in their persons, houses, papers and effects against

unreasonable searches and seizures," Cal. Const., art. I, § 13, has "generally [been] interpreted" as

containing a state action requirement.  *Zelinski*, 24 Cal. 3d at 365 (noting that the provision is

"primarily intended as a protection of the people against . . . governmentally initiated or

governmentally directed intrusions").  Accordingly, exclusion is typically a remedy when private

security personnel "were acting in concert with the police or when the police were standing silently

by."  *Id.* at 365-66.

The California Supreme Court found, however, that exclusion of the evidence was

appropriate because "here the store security forces did not act in a purely private capacity but rather

were fulfilling a public function in bringing violators of the law to public justice."  *Id.*

> In the instant case, the store employees arrested defendant
> pursuant to the authorization contained in [California] Penal Code
> section 837 [*i.e.*, the citizen's arrest statute], and the search which
> yielded the narcotics was conducted incident to that arrest.  Their acts,
> engaged in pursuant to the statue, were not those of a private citizen
> acting in a purely private capacity. . . . [The search] was . . . an integral
> part of the exercise of sovereignty allowed by the state to private
> citizens.  In arresting the offender, the store employees were utilizing
> the coercive power of the state to further a state interest.  Had the
> security guards sought only the vindication of a merchant's private
> interests they would have simply exercised self-help and demanded
> the return of the stolen merchandise.  Upon satisfaction of the
> merchant's interests, the offender would have been released.  By

1    holding defendant for criminal process and searching her, they went
2    beyond their employer's private interests.

3    *Id.* at 367.

4         In a footnote, the Court added:

5         [W]hen a merchant exercises his common law privilege (now
          embodied in California Pen[al] Code § 490.5), to detain a person
6         suspected of taking merchandise, the merchant is exercising a purely
          private and self-interested right to protect his property. His conduct
7         does not assume the color of law *until* he formally arrests the
          suspected thief, as any citizen is empowered to do (Pen[al] Code §
8         837), or, alternatively, continues the detention for delivery of the
          suspect to a peace officer who may arrest.

9

10   *Id.* at 368 n.10 (emphasis added).

11        While California law no longer requires exclusion of improperly obtained evidence, with

12   certain exceptions, *see In re Lance W.*, 37 Cal. 3d 873, 886-87 (1985) (explaining that "Proposition

13   8 . . . eliminate[s] a judicially created remedy for violations of the search and seizure provisions of

14   the federal or state Constitutions, through the exclusion of evidence so obtained, except to the extent

15   that exclusion remains federally compelled") (emphasis omitted), the central holding in *Zelinski* that

16   a citizen's arrest by a private party transforms that party into a state actor is still good law.

17   Accordingly, there is no genuine dispute that Mr. Ellis was a state actor when he initiated the

18   citizen's arrest of Mr. Cuviello.

19        This fact alone, however, does not establish Mr. Ellis's liability. In *Zelinski*, the protections

20   of article I, § 13 of the California Constitution were triggered because the private security guards

21   had exceeded the scope of their authority to search pursuant to California law. *See Zelinski*, 24 Cal.

22   3d at 363-64 (explaining that a citizen effecting an arrest is not authorized to conduct a search for

23   contraband incidental to the arrest and that a merchant who detains a suspected thief also lacks the

24   authority to search). Here, the Court must determine whether there is a genuine dispute of material

25   fact as to whether Mr. Ellis exceeded the scope of his authority to arrest pursuant to California Penal

26   Code § 837.

27        Mr. Ellis's citizen's arrest was predicated on an alleged trespass which is, with certain

28   exceptions not applicable here, deemed a misdemeanor by California Penal Code § 602. Under

1  California law, a law enforcement officer may arrest for a misdemeanor "when he has probable

2  cause to believe that the arrestee committed a misdemeanor in his presence, [but] a private person

3  may only arrest someone for a misdemeanor when the offense *actually* has been committed or

4  attempted in his presence.  Reasonable cause to believe that a misdemeanor has been committed is

5  not sufficient."  *Tekle v. United States*, 511 F.3d 839, 854 (9th Cir. 2006) (emphasis added); *see also*

6  *Cervantez v. J. C. Penney Co.*, 24 Cal. 3d 579, 590-91 n.4 (1979) (indicating that a private citizen

7  does not have the authority to arrest for a misdemeanor based on probable cause); *Hamburg v.*

8  *Wal-Mart Stores, Inc.*, 116 Cal. App. 4th 497, 512 (2004) (noting that "[a] private citizen . . . may

9  arrest another for a misdemeanor only when the offense has actually been committed or attempted in

10  his presence" and that "[t]he mere fact that the private person has reasonable cause to believe a

11  misdemeanor offense has been committed or attempted in his presence is not enough") (internal

12  quotation marks omitted).  In short, Mr. Ellis in effecting a citizen's arrest is held to a standard of

13  strict liability without the benefit of a probable cause standard.

14  For the reasons discussed in Part IX.A.1, *supra*, Plaintiffs did not violate § 602(o) because

15  their actions were protected by the free speech provision of the California Constitution.

16  Accordingly, Mr. Ellis did exceed the scope of his authority to arrest Mr. Cuviello pursuant to § 837,

17  and the arrest was therefore an unlawful seizure under article I, § 13 of the California Constitution.

18  Therefore, the Court recommends that, with respect to the § 52.1 unlawful seizure claim,

19  Plaintiffs' motion for partial summary judgment against Mr. Ellis be **GRANTED** and Mr. Ellis's

20  motion for partial summary judgment be **DENIED**.

21  b.  Joint Venture and SMG

22  For the reasons stated in Part VII.A.7, *supra*, the Joint Venture and SMG are state actors for

23  purposes of the constitutional claim.  Because Mr. Ellis's actions were taken within the scope of his

24  employment, the Joint Venture and SMG are also liable.  *See Myers*, 148 Cal. App. 4th at 1427

25  (stating that, under the doctrine of respondeat superior, an "employer is indirectly or vicariously

26  liable for torts committed by its employees within the scope of their employment"); *cf. Maria D. v.*

27  *Westec Residential Sec.*, 85 Cal. App. 4th 125 (2000) (employer could not be held vicariously liable

28  for acts of security guard because acts were not within scope of employment).  Accordingly, the

1 Court recommends that, with respect to the § 52.1 unlawful seizure claim, Plaintiffs' motion for

2 partial summary judgment against the Joint Venture and SMG be **GRANTED** and the Joint

3 Venture/SMG's motion for partial summary judgment be **DENIED**.

4          7.       Damages

5          For the reasons discussed above, the Court concludes that summary judgment in favor of Mr.

6 Cuviello and against each SMG Defendant is appropriate for the § 52.1 unlawful seizure claim, and

7 the Court now turns to the issue of damages.  As reflected in his motion for partial summary

8 judgment, Mr. Cuviello seek actual damages, punitive damages, and a civil penalty.

9          For the reasons discussed in Part VII.A.9, *supra*, whether § 52(b) damages are available, or

10 whether Mr. Cuviello is limited to only those damages provided for in § 52(a), depends on whether

11 there was an intentional violation of Mr. Cuviello's rights.  There is a genuine dispute of material

12 fact as to whether Mr. Ellis engaged in content or viewpoint discrimination and thus knew that there

13 was no probable cause for the arrest.  Accordingly, Plaintiffs' motion for partial summary judgment

14 on actual damages, punitive damages, and a civil penalty should be **DENIED**.

15 B.       Section 1983 Claim – Right to Be Free from Unlawful Seizures Under U.S. Constitution

16          In the instant case, Mr. Cuviello asserts that Defendants, under the color of state law violated

17 his right to be free from unlawful seizures in violation of the Fourth Amendment of the U.S.

18 Constitution.  That amendment provides in relevant part that "[t]he right of the people to be secure

19 in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

20 violated."  U.S. Const., amend. IV.

21          1.       Avoidance

22          As noted above, "federal constitutional issues should be avoided if cases can be decided on

23 state law grounds[,] . . . even when the alternative ground is one of state constitutional law."

24 *Carreras*, 768 F.2d at 1042.  Given this standard, arguably, the Court should not entertain the § 1983

25 claim based on the alleged violation of Mr. Cuviello's Fourth Amendment rights.  However, because

26 there appear to be some differences in terms of the remedies available for a violation of federal law

27 and a violation of state law, and because this Court is preparing only a report and recommendation,

28 the Court shall address the § 1983 claim on its merits.

United States District Court

For the Northern District of California

2.      Probable Cause

The probable cause analysis in Part IX.A.1, *supra*, is applicable here.  *See Peng*, 335 F.3d at 976 (noting that California probable cause standard is "very similar to the Fourth Amendment test"); *Blankenhorn*, 485 F.3d at 471 (9th Cir. 2007) (noting that California and federal standards for probable cause for arrest are "consistent").  Accordingly, the Court concludes that, under the Fourth Amendment, the officers lacked probable cause to arrest Mr. Cuviello on August 20, 2005.

3.      Individual Police Officers

Although the officers lacked probable cause to arrest Mr. Cuviello, to the extent Plaintiffs' claim is not based on viewpoint discrimination, the Court concludes that the arresting officers have qualified immunity from liability.  As noted in Part VII.B.4, *supra*, qualified immunity protects officials from § 1983 claims unless the alleged conduct (1) violated a constitutional right (2) that was "clearly established."  *Saucier*, 533 U.S. at 201-02.  For a right to be clearly established "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson*, 483 U.S. at 640.  The "relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.

As discussed in Part VII.B.4, *supra*, the officers are protected by qualified immunity because the issue of whether Plaintiffs' speech was protected is infused with fact-specific inquiries such that the contours of the Plaintiffs' speech rights were not sufficiently clear.  As to clearly established law, a reasonable officer could have mistakenly concluded that these areas were not public fora in that the situation in *Kuba* was different from the situation here.  *Kuba* involved restrictions on a sidewalk and parking lots, areas where the public is traditionally free to come and go.  In contrast, here, restrictions were placed on access ramps and landings that constitute part of the architecture of the Arena itself and not part of the public streets.  Also, although there is nothing in the record before the Court to indicate that the presence of persons on the north ramp and landing would in fact endanger animal or public safety, a reasonable officer could have mistakenly believed that restricting access to the north ramp and landing was necessary to protect animal safety, as well as the safety of the public.  *See Cuviello*, 2009 U.S. Dist. LEXIS 4896, at *27 (holding such a

70

United States District Court

For the Northern District of California

1   restriction reasonable where evidence showed that pedestrians' close proximity to circus animals

2   during their walk through public streets might spook the animals or injure participants).

3       Where Mr. Cuviello contends he was arrested for failing to comply with restrictions imposed

4   because of his political viewpoint and that the arresting officers were aware of this fact, it would be

5   clear to a reasonable officer that there was no legitimate probable cause and thus the officers would

6   not enjoy qualified immunity.  As stated above, however, there are factual disputes which prevent

7   summary judgment on this claim.

8       The Court therefore recommends that, with respect to the § 1983 unlawful seizure claim,

9   Plaintiffs' motion for partial summary judgment be **DENIED** and the officers' motion for partial

10  summary judgment be **GRANTED** in part and **DENIED** in part

11      4.    City

12      In his papers, Mr. Cuviello argues that, regardless of the officers' liability, the City at the

13  very least should be held liable for his alleged unlawful arrest because (1) it failed to train its

14  officers properly and (2) it had a policy of accepting a citizen's arrest without probable cause.  The

15  failure-to-train theory fails for the reasons discussed in Part VII.B.5, *supra*.

16      As to Mr. Cuviello's second theory, there is no evidence that the City had a formal policy

17  about citizen's arrests.

18              Absent a formal governmental policy, [Mr. Cuviello] must
19          show a "longstanding practice or custom which constitutes the
            standard operating procedure of the local government entity."[17]  The
            custom must be so "persistent and widespread" that it constitutes a
20          "permanent and well settled city policy."  Liability for improper
            custom may not be predicated on isolated or sporadic incidents; it
21          must be founded upon practices of sufficient duration, frequency and
            consistency that the conduct has become a traditional method of
22          carrying out policy.

23  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see also Mi Pueblo San Jose, Inc. v. City of*

24  *Oakland*, No. C-06-4094 VRW, 2006 U.S. Dist. LEXIS 75109, at *12 (N.D. Cal. Oct. 4, 2006)

25  (stating that "[w]hether a practice is sufficiently persistent to constitute custom depends on such

26

27      [17] Mr. Cuviello does not argue that there was a City policy because his arrest was effected by a
28  person with final policymaking authority or because his arrest was ratified by a person with such
    authority.

United States District Court

For the Northern District of California

1  factors as how longstanding the practice is, the number and percentage of officials engaged in the

2  practice, and the gravity of the conduct").

3          For reasons similar to those stated above, *see* Part VII.B.5, *supra*, the Court concludes that,

4  as a matter of law, Mr. Cuviello has failed to meet this standard.  Mr. Cuviello claims that there was

5  a policy of accepting a citizen's arrest without probable cause based on the same six incidents that

6  supported his failure-to-train theory.  As noted above, all of these incidents but one took place

7  during the circus engagement in August 2003; the last took place in August 2005.  Even if, in each

8  of these instances, it was clear that a police officer had accepted a citizen's arrest without any

9  attempt to conduct a probable cause analysis, given the limited number of incidents and the timing

10  of these incidents, no reasonable jury would conclude that there was a persistent and widespread

11  custom of which the City final policymakers must have been aware.  *See Bordanaro v. McLeod*, 871

12  F.2d 1151, 1156 (1st Cir. 1989) (noting that, for a practice of subordinates to be attributable to a

13  municipality, "it must have been so well settled and widespread that the policymaking officials . . .

14  can be said to have actual or constructive knowledge of it yet did nothing to end the practice");

15  *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984) (stating that "[s]ufficient duration or

16  frequency of abusive practices, or other evidence, must warrant a finding of knowledge on the part

17  of the governing body that the objectionable conduct has become customary practice of city

18  employees").  *See, e.g.*, *Thelma D. v. Board of Educ.*, 934 F.2d 929, 933 (8th Cir. 1991) (concluding

19  that "five complaints [of unconstitutional conduct by teacher] scattered over sixteen years cannot, as

20  a matter of law, be said to comprise a persistent and widespread pattern of unconstitutional

21  misconduct"); *Meehan v. County of Los Angeles*, 856 F.2d 102, 107 (9th Cir. 1988) (concluding that

22  two incidents involving alleged unconstitutional harassment did not support the existence of a

23  custom sufficient to establish municipal liability); *Hamilton v. Rodgers*, 791 F.2d 439, 443 (5th Cir.

24  1986) (holding that a dozen racial incidents over a two-and-a-half-year period did not constitute a

25  pattern "that would warrant the imputation of constructive knowledge to high ranking officers of the

26  Fire Department"; noting that, "[w]hile evidence suggests that these officers heard of occasional

27  incidents, there was no showing that they knew, or had reason to know, of a persistent, nagging

28  problem of racism").

**United States District Court**
For the Northern District of California

1    Accordingly, the Court recommends that, with respect to the § 1983 unlawful seizure claim,

2    Plaintiffs' motion for partial summary judgment against the City be **DENIED** and the City's motion

3    for partial summary judgment be **GRANTED**.

4         5.    County Defendants

5    With respect to the County Defendants, Mr. Cuviello's theory seems to be that they should

6    be held liable for the alleged unlawful seizure based on a failure to train.  *See* Docket No. 102 (Mot.

7    at 34) (asserting municipal liability on part of County Defendants based on failure to train).  The

8    problem with this theory is that there is no evidence that either the County or the Authority had the

9    authority to train police officers.  Indeed, Plaintiffs' position is that the officers are employees of the

10   City and/or the Joint Venture, not the County Defendants.

11   Accordingly, the Court recommends that, with respect to the § 1983 unlawful seizure claim,

12   Plaintiffs' motion for partial summary judgment against the County Defendants be **DENIED** and the

13   County Defendants' motion for partial summary judgment be **GRANTED**.

14        6.    SMG Defendants

15             a.    Mr. Ellis

16   Mr. Cuviello contends that Mr. Ellis's citizen's arrest constituted state action, thereby

17   making him liable for the § 1983 unlawful seizure claim.  Resolution of this issue is governed by

18   *Collins*, 878 F.2d at 1145.  As acknowledged in *Collins*, the state action requirement may be

19   satisfied under a joint action theory.  *See id.* at 1154 (noting that a joint action theory "does not rest

20   solely on the private actions of private parties").  For the reasons discussed in Part VII.A.7, *supra*,

21   the evidence of record establishes joint action between Mr. Ellis and the individual police officers.

22   Accordingly, with respect to the § 1983 unlawful seizure claim, the Court recommends that

23   Plaintiffs' motion for partial summary judgment against Mr. Ellis be **GRANTED** and Mr. Ellis's

24   motion be **DENIED**.  As noted above, *see* note 9, *supra*, Mr. Ellis did not assert a defense of

25   qualified immunity.

26             b.    Joint Venture and SMG

27   As discussed above, in order for the Joint Venture/SMG to be liable under § 1983, it must

28   have had a policy or practice that caused the deprivation of Mr. Cuviello's rights.  *See* 1 Schwartz,

1   Section 1983 Litigation § 6.04[E], at 6-37 to 6-39.  For the reasons stated above, there is a genuine

2   dispute of material fact as to whether the Joint Venture/SMG delegated to Mr. Ellis final

3   policymaking authority sufficient to establish *Monell* liability, *see* Part VII.B.7, *supra*, and therefore

4   both Plaintiffs and the Joint Venture/SMG's motions for partial summary judgment should be

5   **DENIED**.  Furthermore, while proof that the Joint Venture/SMG engaged in a deliberate effort to

6   suppress Plaintiffs' speech because of their political viewpoint could also establish its liability, there

7   are disputed issues of fact that preclude summary judgment based on that claim.

8           7.      Damages

9           At this juncture, only Mr. Ellis is liable for a violation of § 1983.  For the reasons stated in

10  Part VII.A.9.a, *supra*, the issue of the precise amount of actual damages must be left to the trier of

11  fact (*i.e.*, the jury) to decide.  The trier of fact should also decide whether punitive damages should

12  be awarded (*e.g.*, if Mr. Ellis engaged in viewpoint discrimination) and, if so, in what amount.

13  Accordingly, Plaintiffs' motion for partial summary judgment on damages should be **DENIED**.

14          **X.      MALICIOUS PROSECUTION CLAIM**

15                  **(TWELFTH CAUSE OF ACTION)**

16          As reflected in the FAC, *see* Part IV, *supra*, Mr. Cuviello asserts a § 1983 malicious

17  prosecution claim against the individual police officers and Mr. Ellis.  Mr. Cuviello alleges that

18  these "Defendants, under color of law, acting in concert and with malice, did without reasonable

19  cause unlawfully arrest Plaintiff Cuviello, depriving him of liberty."  FAC ¶ 126.  The record

20  reflects that a criminal complaint was filed against Mr. Cuviello based on the alleged trespass.  *See*

21  Docket No. 163 (Cuviello Decl., Ex. A) (criminal complaint).

22          A § 1983 claim may be brought based upon a malicious prosecution theory.  Indeed, the

23  malicious prosecution theory may be based on the claim that the defendant deprived the plaintiff of

24  rights protected by the Fourth Amendment.  *See Awabdy v. City of Adelanto*, 368 F.3d 1062, 1069

25  (9th Cir. 2004) (noting that "a § 1983 malicious prosecution plaintiff must prove that the defendants

26  acted for the purpose of depriving him of a 'specific constitutional right,'" including rights protected

27  by the Fourth Amendment).

28

United States District Court

For the Northern District of California

1    In order for Mr. Cuviello to prevail on his § 1983 claim, however, he must show not only

2    that he was prosecuted without probable cause but also with malice.  *See id.* at 1066 ("In order to

3    prevail on a § 1983 claim of malicious prosecution, a plaintiff 'must show that the defendants

4    prosecuted [him] with malice and without probable cause, and that they did so for the purpose of

5    denying [him] equal protection or another specific constitutional right.'  Malicious prosecution

6    actions are not limited to suits against prosecutors but may be brought, as here, against other persons

7    who have wrongfully caused the charges to be filed."); *see also Johnson v. Knorr*, 477 F.3d 75, 81-

8    82 (3d Cir. 2007) (stating that, "[t]o prove malicious prosecution under section 1983 when the claim

9    is under the Fourth Amendment, a plaintiff must show that: (1) the defendant initiated a criminal

10   proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding

11   without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the

12   plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of

13   seizure as a consequence of a legal proceeding").  With respect to the individual officers as well as

14   Mr. Ellis, there is a genuine dispute as to the issue of malice because there is evidence from which a

15   reasonable jury could infer discrimination against Plaintiffs on the basis of the content of their

16   speech.  *See* Part VII.A.10, *supra*; Part VII.B.8, *supra*.  Accordingly, the Court recommends that the

17   individual officers' and Mr. Ellis's motions for partial summary judgment on the § 1983 malicious

18   prosecution claim be **DENIED.**  Mr. Cuviello did not move for summary judgment on this claim.

19              **XI.    EXCESSIVE BAIL CLAIM**

20                  **(EIGHTH CAUSE OF ACTION)**

21   As reflected in the FAC, *see* Part IV, *supra*, Mr. Cuviello asserts a § 1983 excessive bail

22   claim against the County.  He alleges in the complaint:

23              Defendant Alameda County, who had no reason to believe that
             Plaintiff Cuviello would not show up for his criminal hearing [after
24           being arrested in August 2005], as he was arrested for a non-violent
             misdemeanor trespass charge and had no warrants or previous criminal
25           record, did charge him $2500 bail to get out of jail.

26   FAC ¶ 111.

27   In its motion for partial summary judgment, the County argues that it should be granted

28   summary judgment on this claim because it cannot be held vicariously liable under § 1983 – *i.e.*, a

United States District Court

For the Northern District of California

1  municipality such as the County may be held liable under § 1983 for a constitutional violation by its

2  employees or officials only if the violation results from the municipality's official policies or

3  customs.  *See Monell v. Department of Soc. Servs*., 436 U.S. 658, 694 (1978) ("[I]t is when

4  execution of a government's policy or custom, whether made by its lawmakers or by those whose

5  edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as

6  an entity is responsible under § 1983.").[18]

7      "A single constitutional deprivation ordinarily is insufficient to establish a longstanding

8  practice or custom."  *Christie*, 176 F.3d at 1235.  An isolated constitutional violation is an official

9  policy for which a municipality can be held liable only when: (1) the person causing the violation

10  has "final policymaking authority," *see id.* at 1235-36; (2) the person causing the violation is a

11  subordinate but his or her action is "ratified" by one with final policymaking authority, *see id.* at

12  1238; or (3) the person causing the violation is a subordinate but one with final policymaking

13  authority is "deliberately indifferent" to the subordinate's action.  *See id.* at 1240.  Mr. Cuviello has

14  not offered any evidence that the bail here was set as a result of official policy.  Indeed, presumably

15  it was set by the superior court.  Mr. Cuviello has made no showing establishing County liability.

16      Accordingly, the Court recommends that the County's motion for partial summary judgment

17  be **GRANTED**.  Mr. Cuviello did not move for summary judgment on this claim.

18                     **XII.   ASSAULT AND BATTERY**

19                     **(TENTH CAUSE OF ACTION)**

20      As reflected in the FAC, *see* Part IV, *supra*, Ms. Bolbol asserts a claim for assault and

21  battery – based on the events in August 2006 – against the City, the County, the Authority, the Joint

22  Venture, and SMG.  Ms. Bolbol's theory of liability seems to be that, (1) because the Joint Venture

23  hired the company who employed the security guard who allegedly assaulted her, the Joint Venture

24  and SMG are liable and (2) the City, County, and Authority are liable as employers of the Joint

25  Venture.

26

27  _____

28      [18] The County does not raise the Eleventh Amendment in moving for summary judgment.

United States District Court

For the Northern District of California

1    As noted above, an employer is generally not vicariously liable for the acts of its independent

2  contractor.  Here, there is a genuine dispute of material fact as to whether the security company

3  hired by the Joint Venture was subject to its control.  The video footage provided by Plaintiffs

4  suggests that Mr. Ellis was in charge of the security guards and therefore had control over their

5  enforcing crowd control.  While there is no specific evidence of the Joint Venture's control in

6  respect to the alleged assault, the overall control exercised by the Joint Venture raises a reasonable

7  inference that there may have been sufficient control to impose vicarious liability in this instance.

8  Therefore, the Court recommends that the Joint Venture's motion for partial summary judgment be

9  **DENIED**.  Ms. Bolbol did not move for summary judgment on this claim.

10    For the reasons stated in Part VII.A.8, *supra*, however, the Court recommends that the City

11  and County Defendants' motion for partial summary judgment be **GRANTED**.  There is no

12  evidence that the Authority exercised any control over the Joint Venture as to the means of

13  enforcing security, particularly as to the act alleged here.  Therefore the Authority – as well as the

14  City and County who created the Authority – cannot be vicariously liable.  Ms. Bolbol did not move

15  for summary judgment on this claim.

16                    **XIII.    SECTION 51.7 CLAIM**

17                    **(ELEVENTH CAUSE OF ACTION)**

18    As reflected in the FAC, *see* Part IV, *supra*, Ms. Bolbol asserts a claim pursuant to California

19  Civil Code § 51.7 – also based on the events in August 2006 – against the City, the County, the Joint

20  Venture, and SMG.  Section 51.7 provides in relevant part as follows:

21         All persons within the jurisdiction of this state have the right to be free
           from any violence, or intimidation by threat of violence, committed
22         against their persons or property because of *political affiliation*, *or on
           account of any characteristic listed or defined in subdivision (b) or (e)
23         of Section 51, or position in a labor dispute, or because another
           person perceives them to have one or more of those characteristics*.[19]
24         The identification in this subdivision of particular bases of
           discrimination is illustrative rather than restrictive.

25

26

27 ───────────────

28    [19] Section 51 refers to "sex, race, color, religion, ancestry, national origin, disability, medical
    condition, marital status, or sexual orientation."  Cal. Civ. Code § 51(b).

United States District Court

For the Northern District of California

1   Cal. Civ. Code § 51.7(a) (emphasis added).  According to Ms. Bolbol, she was discriminated against

2   on the basis of her political affiliation as an animal rights activist.

3        The Court finds that there is a genuine dispute of material fact as to whether the security

4   guard's actions were motivated by Ms. Bolbol's political affiliation or simply by her failure to

5   cooperate.  While this would ordinarily counsel against summary judgment in favor of any of the

6   defendants sued on this claim, there is – as above – a vicarious liability problem.  That is, Ms.

7   Bolbol's theory of liability seems to be, once again, that, (1) because the Joint Venture hired the

8   company who employed the security guard who allegedly assaulted her, the Joint Venture and SMG

9   are liable and (2) the City, County, and Authority are liable as employers of the Joint Venture.

10       For the reasons stated above in discussing vicarious liability via agency principles, there is

11  no evidence that the Authority exercised control over the Joint Venture as to the means of enforcing

12  security generally or in this instance.  *See* Part VII.A.8, *supra*.  Accordingly, the Court recommends

13  that the City's motion for partial summary judgment on the § 51.7 claim be **GRANTED**.  Although

14  the County did not move for partial summary judgment on this claim, the Court recommends that the

15  claim be dismissed against the County for the same reasons.  The Joint Venture/SMG did not move

16  for summary judgment on this claim.

## XIV.   RECOMMENDATION

18       For the foregoing reasons, the Court recommends as follows:

19  (1)   **Section 1983 claims based on violations of state law (*i.e.*, second, fourth, fifth, seventh,**

20        **and ninth causes of action).**

21        (a)   **Second cause of action.**  Plaintiffs' motion for partial summary judgment should be

22              denied; Defendants' motions for partial summary judgment should be granted.

23        (b)   **Fourth cause of action.**  Plaintiffs' motion for partial summary judgment should be

24              denied; Defendants' motions for partial summary judgment should be granted.

25        (c)   **Fifth cause of action.**  Plaintiffs' motion for partial summary judgment should be

26              denied; Defendants' motions for partial summary judgment should be granted.

27        (d)   **Seventh cause of action.**  Plaintiffs' motion for partial summary judgment should be

28              denied; Defendants' motions for partial summary judgment should be granted.

United States District Court

For the Northern District of California

(e)     **Ninth cause of action.**  Plaintiffs did not move for partial summary judgment. Defendants' motions for summary judgment should be granted.

(2)     **Section 52.1 free speech claim.**

(a)     **Claim based on assertion that speech restrictions were content-neutral.**

(i)     **Individual police officers.**  Plaintiffs' motion for partial summary judgment should be granted; the police officers' motion for partial summary judgment should be denied.

(ii)    **City.**  Plaintiffs' motion for partial summary judgment should be granted; the City's motion for partial summary judgment should be denied.

(iii)   **Mr. Ellis.**  Plaintiffs' motion for partial summary judgment should be granted; Mr. Ellis's motion for partial summary judgment should be denied.

(iv)    **Joint Venture/SMG.**  Plaintiffs' motion for partial summary judgment should be granted; the Joint Venture/SMG's motion for partial summary judgment should be denied.

(v)     **County Defendants.**  Plaintiffs' motion for partial summary judgment should be denied; the County Defendants' motion for partial summary judgment should be granted.

(vi)    **Damages.**  Plaintiffs' motion for partial summary judgment should be denied. Plaintiffs are limited to the remedies specified in § 52(a).  Under § 52(a), a civil penalty is not available nor are punitive damages (beyond the treble actual damages award (or no less than $4,000) specified in the statute). Actual damages are available but should be decided by the trier of fact.

(b)     **Claim based on assertion that speech restrictions were content-based.**

(i)     **All Defendants except County Defendants.**  Plaintiffs' motion for partial summary judgment should be denied, as should the City Defendants' and the SMG Defendants' motions for partial summary judgment.  Assuming liability, § 52(b) damages, including a civil penalty, would be available.

          (ii)    **County Defendants.**  Plaintiffs' motion for partial summary judgment should be denied; the County Defendants' motion for partial summary judgment should be granted.

(3)    **Section 1983 free speech claim.**

    (a)    **Claim based on assertion that speech restrictions were content-neutral.**

          (i)    **Individual police officers.**  Plaintiffs' motion for partial summary judgment should be denied; the police officers' motion for partial summary judgment should be granted.

          (ii)    **City.**  Plaintiffs' motion for partial summary judgment should be denied; the City's motion for partial summary judgment should be granted in part (with respect to the failure-to-train theory only) and denied in part (with respect to the delegation theory).

          (iii)    **County Defendants.**  Both Plaintiffs' motion for partial summary judgment and the County Defendants' motion for partial summary judgment should be denied.

          (iv)    **SMG Defendants.**  Both Plaintiffs' motion for partial summary judgment and the SMG Defendants' motion for partial summary judgment should be denied.

    (b)    **Claim based on assertion that speech restrictions were content-based.**

          (i)    **All Defendants.**  Plaintiffs' and all Defendants' motions for partial summary judgment should be denied, with one exception.  To the extent Plaintiffs seek to hold the City liable on a failure-to-train theory, the City's motion for partial summary judgment should be granted.  The City may still be held liable under a delegation theory.

(4)    **Section 52.1 equal protection claim.**

    (a)    Both Plaintiffs' and Defendants' motions for partial summary judgment should be denied.  If liability were established, § 52(b) damages, including a civil penalty, would be available.

(5)    **Section 1983 equal protection claim.**

(a)     Both Plaintiffs' and Defendants' motions for partial summary judgment should be denied.

(6)  **Section 52.1 unlawful seizure claim.**

(a)     **Individual officers.**  Plaintiffs' motion for partial summary judgment should be denied; the police officers' motion for partial summary judgment should be granted.

(b)     **City.**  Plaintiffs' motion for partial summary judgment should be denied; the City's motion for partial summary judgment should be granted.

(c)     **County Defendants.**  Plaintiffs' motion for partial summary judgment should be denied; the County Defendants' motion for partial summary judgment should be granted.

(d)     **Mr. Ellis.**  Plaintiffs' motion for partial summary judgment should be granted; Mr. Ellis's motion for partial summary judgment should be denied.

(e)     **Joint Venture/SMG.**  Plaintiffs' motion for partial summary judgment should be granted; the Joint Venture/SMG's motion for partial summary judgment should be denied.

(f)     **Damages.**  Plaintiffs' motion for partial summary judgment should be denied. Whether § 52(b) damages are available, or whether Mr. Cuviello is limited to only those damages provided for in § 52(a), depends on whether there was an intentional violation of Mr. Cuviello's rights.

(7)  **Section 1983 unlawful seizure claim.**

(a)     **Individual officers.**  Plaintiffs' motion for partial summary judgment should be denied; the police officers' motion for partial summary judgment should be granted in part and denied in part.  The officers' motion should be denied to the extent Mr. Cuviello claims that he was subject to viewpoint discrimination and the arresting officers were aware of this fact.

(b)     **City.**  Plaintiffs' motion for partial summary judgment should be denied; the City's motion for partial summary judgment should be granted.

**United States District Court**
For the Northern District of California

1    (c)  **County Defendants.**  Plaintiffs' motion for partial summary judgment should be

2         denied; the County Defendants' motion for partial summary judgment should be

3         granted.

4    (d)  **Mr. Ellis.**  Plaintiffs' motion for partial summary judgment should be granted; Mr.

5         Ellis's motion for partial summary judgment should be denied.

6    (e)  **Joint Venture/SMG.**  Both Plaintiffs' and the Joint Venture/SMG's motion for

7         partial summary judgment should be denied.

8    (f)  **Damages.**  Actual and punitive damages should be determined by the trier of fact,

9         and accordingly Plaintiffs' motion for partial summary judgment on damages should

10        be denied.  Mr. Ellis (the only defendant who is liable at this juncture) did not move

11        for summary judgment regarding damages other than to contest liability.

12  (8)  **Section 1983 malicious prosecution claim.**

13    (a)  **Individual police officers.**  Plaintiffs did not move for partial summary judgment.

14         The police officers' motion for partial summary judgment should be denied.

15    (b)  **Mr. Ellis.**  Plaintiffs did not move for partial summary judgment.  Mr. Ellis's motion

16         for partial summary judgment should be granted.

17  (9)  **Section 1983 excessive bail claim.**

18    (a)  **County.**  Plaintiffs did not move for partial summary judgment.  The County's

19         motion for partial summary judgment should be granted.

20  (10)  **Claim for assault and battery.**

21    (a)  **City.**  Plaintiffs did not move for partial summary judgment.  The City's motion for

22         partial summary judgment should be granted.

23    (b)  **County Defendants.**  Plaintiffs did not move for partial summary judgment.  The

24         County Defendants' motion for partial summary judgment should be granted.

25    (c)  **Joint Venture/SMG.**  Plaintiffs did not move for partial summary judgment.  The

26         Joint Venture/SMG's motion for partial summary judgment should be denied.

27  (11)  **Section 51.7 claim.**

28

**United States District Court**
For the Northern District of California

1    (a)    **City.**  Plaintiffs did not move for partial summary judgment.  The City's motion for

2           partial summary judgment should be granted.

3    (b)    **County.**  Neither Plaintiffs nor the County moved for partial summary judgment.

4           Nevertheless, the claim against the County should be dismissed for the same reasons

5           that the claim against the City should be dismissed.

6    (c)    **Joint Venture/SMG.**  Neither Plaintiffs nor the Joint Venture/SMG moved for

7           partial summary judgment.  Accordingly, no recommendation is made.

8           Any party may file objections to this report and recommendation with the district judge

9    within ten days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);

10   Civil L.R. 72-3.

11

12   Dated:  July 20, 2009

13                                                    _____

14                                                    EDWARD M. CHEN
                                                      United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28