United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH CUVIELLO AND DENIZ BOLBOL,<br><br>    Plaintiffs,<br><br>  v.<br><br>CITY OF OAKLAND, ALAMEDA COUNTY, OAKLAND-ALAMEDA COUNTY COLISEUM AUTHORITY, OAKLAND COLISEUM JOINT VENTURE, L.L.C., SMG, OAKLAND POLICE OFFICER R. VALLADON, OAKLAND POLICE OFFICER R. VILLEGAS, OAKLAND COLISEUM ASSISTANT SECURITY MANAGER "SKEET" ELLIS, AND DOES 1-100,<br><br>    Defendants.<br>_____/ | No. C 06-5517 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re: Feld Entertainment's Motion to Intervene; Plaintiffs' Motion to Modify the Preliminary Injunction; Plaintiffs' Motion for Summary Judgment** |

Plaintiffs filed suit against various defendants alleging violations of their civil rights. Before the court are Feld Entertainment's motion to intervene, plaintiffs' motion to modify the preliminary injunction, and plaintiffs' motion for summary judgment regarding California Civil Code section 52.1. The court finds these motions suitable for decision without oral argument. Civil L.R. 7-1(b). Having considered the parties' submissions, the court enters the following memorandum and order.

BACKGROUND

Unless otherwise noted, all background facts throughout this order are taken from the joint statement of undisputed facts. *See* Docket No. 285 (JSUF). Plaintiffs Joseph Cuviello and Deniz Bolbol are members of Citizens for Cruelty-Free Entertainment, a group dedicated to the humane

treatment of animals. Plaintiffs appear at events organized by the Ringling Brothers and Barnum & Bailey Circus to videotape and protest animal abuses by these entities.

Defendant Alameda County (the "County") is a governmental entity which owns the Oracle Arena (the "Arena") in conjunction with defendant City of Oakland (the "City"). In 1995, the County and the City formed the Oakland-Alameda County Coliseum Authority (the "Authority") to oversee the Arena. Defendants Villegas and Valladon are police officers employed by the Oakland Police Department. Defendants Oakland Coliseum Joint Venture and SMG are private entities which have contracted with the Authority to provide facilities management at the Arena, including event organization, booking, promotion, advertising, security and concession services.

DISCUSSION

I.   Motion to intervene

Feld Entertainment Inc. ("Feld"), which owns the Ringling Brothers Circus, has filed a motion to intervene. The motion is unopposed.

Rule 24 of the Federal Rules of Civil Procedure governs intervention in an action by a non-party. It states that "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impeded the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2).

All three factors are met with respect to Feld. Its motion is timely. It has an interest in the action which may be impaired without allowing intervention: since the Ringling Brothers Circus performs annually at the Arena, Feld would be bound by the terms of an injunction implicating Arena facilities. Feld's interests are not adequately represented by existing defendants who, as governmental actors, have different interests. The governmental-actor defendants appear mainly concerned with crowd control and public safety, whereas Feld may be more interested in the operation of its circus. Feld's motion is therefore granted.

II.     Preliminary injunction

    A.     Background

    Three different preliminary injunctions have issued in this action—one each in 2007, 2008 and 2009. The preliminary injunction currently in force, adopted by this court on August 10, 2009, *see* Docket No. 240 (August 2009 Order), provides that up to four persons including plaintiffs and persons acting in concert with them be permitted to access certain enumerated areas of the Arena without an admission ticket. The injunction allows access to, *inter alia*, "[t]he barricaded corridor leading to the animal compound, the area outside of but directly adjacent to the corridor, and the gap between the corridor and the animal compound entrance except that there shall be a ten-foot barrier zone surrounding the entrance to the compound. Plaintiffs may temporarily be moved from the gap to permit movement of equipment and animals." Docket No. 235 (PI Report) at 12-13.

    Plaintiffs claim that during the 2009 Ringling Brothers Circus' "Animal Open House" event, wherein ticket holders are invited to enter the animal compound area to view the animals, Feld placed an employee and a table within the ten-foot buffer zone, as established above, to espouse the Circus' point of view by distributing promotional materials. This, they claim, undercuts any argument regarding the necessity of a buffer zone to alleviate congestion, and also leads to viewpoint discrimination in violation of the First Amendment. They seek elimination of the buffer zone.

    B.     Discussion

    "[A] district court retains jurisdiction to modify the terms of its injunctions in the event that a change in circumstances requires it." *Anderson v. Central Point Sch. Dist.*, 746 F.3d 505, 507 (9th Cir. 1984). "A party seeking modification . . . of an injunction bears the burden of establishing that a significant change in facts or law warrants revision . . . of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000).

    Restrictions on the time, place, or manner of speech are reasonable "provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for

3

communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Each of the three prongs are met with respect to the buffer zone, and the changed circumstances presented by plaintiffs do not warrant its elimination.

Judge Chen articulated the purpose of the ten-foot buffer zone. Specifically noting the possibility of congestion within the public corridor, he recommended that the free speech zone "[s]hould extend the length of the corridor up to the entrance of the animal compound excepting, however, any space within ten feet of the compound entrance to safeguard against traffic congestions." PI Report at 9. The court shared Judge Chen's concerns and adopted his recommendation. August 2009 Order. The first *Ward* prong is met because the buffer zone is a narrowly tailored remedy that does not reference the content of the regulated speech. *See Schenck v. Pro-Choice Network*, 519 U.S. 357 (1997) (upholding injunction provisions prohibiting demonstrations within fifteen feet of abortion clinics' doorways, parking lot entrances, driveways and driveway entrances). The second *Ward* prong is met because there is a significant governmental interest in allowing ease of ingress and egress at the compound entrance. *See Kuba v. 1-A Agr. Ass'n.*, 387 F.3d 850, 858 (9th Cir. 2004) ("The Association asserts that it has a significant governmental interest in preventing traffic congestion and ensuring the safety of pedestrians and drivers. These interests are indeed significant as many cases have recognized. [citations]"). Finally, the third *Ward* prong is met because plaintiffs may protest throughout the length of the corridor; thus, the injunction does not violate plaintiffs' free speech rights as there remain "ample alternative channels for the communication of information." *Ward*, 491 U.S. at 791 (*quoting Clark*, 468 U.S. at 293).

Feld's temporary occupation of a portion of the ten-foot buffer zone does not compel elimination of the buffer. Even if, as plaintiffs contend, the presence of Feld personnel within the buffer did not lead to congestion, the same result would not follow if the buffer was completely eliminated and unfettered access to the animal compound entrance was allowed. Video evidence submitted by plaintiffs shows the area to be quite small; even a few protestors within the buffer

4

could block the entrance and prevent patrons from entering or leaving. *See* Docket No. 316 (Bolbol Decl.), Exh. A (Video). The court is also aware that there "is a considerable amount of friction that exists between the protestors and Feld Entertainment" and that protestors have made attempts to "drown out" the sales and promotional activities of Feld employees. *See* Docket No. 305 (Bryant Decl.) ¶¶ 2, 11. While the court expresses no opinion regarding plaintiffs' protest tactics, the record reveals that in jockeying for the ear of circus-goers, both Feld employees and plaintiffs could flood the buffer. Therefore, if the buffer were eliminated, it is likely that: 1) the entrance would become crowded and potentially unsafe; 2) ease of access for patrons would decrease; and 3) tensions between the parties would escalate. Feld's temporary occupation of the buffer does not compel its elimination.

*Kuba* does not compel a different result either. That court noted that while measures prohibiting protestors within a certain distance from building entrances were reasonable precautions, the policy at issue "which relegate[d] communication activity to three small, fairly peripheral areas, d[id] not 'sufficiently match' the stated interest of preventing congestion." 387 F.3d at 862 (citing *Grossman v. City of Portland*, 33 F.3d 1200, 1206-07 (9th Cir. 1994)). In contrast, the injunction here excludes plaintiffs from only a small space at the entrance of the animal compound. Moreover, unlike here, there was only a slight chance of congestion in *Kuba*. *Id.* at 862 ("[I]n large parking lots, the likelihood of pedestrian congestion is small."). Here, the entrance to the compound could be easily blocked. *See id.* at 861 ("We do not mean to suggest, of course, that the Association could not prevent demonstrations that do prevent patrons from entering or leaving the facility. . . ."). As a result, despite the new evidence, the ten-foot buffer zone limitation stands.

Feld does not dispute that its employee was within the buffer zone at certain times; instead, it claims that its employee was driven into the buffer by plaintiffs. Although plaintiffs do not claim that the injunction was violated by Feld, the court clarifies that the buffer zone may not be occupied by anybody, regardless of the content of their speech. Any other standard would allow any number of Feld employees to take cover in the buffer zone, thereby completely eliminating the congestion-alleviation purpose of the buffer zone. Moreover, the buffer was not created as a safe haven for Feld

5

to disseminate its own viewpoint. Because injunction restrictions must be content neutral, Feld and its employees may not speak inside the buffer zone, just as plaintiffs are not free to speak there. *See Ward*, 491 U.S. at 791 (stating that restrictions on free speech must be "justified without reference to the content of the regulated speech"). Therefore, hereafter, the prohibition on entering the buffer zone applies to all parties here. Of course, patrons of the circus may pass through the buffer zone to access the animal compound and Feld's employees may enter the buffer zone only as absolutely necessary to assist patrons or attend to exigent circumstances. In view of this holding, the court does not reach Feld's captive audience arguments.

III.     Civil Code section 52.1

    A.     Background

In August 2005, as well as in August 2006, plaintiffs sought access to various portions of the Arena to view and videotape circus animals. In each instance, certain defendants' refusal to permit access prevented plaintiffs from videotaping the animals.

On August 18, 2005, plaintiffs attempted to access the north ramp and landing of the Arena, but were prevented from access by, *inter alia*, Officer Villegas. Plaintiffs told the officer that they were not trespassing pursuant to California Penal Code section 602 because the statute contains an exemption for constitutionally protected activity. Plaintiffs were nonetheless denied access. On August 19, 2005, Bolbol tried to access the north landing but was prevented from doing so by Assistant Security Manager Ellis. On August 20, 2005, Bolbol managed to access the north landing but was asked to leave by Ellis and other security personnel. Officers Villegas and Valladon then appeared at the scene, and told Bolbol that she would be placed under citizen's arrest if she did not leave the area. Bolbol left the landing. Thereafter, she purchased a ticket and again managed to access the north landing. This time Ellis told her that even though she had a ticket, she had to leave because her ticket was for the following show, at 3:30 p.m. Officers Villegas and Valladon again appeared at the scene, and Officer Villegas instructed Bolbol that if a citizen's arrest were effectuated, she would be taken to jail instead of being cited and released. Bolbol left the landing. Thereafter, after the 3:30 pm show had started, Cuviello took Bolbol's ticket and accessed the north

6

landing. He was told by Ellis and Officer Villegas that his ticket was invalid, and thereafter was arrested for trespass pursuant to California Penal Code section 602. He spent the night in jail.

In August of the next year, 2006, Bolbol again accessed the north landing. While there, she was again approached by Ellis and Officers Villegas and Valladon. They told her that the north landing was only open to ticketed persons and that she would be arrested if she did not leave. Bolbol left the landing. The officers and Bolbol were then met by Cuviello, who suggested that Bolbol ask the officers to accept Bolbol's citizen's arrest of a security person who had assaulted her. Bolbol did so, but neither officer acted upon her request. After Bolbol's request, Bolbol called the City police and asked that officers who were not working at the Arena be dispatched. Officers were sent and, after they watched her video, they told her that the security person would be arrested and cited.

B.   Discussion

Plaintiffs claim that defendants have violated California Civil Code section 52.1, which provides for damages if a person "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney . . . ." Cal. Civ. Code § 52.1(a). This court has already found that plaintiffs' rights under Section 52.1 were violated by defendants City of Oakland, Oakland Coliseum Joint Venture, Ellis and officers Villegas and Valladon. *See* Docket No. 263 (Order Adopting R&R). The only question remaining is the quantum of damages available for this violation.

California Civil Code section 52.1(b) provides that for a violation of Section 52.1, any individual "may institute and prosecute in his or her own and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured." The plain language of the statute thus makes a range of remedies available to the

7

aggrieved Section 52.1 plaintiff, including damages under Section 52; however, nowhere does the language specify the scope of the word "damages."

Section 52 enumerates many different types of remedies, including actual damages, treble damages, punitive damages and civil penalties. Cal. Civ. Code § 52. At issue here is Section 52(b)(2), which provides for a civil penalty of $25,000 for violations of Section 51.7. *See id.* § 52(b)(2) ("A civil penalty of twenty-five thousand dollars ($25,000) to be awarded to the person denied the right provided by Section 51.7 in any action brought by the person denied the right, or by the Attorney General, a district attorney, or a city attorney.").

This court has held that because Section 52.1 simply refers to damages under Section 52 without limiting its reference to either sections 52(a) or 52(b), all damages made available by Section 52 may be sought for a violation of Section 51.2. Docket No. 218 (R&R) at 37; Order Adopting R&R at 2. The court reaffirms its prior holding that all *damages* under Section 52 are available to an aggrieved Section 52.1 plaintiff, and the court now addresses whether the civil penalty of Section 52(b)(2) may be awarded for a Section 52.1 violation. Plaintiffs claim that civil penalties are automatic for a Section 52.1 violation; defendants claim civil penalties requires intentional acts with respect to the protected categories enumerated in Section 51.7. Both sides are wrong.

This is an issue of first impression. Although the court previously held that a prevailing Section 52.1 plaintiff may be entitled to civil penalties as provided for in Section 52(b)(2), it revisits that holding here. *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001) (district court can reconsider its prior orders *sua sponte* because "[a]ll rulings of a trial court are subject to revision at any time before the entry of judgment."); *see* Order Adopting R&R at 2 ("The court finds the Magistrate Judge's conclusion that penalties and punitive damages under section 52(b) are not automatic for a violation of section 52.1 to be the most reasonable interpretation of the statute."). Upon further review, the court holds that civil penalties provided by Section 52(b)(2) are not available to a Section 52.1 plaintiff.

The remedies specified in Section 52.1(b) allow for "damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief . . . ." Cal. Civ. Code § 52.1(b). The legislature thus distinguished between damages, injunctive relief and equitable relief. The legislature also distinguished between injunctive relief, equitable relief and civil penalties in Section 52.1(a), which allows public attorneys to seek any of the three forms of relief. *Id.* § 52.1(a). Finally, in Section 52.1(h), the legislature allowed all Section 52.1 litigants to seek attorneys' fees in addition to damages, injunctions and equitable relief. *Id.* § 52.1(h). Thus, Section 52.1, when analyzed as a whole, demonstrates that the legislature distinguished between the five potential remedies: damages, injunctive relief, equitable relief, civil penalties, and attorneys fees.

There is a distinction between civil penalties and damages, which is apparent from the basic definitions of the terms. "Penalty" is defined as "a sum of money exacted as punishment for either a wrong to the state or a civil wrong (as distinguished from compensation for the injured party's loss)," whereas "damage" is defined as "[o]f or relating to monetary compensation for loss or injury to a person or property." Black's Law Dictionary (9th ed. 2009) 1247, 445. Thus, a penalty, unlike damages, is a fine assessed for a violation of a statute without regard to the actual injury suffered.

Case law is in accord. In *Kizer v. County of San Mateo*, 53 Cal. 3d 139 (1991), the California Supreme Court distinguished between damages and civil penalties to hold that state law which limits state liability for damages imposed as punishment does not limit the state's liability with respect to statutory civil penalties. In *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), the Supreme Court distinguished between punitive damages and civil penalties by holding that the factors to be considered when assessing the validity of a punitive damages award include the difference between punitive damages awarded by jury and civil penalties authorized or imposed in comparable cases. Recently, in *Los Angeles County Metro. Trans. Ath. v. Superior Court*, 123 Cal. App. 4th 261 (2004), the California Court of Appeal also distinguished between remedial civil penalties and punitive damages by holding that a governmental entity was not immune from civil penalties imposed by Section 52 even though Government Code section 818 bars imposing punitive damages against public entities. Given the numerous instances in which this distinction has been

9

addressed, the word "damages" in Section 52.1(b) does not include, *sub silentio*, the civil penalties specified in Section 52(b)(2). Section 52 damages include actual damages, treble damages and exemplary damages. Moreover, actual damages include both special damages and general damages. Cal. Civ. Code § 52(h). Accordingly, Section 52(b)(2) civil penalties are not available under Section 52.1(b).

This holding does not render the "including, but not limited to, damages under Section 52" language in Section 52.1(b) surplusage. Section 52.1 does not discuss either treble or exemplary damages, both of which are incorporated by reference to Section 52. Moreover, the addition of the language referencing Section 52 was described in the legislative history as follows: "This bill would specify that the cause of actions for damages includes, but is not limited to, among other damages, those damages set forth in (3)." 1991 Cal. Legis. Serv. Ch. 607 (S.B. 98). The legislative history of point (3) states: "This bill would delete the award of 3 times the amount of actual damages and, instead, would provide merely for an award of exemplary damages. The bill also would increase the civil penalty to $25,000 and would delete the proration of this civil penalty between multiple offenders." *Id.* Again, actual damages, exemplary damages and civil penalties are all treated differently. The legislative history goes on to specify that "this bill would define 'actual damages' to mean special and general damages." *Id.* This declaration of intent, which clarifies the scope of a certain type of damages, but fails to specify that the term "damages" was intended to include civil penalties, further supports the distinction between damages and civil penalties.

*Los Angeles County Metro. Trans. Ath.*, 123 Cal. App. 4th 261, does not compel a different result. That court held that a successful Section 51.7 plaintiff was entitled to actual damages, exemplary damages as determined by the jury, a $25,000 civil penalty, and attorneys' fees as determined by the court. *Id.* at 266-67 ("The civil penalty, however, must be awarded in the sum of $25,000 provided a plaintiff has proven a violation of section 51.7."). The court did not address the scope of damages available for a Section 52.1 violation; consequently, its discussion of Section 52(b)(2) within the context of a Section 51.7 violation is inapposite. That court did not hold that all violations of Section 52.1, even if they do not implicate Section 51.7, mandate a $25,000 civil

10

penalty. Likewise, *D.C. v. Harvard-Westlake School*, 176 Cal. App. 4th 836 (2009), is also unpersuasive because plaintiffs there claimed a violation of Section 51.7 based on death threats. Although a violation of Section 52.1 was also claimed, the court did not even discuss damages, let alone civil penalties, for a Section 52.1 violation in the absence of a Section 51.7 violation.

The above holding overrules the court's prior holding that civil penalties are available for serious violations of Section 52.1. R&R at 38. However, the court reaffirms that "[p]laintiffs are correct that courts have held a violation of section 52.1 itself not to require any heightened severity. *See Venegas v. County of Los Angeles*, 32 Cal. 4th 820 (2004) (holding section 52.1 not to require showing of actual intent to discriminate)." Order Adopting R&R at 2. A plaintiff need not demonstrate actual intent to discriminate in order to establish a prima facie Section 52.1 claim. This holding also does not add limitations to the scope of Section 52.1. *See Venegas*, 32 Cal. 4th at 843 ("added limitations on the scope of section §52.1 [is] more a legislative concern than a judicial one . . . ."). The standard for liability under Section 52.1 remains undisturbed, and encompasses a broader range of acts than enumerated in Section 52, which applies only to certain enumerated classes. *See* Cal. Civ. Code § 51(b) (listing sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status and sexual orientation as protected classes). This broad application of Section 52.1 comports with the language of Section 52.1(g), which states that "[a]n action brought pursuant to this section is independent of any other action, remedy, or procedure that may be available to an aggrieved individual under any other provision of law, including, but not limited to, an action, remedy, or procedure brought pursuant to Section 51.7." *Id.* § 52.1(g).

CONCLUSION

Feld Entertainment's motion to intervene is GRANTED. Plaintiffs' motion to modify the preliminary injunction is DENIED; the ten-foot buffer zone restriction applies to all parties, including Feld Entertainment. Plaintiffs' motion for summary judgment is DENIED because civil penalties under California Civil Code section 52(b)(2) are unavailable for a Section 52.1 violation.

IT IS SO ORDERED.

Dated: August 3, 2010

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

11